1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**LEVI & KORSINSKY, LLP**
Adam M. Apton (SBN 316506)
1160 Battery Street East, Suite 100
San Francisco, CA 94111
Tel.: (415) 373-1671
Email: aapton@zlk.com

*Counsel for Plaintiff*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RICCIO LIBERATO, Individually and on Behalf of All Others Similarly Situated,<br><br>                              Plaintiff,<br><br>       v.<br><br>GROCERY OUTLET HOLDING CORP., ROBERT JOSEPH SHEEDY, and CHARLES C. BRACHER,<br><br>                              Defendants. | Case No.  3:25-cv-00957<br><br>CLASS ACTION<br><br>**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>DEMAND FOR JURY TRIAL |

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Plaintiff Riccio Liberato ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, alleges in this Complaint for violations of the federal securities laws (the "Complaint") the following based upon knowledge with respect to his own acts, and upon facts obtained through an investigation conducted by his counsel, which included, *inter alia*: (a) review and analysis of relevant filings made by Grocery Outlet Holding Corp. ("Grocery Outlet" or the "Company") with the United States Securities and Exchange Commission (the "SEC"); (b) review and analysis of Grocery Outlet's public documents, conference calls, press releases, and stock chart; (c) review and analysis of securities analysts' reports and advisories concerning the Company; and (d) information readily obtainable on the internet.

Plaintiff believes that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. Most of the facts supporting the allegations contained herein are known only to the defendants or are exclusively within their control.

## <u>NATURE OF THE ACTION</u>

1.      This is a federal securities class action on behalf of all investors who purchased or otherwise acquired Grocery Outlet securities between November 7, 2023, to May 7, 2024, inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws (the "Class").

2.      Defendants provided investors with material information concerning Grocery Outlet's expected profit for fiscal year 2024. Defendants' statements included, among other things, confidence in the Grocery Outlet's ability to successfully upgrade and transition the Company's internal systems in a timely and effective manner, while minimizing the risks associated with the ongoing setbacks the Company was experiencing with regard to the transition.

3.      Defendants provided these overwhelmingly positive statements to investors while, at the same time, disseminating materially false and misleading statements and/or concealing material adverse facts concerning the true state of Grocery Outlet's transition to new and upgraded

1

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

systems; notably, that the Company was either not truly equipped to timely and effectively execute on the transition or otherwise failed to disclose the potential for significant setbacks to Grocery Outlet's profitability as a result of delays and implementation issues which impacted the Company's visibility and performance. Such statements absent these material facts caused Plaintiff and other shareholders to purchase Grocery Outlet's securities at artificially inflated prices.

4.    After-market on May 7, 2024, Grocery Outlet announced its financial results for the first quarter of fiscal 2024, published significantly below-expectation guidance for the second quarter, and further reduced its guidance for the full fiscal year 2024. The Company attributed its results and lowered guidance on "unforeseen systems transition costs that surfaced at the end of the quarter" and the resulting "residual expense from our commission support program as we finish store physical inventory counts in the second quarter."

5.    Investors and analysts reacted immediately to Grocery Outlet's revelation. The price of Grocery Outlet's common stock declined dramatically. From a closing market price of $25.90 per share on May 7, 2024, Grocery Outlet's stock price fell to $20.88 per share on May 8, 2024, a decline of about 19.38% in the span of just a single day.

## JURISDICTION AND VENUE

6.    Plaintiff brings this action, on behalf of himself and other similarly situated investors, to recover losses sustained in connection with Defendants' fraud.

7.    The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

8.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. §78aa.

9.    Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b), as Defendant Grocery Outlet is headquartered in this District and a significant portion of its business, actions, and the subsequent damages to Plaintiff and the Class, took place within this District.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

10.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## THE PARTIES

11.     Plaintiff purchased Grocery Outlet common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of the Defendants' fraud. Plaintiff's certification evidencing his transaction(s) in Grocery Outlet is attached hereto.

12.     Grocery Outlet Holding Corp. is a California corporation with its principal executive offices located at 5650 Hollis Street, Emeryville, CA 94608. During the Class Period, the Company's common stock traded on the NASDAQ Stock Market (the "NASDAQ") under the symbol "GO."

13.     Defendant Robert Joseph Sheedy ("Sheedy") was, at all relevant times, the President, Chief Executive Officer, and a Director of Grocery Outlet. Defendant Sheedy resigned from Grocery Outlet on October 30, 2024, after the occurrence of all events contemplated herein.

14.     Defendant Charles C. Bracher ("Bracher") was, at all relevant times until March 1, 2024, the Executive Vice President and Chief Financial Officer of Grocery Outlet.

15.     Defendants Sheedy and Bracher are sometimes referred to herein as the "Individual Defendants." Grocery Outlet together with the Individual Defendants are referred to herein as the "Defendants."

16.     The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Grocery Outlet's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. Each Individual Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information n available to them, each of these

3

Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

17.    Grocery Outlet is liable for the acts of the Individual Defendants, and its employees under the doctrine of respondeat superior and common law principles of agency as all the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

18.    The scienter of the Individual Defendants, and other employees and agents of the Company are similarly imputed to Grocery Outlet under respondeat superior and agency principles.

## SUBSTANTIVE ALLEGATIONS

### A.    Company Background

19.    Grocery Outlet is a value retailer of consumables and fresh products sold via a network of independently operated stores across the United States

20.    More specifically, Grocery Outlet has stores in California, Washington, Oregon, Pennsylvania, Idaho, Nevada, Maryland, New Jersey, and Ohio.

### B.    The Defendants Materially Misled Investors Concerning Grocery Outlet's Ability to Implement Transitions to Upgraded Systems

*November 7, 2023*

21.    On November 7, 2023, Defendants conducted an earnings call corresponding to their third quarter fiscal year 2023 results.  During the call, Defendant Sheedy disclosed an ongoing systems transition (the "Systems Transition") that began in August and would be completed by years' end, stating in pertinent part:

> While pleased with our third quarter performance, ***we experienced operational disruptions as we transition to upgraded systems***. On prior calls, we have discussed our approach and history of investing in modernizing systems to improve capabilities and drive efficiency. ***We began to implement our most recent***

***enhancements in late August, which include upgrades to product, inventory, financial and reporting platforms***. One important component of this upgrade is a new store portal that will provide operators with improved data to make better purchasing, merchandising and marketing decisions. We are excited for the improved functionality, scalability and data analytics that this and other enhancements will provide. ***The transition to these new systems has resulted in ordering and inventory disruptions that have impacted third and fourth quarter results***.

***We have been partnering closely with our independent operators to minimize the impact to customers and sales***. We have also elected to provide commission support to our operators as we continue to make steady progress adapting to the new systems. ***We anticipate the transitional impact to be largely behind us by the end of the year.*** Charles will provide more details in his commentary.

(Emphasis added).

22.    CFO Bracher spoke further as to the negative financial impact caused by the Systems Transition, stating, in pertinent part, the following:

Our third quarter results reflect the continued momentum we are seeing in our business, which drove strong comparable store sales growth and margin expansion. For the quarter, net sales increased 9.3% to $1 billion, primarily due to a 6.4% increase in comparable store sales and the impact of new stores opened over the past 12 months. ***Our system upgrades impacted comparable store sales by an estimated 150 basis points as comps were running in the high single digits before the transition.***

. . .

While our underlying business remains strong, ***we do expect the system transition to significantly impact financial results in the fourth quarter and to a greater degree than the third quarter, given the additional months affected.***

(Emphasis added).

23.    The question-and-answer portion of the call followed, during which Defendants spoke further as to the duration and significance of the impact on the Company's finances from the Systems Transition, pertinently engaging in the following exchanges:

<Q: Leah Dianne Jordan – Goldman Sachs Group, Inc. – Research Analyst> I just wanted to start off with a couple of questions around the new platforms you implemented this quarter. What has been the biggest challenge related to the ordering? Is it just learning the new program? Is there anything specific about the functionality that surprised you?

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

*And then you also said the disruption would be largely behind us by year-end. But how should we think about any impact into the first half of next year, especially any cost that we should think about annualizing?* And then also, you mentioned that would bring better data analytics. Just curious, how quickly you think you can implement those learnings? Or have you any insights to share in just the first few months?

<A: Robert Joseph Sheedy> Leah, I'll take the first couple of parts of that question, and then I'll turn it over to Charles to address your question around impact into 2024. First, just some more information on what I shared in my comments. *We did upgrade a number of systems at the end of August, inclusive of product inventory, financial and reporting platforms. These upgrades include replacement of our AS400 system, which is our legacy ERP system with SAP, along with other third-party plus some new proprietary applications for buying, in-store operations. So that was the enhancement that was implemented back a couple of months ago.*

. . .

*In terms of the challenges and the disruption that we face as we transition to the new systems, we were challenged with inventory visibility, and the impact here was on ordering and inventory management in general.* And unfortunately, this disruption did have an impact throughout the business and the P&L. And notably, as mentioned in our comments, top line sales were impacted by lighter inventory levels, slightly lower variety. We had some pressure on margin as it relates to inventory inefficiencies. And then SG&A was higher as well as we elected to provide operators with support.

*I'll say that we did expect some disruption during this transition. It was factored into our previous guidance, just not to the degree that we've been experiencing it. And of course, we're very disappointed with the magnitude of it and we own it. We own where we are. And at this point, we have addressed the inventory visibility issues, along with other issues we experienced earlier on. So we've made very good progress there.* We've also recently returned to more normalized store ordering practices. We have much healthier warehouse inventory levels and flow throughout the system. So we're feeling good about all of that.

I'll also say that we are still adapting to other parts of the new systems. We were working through some of these new processes and working our way back to what I would describe as more optimal inventory levels and margin management and therefore, the impact that we anticipate throughout the fourth quarter here. *Nevertheless, we are making good daily progress. And as I mentioned, we do anticipate the transitional impacts to be largely behind us as we get to the end of the year*. And I'll kick it over to Charles now to comment on 2024.

<A: Charles C. Bracher> Yes. Leah, this is Charles. Just a bit more color on cost and sort of the cadence as you think about the quarterly impact going into next year. So as it relates to the third quarter, again, think of this as being 1 month of impact

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

to the fiscal quarter. ***And so as RJ mentioned, we felt both the top line and a margin impact in Q3, along with elective commission support. You see the same impacts in the fourth quarter, just to a greater degree as we're feeling the kind of full 3-month impact, if you will, in the fourth quarter***.

***We do expect that as we -- over the course of the fourth quarter, all of those impacts moderate. And as disappointed as we are with the magnitude of the impact in the fourth quarter, we do expect and believe that it will be largely behind us by the end of the year.*** And so our view at this point is we will enter the new year without any lingering cost impacts or otherwise related to the transition.

. . .

<Q: Oliver Chen – TD Cowen – MD & Senior Equity Research Analyst> Charles, regarding your comp guidance, is your expectation that traffic continues to be very positive, offset by average unit retail? What should we think about in terms of average unit retails near and longer term? And as we appreciate a lot of the good changes on the new store portal. ***The issues you had, just what gives you confidence that they'll be largely behind by end of year?***

. . .

<A: Charles C. Bracher> As it relates to the comp headwind as a result of the systems transition, that really did impact ticket. So [ Ring ], as you saw, was down a little less than 2% for the quarter, really coming from lower units. And that's both as a result of higher trip frequency. But yes, lighter inventory levels and variety is a result of the system transition.

. . .

<A: Robert Joseph Sheedy> And on the -- your question around the systems upgrades, Oliver, as I mentioned before, ***we have addressed the bigger issues that we faced earlier on around inventory issue -- around inventory visibility issues as well as product flow challenges, both into the warehouse and also from the warehouse to the stores***. So that progress feels really good. And as a result, we have returned to more, I'll call them, more normalized store ordering practices. And then together with that, healthier warehouse and store inventory levels at a really important time. So feeling good about the progress that we've made in support of the holiday shopping period that we're in the middle of right now.

We are still adapting to other parts of the new systems. There are a lot of new processes, new functionality that comes with these new systems. And then together with that, working our way back to what we would consider to be optimized inventory levels along with how we manage the business and total margin and operations included. ***Given the progress that we've made and the daily progress that we continue to make, we do feel confident in being able to resolve these***

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

***outstanding issues to the point where the impact is then largely behind us by the end of the year.***

. . .

<Q: Krisztina Katai> So RJ, I just wanted to follow up on the system upgrades. I mean, it does sound like you anticipated some disruption but then it has actually come in well ahead of that. Like, one, is that a fair characterization? And then two, is it fair to say that this doesn't alter any of the margin structure into next year or the long term? And you'll essentially be able to fully recapture all of the margin pressures once you lap the third and the fourth quarters?

<A: Robert Joseph Sheedy> The -- yes, for your first question, that is a fair characterization. We did expect -- this is a big transition from a legacy platform that we've been operating on for the past several decades. So -- and it's something that we've been working on for a couple of years now. ***So we've always known how large it was and complex. We did expect as a result, some disruption, certainly not to this degree or this magnitude.*** So I think you characterized it well.

And then in terms of impact looking forward, and I think similar to the earlier question, we -- as I said, ***we do the transitional impact to be contained to this year, from what we've already experienced in the third quarter. And then largely behind us at the end of the year***. So you should think about us reverting back to previous performance and all the things that we've always talked about related to consumer trends, top line sales and how we've managed for both gross margin and bottom-line profit.

(Emphasis added).

<u>December 11, 2023</u>

24.     On December 11, 2023, Defendants issued a press release, announcing Defendant Charles Bracher "informed the company of his intention to step down as Chief Financial Officer, effective as of March 1, 2024."

25.     The press release further highlighted that the company "also reaffirmed its outlook for the fourth quarter and guidance for fiscal 2023, as provided on November 7, 2023."

<u>February 27, 2024</u>

26.     On February 27, 2024, Defendants issued a press release announcing Grocery Outlet's fourth quarter fiscal year 2023 results. In pertinent part, the release highlighted the issues related to the Systems Transition as follows:

Highlights for Fourth Quarter Fiscal 2023 as compared to Fourth Quarter Fiscal 2022:

. . .

- As previously disclosed, the Company experienced disruptions as a result of the implementation of new technological platforms in late August 2023. Such disruptions are estimated to have negatively impacted comparable store sales by approximately 200 basis p2oints and gross margin by 130 basis points in the fourth quarter

. . .

Highlights for Fiscal 2023 as compared to Fiscal 2022:

. . .

- Disruptions as a result of the implementation of the new technology platforms in late August 20234 are estimated to have negatively impacted comparable store sales by approximately 90 basis points and gross margin by 50 basis points in fiscal 2023.

27.    During the company's same-day earnings call, Defendants spoke to the progress surrounding the Systems Transition, pertinently stating as follows:

*We have made steady progress with our systems implementation work, though data integration efforts are taking longer than expected and are still impacting our business results. The largest remaining issues are related to warehouse product expiry data and store level reporting for IOs. We expect these to be resolved soon, after which the P&L impact will be behind.* Charles will provide more details in his comments.

. . .

We estimate the system transition impacted comp sales by approximately 200 basis points for the quarter. We opened 13 new stores during the quarter, including 7 in the East and 1 in Southern California, ending the year with 468 locations. We remain pleased with the performance of our new stores, which are ramping in line with our expectations.

Gross profit increased 6.3% to $298.9 million, representing a 30.2% gross margin rate, slightly better than our expectations. We continue to experience healthy deal flow, which helped offset the margin impact of our system integration which we estimate was approximately 130 basis points in the quarter.

. . .

Now let me provide you with some commentary on our fiscal 2024 guidance, which includes the impact of the United Grocery Outlet acquisition and the system transition . . . *With respect to our system transition, while we have made progress,*

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

*the data integration efforts have taken longer than anticipated. Because of this, we expect we'll continue to experience P&L impacts during the first quarter*.

With that as background, let me provide you with our expectations for fiscal 2024. For the full year, we are projecting comp sales growth in the range of 3% to 4%. *We expect comp growth in the first quarter to be approximately 2%, which includes an estimated 50-basis-point impact from the system transition*

. . .

*We expect gross margin for the first quarter of approximately 30.4%, which includes an estimated 100-basis-point impact from the system transition*

(Emphasis added).

28.     During the question-and-answer portion of the call, Defendant Bracher directly addressed an inquiry regarding the Company's effectiveness in handling the Systems Transition during the following pertinent exchange:

<Q: Leah Dianne Jordan – Goldman Sachs Group, Inc. – Research Analyst> I just wanted to touch on the 4Q comp a little bit. It looks like the headwind from the systems change came in about 100 basis points better than you initially guided, but less than that flowed through to the total comp. So I guess what surprised you versus your internal expectations for the core business? And can you talk about just the dynamics in ticket overall and how volumes trended as the ERP rollout improved.

<A: Charles C. Bracher> Yes. So let me start first in terms of overall comp for -- again 2.7% for us in the quarter, a bit better than we guided. It was a combination of slightly higher *basket. So think about that as being the inventory recovery coming out -- working through the system implementation was a bit faster than we thought so that helped basket*. And supplementing that traffic was a little bit better. In terms of cadence throughout the quarter, we saw comps improve modestly as we progressed. More importantly, we're tracking very closely the prior year comparisons get a little bit noisy now. We're looking at average weekly sales into some nice improvement through the fourth quarter, that has continued into the first quarter. *So I feel like the underlying trends in the business are healthy and improving as we again work our way through the system transition.*

(Emphasis added).

29.     The following day, Grocery Outlet filed its annual 10-K regarding their fiscal year 2023 results.  In pertinent part, Defendants discussed the Systems Transition as follows:

The ongoing modernization, enhancement and maintenance of our information systems have allowed us to support the growth in our business and store base. We have modernized and added several systems that provide us additional functionality

and scalability in order to better support operational decision-making, including enhanced point of sale, warehouse management, human resource planning, business intelligence, vendor tracking and lead management, store communications, real estate lease management and financial planning and analysis systems.

We modify, update and replace our systems and infrastructure from time to time, including by adding new hardware, software and applications; maintaining, updating or replacing legacy programs; converting to enhanced systems; integrating new service providers; and adding enhanced new functionality, such as cloud computing technologies. *In addition, we have a customized enterprise resource planning system, components of which have been replaced over the past several years, including our financial ledger, inventory management platform and product data warehouse system, which were replaced in late August 2023. As previously disclosed, the implementation of these system upgrades resulted in ordering and inventory disruptions, which impacted our results of operations during the remainder of fiscal 2023.* We also will continue to identify and implement productivity improvements through both operational initiatives and system enhancements, such as category assortment optimization, improved inventory management tools and greater purchasing specialization.

. . .

We rely on our distribution, transportation and technology network and systems to provide goods to our distribution centers and stores in a timely and cost-effective manner. Our stores are highly dependent on the successful operations of our distribution, transportation and technology networks, as IOs use these systems to order multiple deliveries per week and many of our products have a limited shelf life from the time of purchase, particularly opportunistic buys and fresh foods. Deliveries to our stores occur from our distribution centers or directly from our suppliers. We use three primary leased distribution centers that we operate and five primary distribution centers operated by third-parties. Any disruption, unanticipated or unusual expense or operational failure related to these processes and systems could affect store operations negatively. For example, *during fiscal 2023 we replaced components of our enterprise resource planning system, including our financial ledger, inventory management platform and product data warehouse system. The implementation of these system upgrades resulted in ordering and inventory disruptions beginning in late August 2023, which resulted in reduced net sales and gross margin.*

. . .

We modify, update and replace our systems and infrastructure from time to time, including by adding new hardware, software and applications; maintaining, updating or replacing legacy programs; converting to global systems; integrating new service providers; and adding enhanced or new functionality, such as cloud computing technologies. *In late August 2023, we replaced components of our*

*enterprise resource planning system, including our financial ledger, inventory management platform and product data warehouse system. The implementation of these system upgrades resulted in more than anticipated ordering and inventory disruptions during the remainder of fiscal 2023*. These disruptions are estimated to have negatively impacted comparable store sales by approximately 90 basis points and gross margin by 50 basis points in fiscal 2023.

. . .

Further, the time and resources required to implement or optimize the benefits of new technology initiatives, or potential issues that arise in implementing such initiatives, could reduce the efficiency of our operations in the short term. *The efficient operation and successful growth of our business depends upon our information systems, including our ability to operate, maintain and develop them effectively. A failure of those systems could disrupt our business, subject us to liability, damage our reputation, or otherwise impact our financial results.*

. . .

The Company's management conducted an assessment of the Company's internal control over financial reporting based on the framework established by the Committee of Sponsoring Organizations of the Treadway Commission in Internal Control - Integrated Framework (2013). In connection with this assessment, the Company's management identified deficiencies in the design and operating effectiveness of controls in its internal control over financial reporting related to certain information technology general computer controls ("ITGC's*")*. *The replacement of components of our enterprise resource planning system in late August 2023 led to a significant increase in the volume of transactions across user access, program change management, and IT operations for which our existing controls were not designed to address. As a result, certain of the Company's related business controls that are dependent upon the affected ITGC's were also deemed ineffective*. We did not identify any misstatements to the consolidated financial statements as of and for the year ended December 30, 2023 because of these control deficiencies. However, *the pervasive impact of these control deficiencies to the Company's internal control over financial reporting created a reasonable possibility that a material misstatement to the consolidated financial statements would not be prevented or detected on a timely basis. Therefore, we concluded that the deficiencies represent a material weakness in our internal control over financial reporting and, as such, our internal control over financial reporting was not effective as of December 30, 2023.*

(Emphasis added).

30.     The above statements in Paragraphs 21 to 29 were false and/or materially misleading. Defendants created the false impression that they possessed reliable information pertaining to the completion of Grocery Outlet's System Transition and any potential negative

impact resulting therefrom, while also minimizing the risks associated with potential and perceived setbacks to the Company's finances as a result of implementation errors and other issues surrounding the System Transition. In truth, Defendants' repeated indications as to both when the Systems Transition would be completed and how significantly it would impact Grocery Outlet's sales and margins fell short of reality as the Defendants relied far too heavily on their ability to implement these new or otherwise upgraded systems without significant setbacks to the Company's finances. Grocery Outlet was simply not equipped to properly execute on the transition as planned and communicated to investors, despite repeated assurances that the issues would be resolved and the transition completed with each coming quarter.

### C.    The Truth Emerges during Grocery Outlet's First Quarter Fiscal 2024 Earnings Report

*May 7, 2024*

31.    On May 7, 2024, Defendants released their Q1FY24 results, which surprisingly announced both a significantly larger-than-expected impact from Systems Transition issues and significantly below-market guidance for the second quarte. In pertinent part, Defendants' press release provided the following:

Highlights for First Quarter Fiscal 2024 as compared to First Quarter Fiscal 2023:
. . .

- Gross margin decreased 180 basis points to 29.3%. As previously disclosed, the Company experienced disruptions as a result of the implementation of new technology platforms in late August 2023. Such disruptions are estimated to have negatively impacted gross margin by 210 basis points in the first quarter.
- Selling, general and administrative expenses increased by 13.3% to $303.4 million, or 29.3% of net sales. This includes $12.4 million of commission support we elected to provide our operators in connection with our system upgrades.

32.    During the same-day earnings call, Defendants outlined the setbacks and reduced guidance, in pertinent part, as follows:

Our low first quarter margins were the result of ***both expected and unexpected impacts from our systems transition***. We've made good progress since our last call, resolving known issues and have ended the IO commission support program as planned. ***However, our results were incrementally impacted by unforeseen***

13

*systems transition costs that surfaced at the end of the quarter. We are all very disappointed with our poor Q1 results, and we are committed to getting these system impacts behind us very soon.*

. . .

First quarter gross margin of 29.3% was ***110 basis points below our expectations and includes approximately 210 basis points of impact from our systems transition issues***. In late August, we upgraded our product, inventory, financial and reporting platforms***. This transition has disrupted our business operationally and financially over the past 8 months*** as we discussed on our last 2 calls. ***In February, there were 2 large remaining system issues impacting profit. One was related to warehouse product expiry data and the other related to store level reporting. We have since resolved both of these and the negative impact to first quarter gross margin came in as expected at about 100 basis points.***

We've reduced warehouse shrink close to normal levels with better data visibility and accurate store-level reporting enabled us to end the commission support program in March. Lindsay will speak later about some residual expense from the commission support program that will extend through the end of the second quarter. ***While we are encouraged by this progress, we are disappointed that we did not foresee the additional 110 basis points of margin impact. This was quantified during catch-up invoice processing and final margin reconciliation at the end of the quarter. Delayed payment processes during Q1, combined with poor data visibility, contributed to this miss versus guidance. We are disappointed by this as it is below our performance and forecasting standards.***

We have recently improved our payables process in the new system and have also increased our data visibility. Both of these improvements will enable us to manage the business back to historical margin levels and forecast with the same consistency as we did before.

. . .

Now on to guidance. Forecasting has been difficult during the system transition as we have not had good visibility to our normal business reporting and tools. Compounding this have been data integration issues and new processes that we and our operators are adapting to within new applications. Our guidance takes us into consideration as we complete final stages of our stabilization work.

Our fiscal 2024 guidance continues to assume incremental sales of approximately $125 million, adjusted EBITDA of $7 million and a modest benefit to adjusted EPS from the acquisition of UGO. For the full year, we are now projecting comp sales growth in the range of 3.5% to 4.5%, up from 3% to 4% to reflect better-than-expected first quarter sales. We expect comp growth in the second quarter to be approximately 3.2%, which reflects a 100 basis points Easter shift out of Q2 into Q1. We now expect to add a total of 58 to 62 net new stores this year, up from 55

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

to 60. This includes the 40 newly acquired United Grocery Outlet stores as well as 18 to 22 new Grocery Outlet stores. In total, we continue to project fiscal 2024 net sales of $4.3 billion to $4.35 billion.

For the full fiscal year, we now project gross margin of approximately 30.5%. *We expect gross margin for the second quarter of approximately 30.0%, which includes an estimated 100 basis point impact from the systems transition. This is due to residual expense from our commission support program as we finish store physical inventory counts in the second quarter.* We expect gross margins to increase sequentially in the back half of the year

(Emphasis added).

33.     The aforementioned press releases and statements made by the Individual Defendants are in direct contrast to statements they made during the alleged false and/or materially misleading statements identified above. In those statements, Defendants continually praised their efforts to upgrade and transition the Company's internal systems and touted the benefits of such new and upgraded systems, while continually minimizing the risks associated with potential and perceived issues surrounding the implementation of its Systems Transition.

34.     Investors and analysts reacted immediately to Grocery Outlet's revelation. The price of Grocery Outlet's common stock declined dramatically. From a closing market price of $25.90 per share on May 7, 2024, Grocery Outlet's stock price fell to $20.88 per share on May 8, 2024, a decline of about 19.38% in the span of just a single day.

35.     A number of well-known analysts who had been following Grocery Outlet lowered their price targets in response to Grocery Outlet's disclosures. For example, Guggenheim, while remaining "neutral" despite cutting estimates, highlighted that "[t]he ERP-related operational/financial disruption, which has dominated the narrative over the past six months, reached a crescendo with the largest 'miss and guide-down' to date driving the shares ~15% lower after-hours." Speaking to Grocery Outlet's overall performance for the quarter and disappointing second quarter guide, the analyst further noted the following:

However, adjusted EBITDA missed by $14 million with margin declining a greater-than-we-modeled 270 basis points. Reported gross margin eroded by 182 basis points, *a shortfall of more than 100 basis points which was attributed to a lack of visibility into margin dynamics. GO's unique, treasure hunt-oriented*

*procurement model requires informed buying and pricing decisions and this was lacking, in our view.*

. . .

The 2Q guide was even more surprising *since we assumed that the transitory costs were behind us*. Instead, as detailed in Exhibit 4, management guided to gross and EBITDA margins of 30.0% and 5.4%, respectively, *150-200 basis points below our estimates*"

(Emphasis added).

36.     Additionally, Telsey Advisory Group, while cutting their price target, summarized the issues surrounding the Systems Transition in detail, stating in pertinent part:

> In August 2023, Grocery Outlet started to upgrade its inventory, financial, and reporting systems, but the implementation has taken longer to execute, creating product and data visibility issues as well as operating challenges. In February 2024, the company finally completed the upgrade of its last two remaining systems — warehouse product expiry data and store level reporting. However, execution challenges, physical inventory counting, and invoicing issues caused pressure on the gross margin. Furthermore, Grocery Outlet provided commission support to its independent operators (IOs) during this disruption, which further elevated expenses. Overall, the system transition issue created profit pressure of ~$65MM over the past year, with half of it being IO commission support

37.     Similarly, Jefferies, while also cutting their price target, highlighted the impact resulting from Systems Transition in the current quarter as follows:

> GM came in at ~29.3%, below cons of ~30.4%, due to the new systems integration headwinds. The co. estimated the systems disruption equated to a ~210bps drag on GM in Q1, or ~110bps higher than mgmt's expectations. Looking ahead, GO expects the disruption to continue through Q2; however, noted that critical reporting and visibility functions have been restored, and anticipate a reversion to a more normalized margin level in 2H.

38.     The fact that these analysts, and others, discussed Grocery Outlet's shortfall and below-expectation projections suggests the public placed significant weight on Grocery Outlet's prior revenue, sales, and margin estimates. The frequent, in-depth discussion of Grocery Outlet's Systems Transition issues confirms that Defendants' statements during the Class Period were material.

### D.    Loss Causation and Economic Loss

39.    During the Class Period, as detailed herein, Defendants made materially false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Grocery Outlet's common stock and operated as a fraud or deceit on Class Period purchasers of Grocery Outlet's common stock by materially misleading the investing public. Later, Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the price of Grocery Outlet's common stock materially declined, as the prior artificial inflation came out of the price over time. As a result of their purchases of Grocery Outlet's common stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages under federal securities laws.

40.    Grocery Outlet's stock price fell in response to the corrective event on May 7, 2024, as alleged *supra*. On May 7, 2024, Defendants disclosed information that was directly related to their prior misrepresentations and material omissions concerning Grocery Outlet's ability to both rectify and avoid future issues associated with the Company's Systems Transition.  Defendants further disclosed information pertaining to Grocery Outlet's ability, or lack thereof, to complete the transition process so the Company could benefit from the purported advantages associated with the new and upgraded systems.

41.    In particular, on May 7, 2024, Grocery Outlet announced results for the first quarter of fiscal year 2024 below expectations and further reduced their own prior guidance for the entirety of the fiscal year, revealing underwhelming financial results for the second quarter. Pertinently, Grocery Outlet announced additional impacts from Systems Transition issues that more than doubled what the Company had predicted for the second quarter and further announced continued impact leading into the second quarter, despite prior indications and assurances that the Systems Transition would be completed by the end of fiscal 2023, and again by the end of the first quarter of fiscal 2024.

**E.    Presumption of Reliance; Fraud-On-The-Market**

42.    At all relevant times, the market for Grocery Outlet's common stock was an efficient market for the following reasons, among others:

(a)    Grocery Outlet's common stock met the requirements for listing and was listed and actively traded on the NASDAQ during the Class Period, a highly efficient and automated market;

(b)    Grocery Outlet communicated with public investors via established market communication mechanisms, including disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(c)    Grocery Outlet was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period. Each of these reports was publicly available and entered the public marketplace; and

(d)    Unexpected material news about Grocery Outlet was reflected in and incorporated into the Company's stock price during the Class Period.

43.    As a result of the foregoing, the market for Grocery Outlet's common stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in Grocery Outlet's stock price. Under these circumstances, all purchasers of Grocery Outlet's common stock during the Class Period suffered similar injury through their purchase of Grocery Outlet's common stock at artificially inflated prices, and a presumption of reliance applies.

44.    Alternatively, reliance need not be proven in this action because the action involves omissions and deficient disclosures. Positive proof of reliance is not a prerequisite to recovery pursuant to ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security.

**F.    No Safe Harbor; Inapplicability of Bespeaks Caution Doctrine**

45.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the material misrepresentations and omissions alleged in this Complaint. As alleged above, Defendants' liability stems from the fact that they provided investors with revenue and margin projections while at the same time failing to maintain adequate forecasting processes due to the ongoing Systems Transition issues. Defendants provided the public with forecasts that failed to account for Grocery Outlet's inability to timely resolve the Systems Transition issues, successfully implement the upgrades associated therewith, or otherwise predict and/or adequately disclose the forecasting issues that arose due to the Company's methods of implementation.

46.    To the extent certain of the statements alleged to be misleading or inaccurate may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

47.    Defendants are also liable for any false or misleading "forward-looking statements" pleaded because, at the time each "forward-looking statement" was made, the speaker knew the "forward-looking statement" was false or misleading and the "forward-looking statement" was authorized and/or approved by an executive officer of Grocery Outlet who knew that the "forward-looking statement" was false. Alternatively, none of the historic or present-tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

## CLASS ACTION ALLEGATIONS

48.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Grocery Outlet's common stock during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

49.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Grocery Outlet's common stock were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Grocery Outlet or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. As of May 2, 2024, there were 99.86 million shares of the Company's common stock outstanding. Upon information and belief, these shares are held by thousands, if not millions, of individuals located throughout the country and possibly the world. Joinder would be highly impracticable.

50.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

51.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

52.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Grocery Outlet;

(c)    whether the Individual Defendants caused Grocery Outlet to issue false and misleading financial statements during the Class Period;

(d)    whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

(e)    whether the prices of Grocery Outlet's common stock during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(f)    whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

53.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I

### *Against All Defendants for Violations of*

### *Section 10(b) and Rule 10b-5 Promulgated Thereunder*

54.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

55.    This Count is asserted against defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

56.    During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Grocery Outlet common stock; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Grocery Outlet's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

57.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Grocery Outlet's securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company.

58.    By virtue of their positions at the Company, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of defendants

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

were committed willfully or with reckless disregard for the truth. In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

59.    Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within defendants' knowledge and control. As the senior managers and/or directors of the Company, the Individual Defendants had knowledge of the details of Grocery Outlet's internal affairs.

60.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of the Company. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Grocery Outlet's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Grocery Outlet's common stock was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning the Company which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Grocery Outlet's common stock at artificially inflated prices and relied upon the price of the common stock, the integrity of the market for the common stock and/or upon statements disseminated by Defendants, and were damaged thereby.

61.    During the Class Period, Grocery Outlet's common stock was traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Grocery Outlet's common stock at prices artificially inflated by defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said common stock, or would not have purchased or otherwise acquired

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Grocery Outlet's common stock was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of Grocery Outlet's common stock declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

62.     By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

63.     As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's common stock during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### *Against the Individual Defendants*
### *for Violations of Section 20(a) of the Exchange Act*

64.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

65.     During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information about Grocery Outlet's misstatements.

66.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information, and to correct promptly any public statements issued by Grocery Outlet which had become materially false or misleading.

67.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

public filings which Grocery Outlet disseminated in the marketplace during the Class Period concerning the misrepresentations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Grocery Outlet to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Grocery Outlet's common stock.

68.    Each of the Individual Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause Grocery Outlet to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

69.    By reason of the above conduct, the Individual Defendants and/or Grocery Outlet are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demand judgment against defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representatives;

B.    Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiff and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## **DEMAND FOR TRIAL BY JURY**

Plaintiff hereby demands a trial by jury.


Dated: January 30, 2025                    Respectfully submitted,

                                           **LEVI & KORSINSKY LLP**

                                            /s/ Adam M. Apton
                                           Adam M. Apton (SBN 316506)
                                           1160 Battery Street East, Suite 100
                                           San Francisco, CA 94111
                                           Tel.: (415) 373-1671
                                           Email: aapton@zlk.com

                                           *Counsel for Plaintiff*

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS