Laurence M. Rosen, Esq. (SBN 219683)
THE ROSEN LAW FIRM, P.A.
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Lead Counsel for Lead Plaintiff and the Class*

*[Additional Counsel on Signature Page]*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re Grocery Outlet Holding Corp. Securities Litigation | Master File No: 4:25-cv-957-JST |
| | CLASS ACTION |
| | **AMENDED COMPLAINT** |
| | JURY TRIAL DEMANDED |
| This Document Relates To: All Actions | |

Lead Plaintiff Casey Cavanaugh ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, alleges the following based upon personal knowledge as to his own acts, and upon facts obtained through an investigation conducted by his counsel, which included, inter alia: review and analysis of Defendants' public statements, public documents, conference calls, and announcements, United States Securities and Exchange Commission ("SEC") filings, and wire and press releases published by and regarding Grocery Outlet Holding Corp. ("Grocery Outlet" or the "Company"); media and analyst reports and advisories about the Company; interviews with confidential witnesses; information from related court filings; and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. Most of the facts supporting the allegations contained herein are known only to Defendants (defined below) or are exclusively within their control.

## NATURE OF THE ACTION

1.      Plaintiff brings this action as a federal securities class action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil procedure, on behalf of a Class defined as: all persons and entities who purchased Grocery Outlet common stock between August 9, 2023 through May 7, 2024, both dates inclusive ("Class Period") and were damaged thereby.[1] Plaintiff brings claims individually and on behalf of the Class pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and SEC Rule 10b-5 promulgated thereunder.

2.      In 2021, more than two years before the beginning of the Class Period, Grocery Outlet decided to completely overhaul its internal enterprise resource planning ("ERP") and information technology systems to modernize and expand its capabilities to deal with the needs of the growing company ("Systems Transition"). The Systems Transition affected all aspects of the Company, including its financial ledger, inventory management platform, and product data warehouse system, which impacted the Company's procurement, distribution, accounting, and financial reporting. The decision to implement the Systems Transition was made at the highest levels of the Company, and the process of changing from the legacy "AS400" systems to the new SAP systems was overseen by Defendants and those who reported directly to them.

3.      After more than a year of preparations and testing, the Company worked to prepare its various interconnected systems for the launch of the Systems Transition. The Company had a Project Steering Committee, helmed by its Chief Information Officer ("CIO"), which tracked the internal readiness of each of its departments to implement the Systems Transition. As the internally-set "go-live" launch date of March 2023 approached, Defendants knew that Grocery Outlet was not prepared to effectively implement the new systems. Until that point, the Company had not even attempted "end-to-end" testing of the new systems – testing how the different systems would interact between procurement, inventory and warehouse management, and store-level reporting. When they did

---

[1] Excluded from the Class are: Defendants; the present and former officers and directors of the Company at all relevant times; members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which any of the excluded persons has or had a controlling or majority ownership interest at any time.

attempt to put the systems together, they realized it did not work. The Company postponed the launch date until July 2023.

4.    As the preparations continued into the summer of 2023, the Company continued to struggle with integrating and testing the new system. As of July 2023, the Company was still woefully unprepared to "go live" with the new system. In fact, it hadn't even completed crucial User Acceptance Testing, which means having the Company's actual end-users test the new systems using real-world applications and data, from start to finish.

5.    None of this was disclosed to investors. When the Company announced that their new system upgrades were being brought online in August 2023, Defendants touted the numerous benefits the new systems would provide, but concealed from investors that the Company had not yet completed critical preparations for implementing the SAP systems, yet they were planning to launch the Systems Transition anyway and attempt to troubleshoot on the fly.

6.    Having worked on the Systems Transition for two years, Defendants decided it was time to "rip off the band aid" and they launched the Systems Transition in late August 2023, even though they knew the Company was not ready for it. As soon as they did, the Company was inundated with widespread disruptions to its core functionalities as a direct result of prematurely implementing the Systems Transition. These disruptions and other problems infected all aspects of the business – from inventory control and ordering by store operators to financial forecasting and reporting by the Company's finance and accounting departments. In fact, the problems created by the new system were so rampant that they created a material weakness in the Company's internal controls over financial reporting.

7.    However, while the massive risk of encountering these very problems was apparent to Defendants before the launch, Defendants' disclosures on this topic amounted to little more than grudging half-truths and further misleading statements and omissions. Over the course of four quarters, Defendants repeatedly told the market that while they had encountered problems that had materially impacted their top-line sales, gross margins, and bottom-line earnings, the worst was behind them and material financial impacts of the Systems Transition disruptions were contained.

Amended Complaint

8.    For example, when the Company disclosed its third quarter results in November 2023, the Company reported disappointing results and revealed for the first time that the Systems Transition was responsible for its disappointing financial results, as Defendants had apparently expected (but not disclosed). Yet Defendants also sought to reassure the market that the Company had "addressed the inventory visibility issues, along with other issues we experienced earlier on," and "recently returned to more normalized store ordering practices." Defendants promised the "impact" would be "largely behind us at the end of the year. So you should think about us reverting back to previous performance and all the things that we've always talked about related to consumer trends, top line sales and how we've managed for both gross margin and bottom-line profit."

9.    That was not the case. Instead, when Defendants reported their fourth quarter financial results in February 2024, Defendants revealed not only a larger fourth quarter impact to their financial results than previously discussed, but also that they expected the ensuing first quarter results to be materially affected by the Systems Transition as well. Yet again, Defendants' disclosure came with the reassurance that the disruptions had been resolved and "the P&L impact [from the Systems Transition disruptions] will be behind [us]."

10.    Once again, not so. As the Company revealed in May 2024, not only were the first quarter financial results impacted by the Systems Transition disruptions, those effects were even greater than they were in the prior quarter, more than *double* what they previously estimated, and were still lingering in the second quarter. Defendants also admitted that not only had the Systems Transition affected the Company's top- and bottom-line financial results, but it had affected the Company's ability to forecast financial results in the first instance:

> Forecasting has been difficult during the system transition as we have not had good visibility to our normal business reporting and tools. Compounding this have been data integration issues and new processes that we and our operators are adapting to within new applications.

11.    As Defendants provided piecemeal admissions and disclosed the financial damage that the Systems Transition was inflicting on the Company, the stock price repeatedly declined even as investors were repeatedly, misleadingly told that the worst was behind them. The May disclosure was particularly significant and surprising, causing the stock price to drop almost 20% in a single day.

- 4 -

12.     Finally, while the direct financial implications to the Company's operations and financial results appeared to materially end after the second quarter of 2024, the fallout from Defendants' disclosures and failed roll-out of the Systems Transition did not. In October 2024, Defendant Sheedy was fired by the Board of Directors for the Company's struggles to effectively implement the Systems Transition. On that news, class members who still held their shares suffered another single-day 16% decline.

## JURISDICTION AND VENUE

13.     The claims asserted herein arise under and pursuant to §§ 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

14.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331 and § 27 of the Exchange Act (15 U.S.C. § 78aa).

15.     This Court has jurisdiction over each Defendant named herein because each Defendant has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

16.     Venue is proper in this judicial district pursuant to § 27 of the Exchange Act (15 U.S.C. § 78aa(c)) and 28 U.S.C. § 1391(b), because the alleged false and misleading public filings and statements were made in, or issued from, this judicial district and Grocery Outlet's headquarters are located in this judicial district.

17.     In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications, the Internet, and the facilities of the national securities exchange.

## PARTIES

18.     Lead Plaintiff Casey Cavanaugh, as set forth in his certification on file with the Court (Dkt. No. 19-2) and incorporated by reference herein, purchased Grocery Outlet common stock at artificially inflated prices during the Class Period and was damaged thereby.

19.     Defendant Grocery Outlet is a Delaware corporation with its principal executive offices located at 5650 Hollis Street, Emeryville, CA 94608. During the Class Period, the Company's common stock traded on the NASDAQ national stock exchange under the ticker symbol "GO."

20.     Defendant Robert Joseph ("RJ") Sheedy served as the President, CEO, and a Director of the Company from January 2023 to October 29, 2024. Prior to that, Sheedy served as the Company's President from January 2019 to December 2022, its Chief Merchandise, Marketing & Strategy Officer from April 2017 to December 2018, its Chief Merchandise & Strategy Officer from March 2014 to April 2017, and its Vice President, Strategy from April 2012 to February 2014. On October 29, 2024, Sheedy resigned from his board seat and as President and CEO, effective immediately.

21.     Defendant Charles C. Bracher was the Company's Chief Financial Officer and Executive Vice President from August 2012 until March 1, 2024. On December 8, 2023, Bracher submitted his resignation, effective March 1, 2024.

22.     Defendants Sheedy and Bracher are sometimes referred to herein as the "Individual Defendants."

23.     Each of the Individual Defendants:

(a)     directly participated in the management of the Company;

(b)     was directly involved in the day-to-day operations of the Company at the highest levels;

(c)     was privy to confidential proprietary information concerning the Company and its business and operations;

(d)     was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e)     was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f)     was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g)     approved or ratified these statements in violation of the federal securities laws.

24.     The Company and the Individual Defendants are referred to herein, collectively, as the "Defendants."

25.     Grocery Outlet is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

26.     Accordingly, the scienter of the Individual Defendants and other employees and agents of the Company is imputed to Grocery Outlet. This is particularly true with respect to Defendants Sheedy and Bracher, the highest ranking officers of Grocery Outlet who were sufficiently senior in the organization that it is proper to impute their scienter to Grocery Outlet.

## COMPANY BACKGROUND

27.     According to its website, Grocery Outlet is an "extreme value retailer of consumables and fresh products sold via a network of independently owned and operated stores." Grocery Outlet's business model is similar to the franchise model – relying on the vast majority of its stores to be "independently operated" at the local level by an individual or entity that has invested their own money into the business (referred to by the Company as an "independent operator," or "IO"). Grocery Outlet then generally shares 50% of its store-level gross profits with its IOs.

28.     At the beginning of the Class Period, Grocery Outlet had approximately 450 stores spread across eight or nine different states. Nearly all of the Company's stores were operated by independent operators, the "vast majority" of whom operated only one store. These IOs are responsible for their own store operations, including ordering, merchandising, and managing inventory, as well as staffing and marketing for their stores. Other business functions, such as obtaining and maintaining available discount inventory from which the IOs obtain inventory for their local stores ("procurement"), distribution to the local stores ("supply chain"), as well as backroom functions such as information systems, are handled centrally by the Company.

29.     According to the Company's most current annual report prior to the beginning of the Class Period, for the fiscal year ended December 31, 2022, filed with the SEC on Form 10-K on March 1, 2023 ("2022 10-K"), the Company's centralized "flexible sourcing and supply chain model" is the key to its success. Grocery Outlet claims that it "allows us to offer quality, name-brand

opportunistic products at prices generally 40% to 70% below those of conventional retailers," and its "differentiated model for buying and selling ... supports profitable sales growth."

30.    More specifically, Grocery Outlet purports to source its product offerings "opportunistically through a centralized purchasing team .... Our speed and efficiency in responding to supplier needs, combined with our specialized supply chain capabilities and flexible merchandising strategy, enhance our access to discounted products and allow us to turn inventory quickly and profitably."

31.    The Company's information systems were thus instrumental to the Company's profitability and growth – both for its centralized procurement and supply chain effectiveness, and for its IOs to effectively implement the Company's sales and marketing strategy at the local store level. "IOs leverage our national purchasing network, sophisticated ordering and information systems and field support in order to operate more efficiently."

32.    According to Defendants,

> Our information systems provide a broad range of business process assistance and real-time data to support our purchasing and planning approach, merchandising team and strategy, multiple distribution center management, store and operational insight and financial reporting. We selected and developed these technologies to provide the flexibility and functionality to support our unique buying and selling model as well as to identify and respond to merchandising and operating trends in our business.
>
> *        *        *
>
> The ongoing modernization, enhancement and maintenance of our information systems have allowed us to support the growth in our business and store base. We have modernized and added several systems that provide us additional functionality and scalability in order to better support operational decision-making, including enhanced point of sale, warehouse management, human resource planning, business intelligence, vendor tracking and lead management, store communications, real estate lease management and financial planning and analysis systems.

33.    Because of Grocery Outlet's business model, any disruptions to the Company's information systems could have an immediate and substantial financial impact. Defendants admitted as much by including the following "Risk Factor" in that same FY 2022 10-K:

> The efficient operation and successful growth of our business depends upon our information systems, including our ability to operate, maintain and develop them effectively. A failure of those systems could disrupt our business, subject us to liability, damage our reputation, or otherwise impact our financial results.

34.    As an investment thesis, the key to the Company's long-term growth was (and remains) increasing the number of stores. "We believe that new store growth remains our biggest driver of long-term stockholder value."  This is due in large part to the narrow profit margins for the Company's "extreme value" grocery store business model.  For example, the Company reported net income of a meager 2.0% of net sales in 2021, and 1.8% in 2022.

35.    But new stores take time to become profitable.  As stated in that same 2022 10-K, "On average, we aim for our stores [to] achieve profitability during the first year of operations."  Thus, in the near- and intermediate-term, even relatively small changes in the Company's expenses, income, and thus margins, can have a significant effect on the Company's financial performance and resulting stock price.

36.    As the Company reported in its 2022 10-K, its "key ... financial measures" and "key operational metrics" include gross margin and selling, general and administrative expenses ("SG&A"), "comparable store sales," and EBITDA (Earnings Before Interest, Taxes, Depreciation, and Amortization). As defined by the Company, comparable store sales "measure performance of a store during the current reporting period against the performance of the same store in the corresponding period of the previous year," but includes only "net sales from our stores beginning on the first day of the fourteenth full fiscal month following the store's opening."

## DEFENDANTS KNEW THE COMPANY WAS UNPREPARED TO LAUNCH ITS SYSTEMS TRANSITION

37.    As the Company prepared to implement the massive transition of multiple critical ERP and information technology systems, it engaged in a months-long internal campaign to align the new SAP systems' functionalities with legacy systems and train its personnel on the new systems. The new systems would impact how inventory was tracked and managed, how the Company's buyers and planners would strategize what goods to purchase, how the Company's IOs would view and order

inventory from the Company's warehouses, and how the Company's financial and accounting systems would integrate with the new systems.

38.     Former Employee 1 ("FE1") worked as a Director of Financial Planning and Analysis for Grocery Outlet from August 2021 to September 2024. FE1 was responsible for the "full P&L" and balance sheet of the Company, as well as annual budgeting and monthly and quarterly forecasting. FE1 also supported the Company's investor relations department with data used for earnings conference calls and financial statements. FE1 reported to Grocery Outlet's Senior Vice President of Finance, Dorian Bertsch, who reported to Defendant Bracher. FE1 participated in monthly business review meetings with Bracher both in person and by email.

39.     Former Employee 2 ("FE2") worked for Grocery Outlet from January 2012 to April 2020 and again from March 2022 to February 2025, as a Grocery Buyer for roughly 60 Grocery Outlet stores in the eastern U.S. FE2 reported to Senior Vice President of Grocery Paul Miller, who reported to Executive Vice President and Chief Purchasing Officer Steve Wilson, who reported to Defendant Sheedy. FE2 participated in meetings with Sheedy on a quarterly or biannual basis, in conjunction with department heads. As a Grocery Buyer, FE2 used the SAP ERP systems for a wide variety of functions, including "all inventory management," tracking sales, cost of goods sold, and profitability, as well as for creating purchase orders, and referencing a "history" of the products that Grocery Outlet sold.

40.     Former Employee 3 ("FE3") worked as an Assistant Planner for Grocery Outlet from May 2023 to October 2024. FE3 was involved with allocating products to all of the Company's retail stores and helping the Company's buyers plan for what to buy. FE3 had been trained on Grocery Outlet's legacy ERP systems, including critical applications used for planning and buying inventory, and had firsthand experience transitioning to using the new SAP systems.

41.     According to FE1, Grocery Outlet started preparing for the Systems Transition prior to FE1's tenure at Grocery Outlet. Soon after FE1 began working for the Company in August 2021, FE1 joined the Finance department's project working team dedicated to the implementation of the SAP systems – which project was already underway. The team was responsible for determining how the SAP systems needed to be structured to support the Finance department's requirements.

42.     FE2 was aware that Grocery Outlet had begun preparing for the implementation of the SAP systems by at least late 2022. FE2 attended meetings in late 2022 to discuss issues related to "consolidating inventory," particularly item numbers, to "rectify inconsistencies," as well as "scraping excess and obsolete inventory" from the legacy systems that Grocery Outlet had used prior to SAP.

43.     As FE1 explained, the Company used internal tracking documents maintained in Excel spreadsheets that different departments within the Company used to track their respective readiness for "going live" with the Systems Transition. For example, FE1 reported that the Finance and Accounting groups met weekly to review these documents. In FE1's experience there were typically 20-30 lines of unfinished issues to fix each week, and "continuing risk levels" were assigned to each of these issues.

44.     According to FE1, Grocery Outlet had a "Project Steering Committee" for the SAP implementation. The project steering committee maintained the internal tracking documents. The Project Steering Committee held meetings every Monday that were led by Grocery Outlet's CIO, Harrison Lewis. At these meetings, the committee would discuss "critical issues" with the SAP implementation, including what was "ready and not ready." According to FE1, Defendant Bracher and Grocery Outlet's Senior Vice President of Accounting, Lindsay Gray, represented the Finance and Accounting groups in these committee meetings. FE1 understood that the Company's "C-suite" and Executive Vice Presidents typically attended these meetings. Bracher and Gray typically "gave readouts" from the weekly meetings, reporting back to FE1 and others in the Finance and Accounting departments about when Systems Transition issues were expected to be fixed.

45.     According to FE1, the Project Steering Committee maintained internal tracking documents for each of the Company's various departments, not just the Finance department. FE1 reported that not only were there internal tracking documents for each department, but there was also a "master document" that tracked all the items being handled by the individual departments and rated the issues that needed to be resolved by "urgency," resources needed, and key contact personnel responsible for the issues. According to FE1, both the master tracking document as well as the individual department tracking documents were "widely shared on SharePoint," a web-based business

collaboration platform accessible on the Company's computer system. FE1 personally saw both the master and individual department tracking documents.

46.     According to FE1, the original "go-live" date for SAP implementation was set for March 2023. However, as that date approached it became clear within Grocery Outlet that large parts of the Company were not ready for the implementation. The Company thus decided to push out the "go-live" date for implementation to July 2023. FE1 estimated that the decision to push out the launch date from March 2023 to July 2023 was made approximately one month prior to the March launch date. FE2 also recalled that Grocery Outlet had been working towards transitioning to SAP systems "for years" and that "going live" with the SAP systems had been "pushed out several times" because the Company was "not ready."

47.     According to FE1, the primary problem was that the Company's various "silos" (*e.g.*, Finance, Operations, or Inventory) had each prepared for the Systems Transition independently, without any attempt to integrate or jointly test the various interconnected systems. As the original March 2023 launch date approached, the Company finally attempted to integrate the new systems together as a whole, as they needed to for the new systems to support operations. However, when they tried to "plug together" all the various applications and systems they realized it did not work as an integrated whole, even if the individual applications worked independently within each "silo."

48.     By July 2023, FE1 reported that the Company was still not ready to implement the SAP systems. That is when the Company made the critical decision to "rip off the band-aid" and proceed with the Systems Transition launch in August 2023, notwithstanding the fact that the Company still was not adequately prepared to do so. According to FE1, employees at the Company were informed of this decision in a Company-wide email from Defendant Sheedy, who was ultimately accountable for the project.

49.     FE2 noted that "most of us [at Grocery Outlet] thought it was premature" to proceed with implementation in August 2023. FE3 agreed that the Company launched the SAP systems "prematurely."

50.     FE1 recalled that one of the key unfinished preparations when the Company decided to prematurely forge ahead with the Systems Transition launch was User Acceptance Testing

("UAT"). UAT progress (or lack thereof) was specifically noted in the internal tracking documents maintained by the project steering committee.

51.    UAT is the final phase of ERP pre-implementation testing where a company's real end-users validate that the system works as intended in real-world scenarios before the ERP system goes live. The purpose of UAT is to confirm that the ERP system meets a company's needs and catches usability, data migration, or cross-functionality issues early, helping to prevent costly surprises and disruptions after full deployment.

52.    Despite extensive testing in previous phases, UAT can uncover issues not identified previously. End-users are closest to the company's day-to-day operations and are best positioned to gauge the usability of the system, including its interfaces, navigation, cross-functionality, and ease of use. UAT may also highlight where additional training or user support may be required. Successful completion of UAT provides senior management with confidence in the ERP system's readiness for deployment. It allows management to witness first-hand the system's real-world capabilities and make an informed decision on when or whether to proceed with the 'go-live' launch.

53.    For SAP implementation, UAT often involves testing complete end-to-end business processes that may span multiple SAP modules and integrate with other internal or external systems, reflecting how the business actually operates day-to-day. With respect to Grocery Outlet's SAP implementation, UAT would have entailed having IOs attempt to use the new portal and inventory ordering systems, having Grocery Outlet's planners and buyers attempt to actually manage warehouse inventory, and having finance and accounting personnel use the new systems to attempt to accurately make calculations and projections for cost of goods sold, margins, and other key metrics.

54.    According to FE1, Grocery Outlet had not conducted end-to-end UAT prior to launching the Systems Transition. The new systems were not tested as an integrated whole to see how they would perform from beginning to end, *e.g.*, from writing an initial purchase order for a product, to shipping the product from the supplier to a distribution center, to shipping the product from the distribution center to a store, to reporting the store's sale of that product to the finance and accounting departments. In that regard, even if the individual "silos" had been tested independently,

failing to conduct and complete full end-to-end UAT to see how the separate silos interacted with each other prevented the Company from seeing the full functional flow of information needed to effectively conduct the Company's most central operations.

55.    FE1 also reported that the testing performed in the individual silos used only "dummy data," not actual data from the Company's normal operations. While using "dummy data" could show that random data was flowing where it needed to go, without actual data it would not be possible to see if the data flows actually "made sense" and were not being distorted or lost as they passed through the various systems.

56.    FE2 recalled that reconciling and scrubbing data from Grocery Outlet's legacy systems was also not fully completed when the Company decided to "go live" with the SAP systems. This was a problem because whereas the Company's legacy AS400 system had tracked inventory by item number, the SAP system was "completely UPC-driven." As FE2 explained, the issue with transitioning to a UPC-driven system was that multiple Grocery Outlet products with different item numbers often shared the same UPC, such as different sizes of cans of the same type of soda – these would each have different item numbers in the AS400 system but all had the same UPC. The result was a "big issue with inventory control."

57.    According to FE2, the Company also "struggled with different item numbers" that were used for the same products in the eastern and western regions in which Grocery Outlet operated, so the Company had to determine which item numbers to use for the new system. These issues with the item numbers had to be resolved quickly because they significantly impacted Grocery Outlet's operations, and it took until the first couple of months *after* the Systems Transition for the Company to resolve those problems. FE2 stated the Company did not adequately anticipate and was not adequately prepared for these issues prior to the Systems Transition.

58.    According to FE1, when the SAP systems went live in late August 2023, the biggest, immediate problem related to inventory, particularly in regards to "visibility" of how much inventory was actually on hand and determining the valuation of the inventory. As FE1 explained, every product had its own cost-of-goods-sold ("COGS") and the price at which it was sold, but determining the quantities of some products could be problematic. For instance, similar to what FE2 described, there

might be a COGS and sales price for a single granola bar, but those single bars would come in a box of six. As such, there could be times when, a single bar was "ringing up" as a box in SAP and thereby resulted in incorrectly valuing the inventory. These issues were not due to latent data integrity issues in the legacy ERP systems, they were attributable to "keying issues" (*i.e.*, end-users entering details incorrectly) and learning to manage the new SAP systems, especially data flows between purchasing, the stores and warehouses.

59.     FE1 reported that Grocery Outlet had poor visibility as to its inventory because of the poor data flow. Without adequate visibility, the Company was "flying blind" when it came to valuing its inventory. According to FE1, in the fourth quarter of 2023, after the Systems Transition was implemented, Grocery Outlet did "not know what we had" with regard to inventory. While the Company was able to see how much inventory had been purchased, it did "not have good visibility" to inventory levels. This, in turn, meant the Company did not know the volumes of inventory at risk of spoiling. According to FE1, through at least November 2023 the company had been deliberately conservative in how much inventory it purchased because of this lack of visibility on inventory levels.

60.     FE3 reported that when the Systems Transition launched at the end of August 2023, it immediately "broke all the functionality of everything." FE3 specifically noted that data integrity was severely compromised when the SAP systems went live, such that "none of the data made sense," and was instead "all random information" such that the Company had "no idea what was accurate."

61.     Had Grocery Outlet completed end-to-end UAT for the Systems Transition, it would have been able to identify and resolve, or at least mitigate, these inventory issues *before* implementing the new SAP systems. Indeed, FE2 reported that the Systems Transition imposed a steep "learning curve" on the Company's IOs as they adapted to the new SAP systems. Failing to complete end-to-end UAT on the new SAP systems prior to launching the Systems Transition created *a material risk* that the Company would encounter significant disruptions to its operations, with material adverse impacts on its financial results and financial reporting.

62.     The Systems Transition was a massive Company-wide project, ultimately spearheaded by Defendant Sheedy. The project involved Company-wide overhaul of ERP systems and implicated

multiple key operational aspects of the Company, including inventory, warehouse data, store level reporting, and financial reporting.

63. Ultimately, the strategic decision to implement the Systems Transition when Defendants knew the Company was not ready to do so led to material impacts on key financial metrics, such as sales growth and margins, and led to a material weakness in the Company's internal controls on financial reporting. Sheedy was eventually asked to step down in light of the prematurely implemented and poorly executed Systems Transition.

64. FE2 also reported that Sheedy personally addressed issues regarding the SAP transition during Company "town hall" meetings, further indicating Sheedy's knowledge of, and direct involvement in, preparing the Company and implementing the Systems Transition.

**DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS, OMISSIONS, AND HALF-TRUTHS ABOUT THE COMPANY'S SYSTEMS TRANSITION**

65. During the Class Period, Defendants made numerous material false and misleading statements, omissions, and half-truths concerning the Company's Systems Transition, concealing the known risks attendant thereto. Each of these false or misleading statements and omissions was made with Defendants' knowledge of, or severely reckless disregard for, the undisclosed material facts which rendered those statements misleading.

66. On March 1, 2023, after the close of trading, the Company filed the 2022 10-K, which Defendants Sheedy and Bracher signed. The 2022 10-K contained the following purported risk disclosure, which was identical to the risk disclosure provided in the Company's annual report for the prior year:[2]

> **Any material challenges or difficulties in maintaining or updating our existing technology, including modernizing components of our existing system architecture, or developing or implementing new technology could have a material adverse effect on our business or results of operations.**
>
> We modify, update and replace our systems and infrastructure from time to time, including by adding new hardware, software and applications; maintaining, updating or replacing legacy programs; converting to global systems; integrating new service providers; and

---

[2] Emphasis is added unless otherwise indicated.

adding enhanced or new functionality, such as cloud computing technologies. In addition, we have a customized enterprise resource planning system, components of which have already been replaced and additional components of which we are replacing over the next several years, including our financial ledger, inventory management platform and product data warehouse system. The implementation, operation, and proper functionality of these improvements is anticipated to require a significant investment of financial, human, and technical resources. It is possible that we could experience implementation, operational and functionality issues, delays, higher than expected costs and other issues during the course of implementing and utilizing these improvements. With any update or replacement of our systems and infrastructure there is a risk of business disruption, liability and reputational damage associated with these actions, including from not accurately capturing and maintaining data, efficiently testing and implementing changes, realizing the expected benefit of the change and managing the potential disruption of the actions and diversion of internal teams' attention as the changes are implemented.

Further, the time and resources required to implement or optimize the benefits of new technology initiatives, or potential issues that arise in implementing such initiatives, could reduce the efficiency of our operations in the short term.

The efficient operation and successful growth of our business depends upon our information systems, including our ability to operate, maintain and develop them effectively. A failure of those systems could disrupt our business, subject us to liability, damage our reputation, or otherwise impact our financial results.

67.    On August 8, 2023, after the market closed, the Company filed with the SEC on Form 10-Q its Quarterly Report for the quarter ended July 1, 2023 ("Q2'23 10-Q"). Defendant Bracher signed the Q2'23 10-Q.

68.    Under the subheading, "Item 1A. Risk Factors," the Q2'23 10-Q stated that: "our business, financial condition and operating results can be affected by a number of factors, ... including but not limited to those described in Part I, Item 1A of our 2022 Form 10-K under the heading 'Risk Factors,'.... ***There have been no material changes to our risk factors since the 2022 Form 10-K***." Thus, the Q2'23 10-Q incorporated the risk factor specified above in the 2022 10-K.

69.    The underlined sentences above in the 2022 10-K were misleading, and the risk disclosure was inadequate, when incorporated into the Q2'23 10-Q because Defendants failed to disclose known material adverse facts about the planned launch of the Systems Transition.

70.     Specifically, Grocery Outlet had originally planned to deploy the new SAP systems in March 2023, but Defendants postponed the "go-live" date to July 2023 because they knew the Company was not adequately prepared to implement the new systems. Then in July 2023, although they knew the Company was still unprepared and could not effectively deploy the Systems Transition without a material risk of significant disruptions, Defendants decided they did not want to wait any longer and that they would deploy the new SAP systems in August 2023 anyway. The purported risk disclosure, as incorporated into the Q2'23 10-Q, framed these risks as hypothetical and generalized, concerning "*any* update or replacement of our systems," or that the implementation of the Company's new ERP systems "***could***" cause "implementation, operational and functionality issues, delays, higher than expected costs and other issues during the course of implementing" the ERP system upgrades.

71.     In reality, at the time these statements were made the risks were specific and no longer hypothetical because by August 2023 Defendants had already decided to "go live" with the Systems Transition despite the Company still being inadequately prepared, due in part to a failure to complete end-to-end UAT.

72.     Also on August 8, 2023, after the market closed, the Company held an earnings conference call for the second quarter of 2023 ("Q2'23 Earnings Call"). On the Q2'23 Earnings Call, Defendant Sheedy made the following statement about certain aspects of the System Transition: "our forthcoming store portal[] is a new platform that will provide operators with better analytics and easier access to information to make smarter business decisions. We look forward to delivering this new application to operators this quarter."

73.     This statement was misleading because the Company originally planned to deploy the Systems Transition in March 2023, but already had to delay the "go-live" date until at least July 2023 because it was inadequately prepared to implement Systems Transition. By July 2023 the Company was ***still*** inadequately prepared, but Defendants decided to press forward with deploying the Systems Transition in August 2023 anyway. Thus, it was misleading for Sheedy to tout the purported benefits of the Systems Transition while omitting the material likelihood that the Company would experience

severe disruptions, reduced visibility into inventory and finances, and other significant issues with implementation due to being inadequately prepared.

74.    The Q2'23 Earnings Call also included the following exchange between an analyst and Defendant Sheedy:

> **Analyst:** ... when is the portal going to be out there? And what do you think—if you had to pick 2 elements of that, that will be the most impactful for the IOs. What would that be? I'm sort of curious in terms of so many items, elasticity. Is that one of the that would allow the IOs to price more opportunistic if they haven't to date?

> **Defendant Sheedy**: ... And then yes, in terms of benefits for the operator, gosh, so many. I think, John, the first thing that comes to mind is just easier access to information and access to new information that they've not seen before, at least not in the format that it will be available. And then with that, comes better decision-making, faster, better decision-making around inventory, around ordering, around managing the mix, really in all aspects for how they manage their business, which is a huge benefit, so which to grow sales and improve margin. And then the other benefit that I would mention is just efficiencies. So certainly, you've talked about rise in costs, operating expenses, labor, et cetera, challenges that we, together with operators, have managed through for a long time now, but this new platform portal will allow them to operate even more efficiently, better use of their time, reallocate it to spend time with customers, or operate the P&L more efficiently to help them with their income growth.

75.    These statements by Defendant Sheedy about the benefits that the impending implementation of the Systems Transition would bring were misleading because the Company originally planned to deploy the Systems Transition in March 2023, but already had to delay the "go-live" date until at least July 2023 because it was inadequately prepared to implement the new SAP systems. The Company was still inadequately prepared in July 2023, but it decided to press forward with deploying the Systems Transition in August 2023 anyway. Thus, it was misleading for Sheedy to tout the purported benefits of the Systems Transition such as "easier access to information," "grow[ing] sales and improv[ing] margins," and "efficiencies" while omitting the likelihood that the Company would experience disruptions, reduced visibility into inventory and finances, and other issues with implementation due to being inadequately prepared, which would have a material and

adverse impact on the Company's sales growth, margins, and efficiencies in the forthcoming periods as the Systems Transition was implemented.

76. Defendant Sheedy's comments about the purported benefits Grocery Outlet expected from the impending Systems Transition were noted by securities analysts following Grocery Outlet, demonstrating the importance to investors of the implementation of the Systems Transition. For example, an analyst report from Guggenheim Partners on August 9, 2023 noted that "the new IO portal, going live this month, would, among other things, improve pricing."

77. Likewise, an analyst report from Telsey Advisory Group on the same day highlighted Grocery Outlet's "new technology initiatives, including the rollout of a new store portal for IO's—a new platform that will provide operators with better analytics."

78. A second report by Telsey Advisory Group on September 15, 2023, following a virtual investor meeting with Defendants Sheedy and Bracher, noted that "Grocery Outlet also is leveraging technology via its ... and new IT platform for independent operators (IO's)—all helping gain new customers and increase productivity."

79. On November 8, 2023, Grocery Outlet filed with the SEC on Form 10-Q its Quarterly Report for the quarter ended September 30, 2023 ("Q3'23 10-Q"). The Q3'23 10-Q stated, under the subheading, "Changes in Internal Control over Financial Reporting," that:

> During the quarter ended September 30, 2023, we replaced components of our enterprise resource planning system, including our financial ledger, inventory management platform and product data warehouse system. These new systems are intended to provide us with enhanced transactional processing, security and management tools, and are an important element of our system of disclosure controls and procedures. We modified certain existing internal controls, as well as implemented new controls and procedures impacted by the implementation of these new systems. We will continue to monitor and evaluate the operating effectiveness of the related controls during subsequent periods. Except for the implementation of these new systems, there was no change in our internal control over financial reporting identified in connection with the evaluation required by Rule 13a-15(d) and 15d-15(d) of the Exchange Act that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

Amended Complaint

80.    The underlined statement was false and misleading because, due to the premature implementation of the Systems Transition, the Company suffered disruptions to numerous functions within the Company that were so pervasive that the Company experienced an undisclosed material weakness in its internal control over financial reporting related to its information technology general computer controls ("ITGC's"). As the Company later admitted in February 2024, the Systems Transition had "led to a significant increase in the volume of transactions across user access, program change management, and IT operations for which [the Company's] existing controls were not designed to address. As a result, certain of the Company's related business controls that are dependent upon the affected ITGC's were also deemed ineffective." As a result of the Systems Transition, implemented over one month prior to the end of the quarter, "the pervasive impact of these control deficiencies ... created a reasonable possibility that a material misstatement to the consolidated financial statements would not be prevented or detected on a timely basis." These deficiencies represented a new, undisclosed material weakness in the Company's internal control over financial reporting that arose during the third quarter, and rendered its internal control over financial reporting not effective after the Systems Transition was implemented – before the quarter's end and before the Q3'23 10-Q was filed.

81.    Attached to the Q3'23 10-Q were SOX certifications signed by Defendants Sheedy and Bracher, attesting to the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

82.    Specifically, the SOX certifications attached to the Q3'23 10-Q stated that: (1) "this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report"; and (2) the certifying officers "are responsible for establishing and maintaining disclosure controls and procedures ... and internal control over financial reporting" for the Company, and that they have disclosed any change in the Company's internal control over financial reporting that occurred during the quarter "that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting." The SOX certifications also stated that the certifying officers had disclosed to the Company's auditors

1  and the Board's audit committee "[a]ll significant deficiencies and material weaknesses in the design

2  or operation of internal control over financial reporting which are reasonably likely to adversely affect

3  the registrant's ability to record, process, summarize and report financial information."

4      83.    These SOX certifications were false because the Q3'23 10-Q report, to which these

5  SOX certifications were attached, omitted material facts that rendered certain of its statements

6  misleading, as identified above, and did not disclose a material weakness in the Company's internal

7  control over financial reporting that had arisen during the quarter.

8                    **PLAINTIFF AND THE CLASS WERE DAMAGED**
                      **AS THE CONCEALED RISKS MATERIALIZED**
9

10     84.    Defendants' misleading statements and omissions about the Systems Transition, as

11 identified above, concealed the material risk that the Company would suffer significant disruptions

12 to its operations and financial functions because it was inadequately prepared to implement the

13 Systems Transition when it decided to "go live" anyway, which disruptions were likely to have a

14 material adverse impact on the Company's financial results. That concealed risk came to light

15 through a series of partial disclosures beginning in late 2023, revealing that the risk had indeed come

16 to bear as the Company experienced significant disruptions to its inventory systems, warehousing,

17 and financial reporting visibility, among other things, as a result of trying to implement the Systems

18 Transition without being adequately prepared, and instead being forced to troubleshoot on the fly.

19 As the truth came to light, these revelations caused Grocery Outlet's share price to fall, harming

20 Plaintiff and the Class.

21     85.    Defendants also continued to make misleading statements as they repeatedly assured

22 analysts and investors that the impact from the Systems Transition would extend no further than the

23 then-current quarters, despite knowing several material, undisclosed facts showing there was no

24 reasonable factual basis for those assurances.

25     86.    On November 7, 2023, the Company held an earnings conference call for the third

26 quarter of 2023 ("Q3'23 Earnings Call"). During the Q3'23 Earnings Call, Defendant Sheedy

27 revealed for the first time that implementation of the Systems Transition during the third quarter

28

resulted in significant disruptions that materially impacted Grocery Outlet's third and fourth quarter financial results:

> While pleased with our third quarter performance, ***we experienced operational disruptions as we transition to upgraded systems***. On prior calls, we have discussed our approach and history of investing in modernizing systems to improve capabilities and drive efficiency. ***We began to implement our most recent enhancements in late August, which include upgrades to product, inventory, financial and reporting platforms***. One important component of this upgrade is a new store portal that will provide operators with improved data to make better purchasing, merchandising and marketing decisions. We are excited for the improved functionality, scalability and data analytics that this and other enhancements will provide. ***The transition to these new systems has resulted in ordering and inventory disruptions that have impacted third and fourth quarter results***.
>
> We have been partnering closely with our independent operators to minimize the impact to customers and sales. ***We have also elected to provide commission support to our operators as we continue to make steady progress adapting to the new systems.*** ...

87.    During the same call, Defendant Bracher provided further details of the negative financial impact in the third quarter of 2023 caused by problems from implementing the Systems Transition:

- "Our system upgrades impacted comparable store sales by an estimated 150 basis points"
- The Company estimated that "inventory inefficiencies related to our system transition... impacted gross margin by approximately 50 basis points."
- "SG&A expense increased 8.7% to $278.1 million compared to the third quarter of 2022. The increase was driven by higher commission payments to IOs, .... Higher commission expense reflects strong gross profit growth together with support we elected to provide to our IOs in connection with our system upgrades."
- "While our underlying business remains strong, we do expect the system transition to significantly impact financial results in the fourth quarter and to a greater degree than the third quarter, given the additional months affected."
- "With respect to the top line, we expect fourth quarter comp growth to be approximately 2%, which assumes a 300 basis point headwind from the system transition."

- "We expect fourth quarter gross margin to be approximately 30%, reflecting ... approximately 150 basis points of impact due to the system transition."

88. The question-and-answer portion of the call followed, during which several analysts repeatedly questioned Defendants about the impact of the Systems Transition and Defendants Sheedy and Bracher provided additional detail about the disruptions and impact to the Company's third and fourth quarter financial results.

89. For example, Defendant Sheedy provided more detail about the various upgrades involved in the Systems Transition, and how the disruptions caused by the Systems Transition led to the impacts on sales (due to "lighter inventory levels"), margins (due to "inventory inefficiencies"), and SG&A expenses (due to commission support for IOs). Sheedy also admitted that "we did expect some disruption during this transition."

> **[Goldman Sachs Analyst:]** ... I just wanted to start off with a couple of questions around the new platforms you implemented this quarter. What has been the biggest challenge related to the ordering? Is it just learning the new program? Is there anything specific about the functionality that surprised you?
>
> And then you also said the disruption would be largely behind us by year-end. But how should we think about any impact into the first half of next year, especially any cost that we should think about annualizing? ...
>
> **[Defendant Sheedy:]** ...We did upgrade a number of systems at the end of August, inclusive of product inventory, financial and reporting platforms. These upgrades include replacement of our AS400 system, which is our legacy ERP system, with SAP along with other third-party plus some new proprietary applications for buying and store operations. So that was the enhancement that was implemented back a couple of months ago.
>
>           *       *       *
>
> In terms of the challenges and the disruption that we face as we transition to the new systems, we were challenged with inventory visibility, and the impact here was on ordering and inventory management in general. And unfortunately, this disruption did have an impact throughout the business and the P&L. And notably, as mentioned in our comments, top line sales were impacted by lighter inventory levels, slightly lower variety. We had some pressure on margin as it relates to inventory inefficiencies. And then SG&A was higher as well as we elected to provide operators with support. ***I'll say***

> ***that we did expect some disruption during this transition. It was***
> ***factored into our previous guidance,*** just not to the degree that we've
> been experiencing it. And of course, we're very disappointed with the
> magnitude of it and we own it. We own where we are.

90.     Sheedy's statements that they "did expect some disruption during this [Systems Transition" also supports an inference that Defendants knew that Grocery Outlet was inadequately prepared to launch the Systems Transition when they decided to "go live" anyway.

91.     Following up on the same analyst's questions, Defendant Bracher explained that the impact from the fourth quarter was expected to be greater than the third simply because of the timing of the Systems Transition being implemented in late August, with only just over one month left in the third quarter, compared to the full three-month impact expected in the fourth quarter. Yet in the same breath, Bracher also confirmed that the Company expected the impacts from the Systems Transition to be resolved by the end of the fourth quarter, and thus the Company would "***enter the new year without any lingering cost impacts or otherwise related to the transition***."

> We do expect that as we -- over the course of the fourth quarter, all of
> those impacts moderate. <u>And as disappointed as we are with the</u>
> <u>magnitude of the impact in the fourth quarter</u>**,** <u>we do expect and believe</u>
> <u>that it will be largely behind us by the end of the year. And so our view</u>
> <u>at this point is we will enter the new year without any lingering cost</u>
> <u>impacts or otherwise related to the transition.</u>

92.     These underlined statements were misleading because Defendants knew they had no reasonable basis to assure analysts and investors that the impacts of the Systems Transition would be resolved over the few weeks remaining until the end of the year. Specifically, Defendants knew at the time these statements were made that: (1) Grocery Outlet had launched the Systems Transition without being adequately prepared and immediately faced widespread disruptions across critical business functions; (2) the Company had atypically poor visibility into its normal business reporting and tools that led to difficulty with forecasting and limited data visibility; (3) the disruptions from the Systems Transition were so rampant that they created a material weakness in the Company's internal control over financial reporting and deficiencies in other business controls; and (4) while Defendants claimed that the disruptions were to some extent "expected," they admitted that they had significantly underestimated the magnitude of the problems, which were still ongoing and unresolved when these

assurances were made. These statements (along with other similar statements during the same call) gave investors the false impression that Defendants had a realistic grasp of the extent of the problems from implementing the Systems Transition and a reasonable basis for claiming the impacts would end by the end of the quarter when they made these statements, when in fact they did not.

93.    Defendant Sheedy echoed the same sentiment. He also admitted that "*we've always known how large [the Systems Transition] was and complex. We did expect as a result, some disruption*." Sheedy further confirmed that for 2024, analysts "*should think about us reverting back to previous performance ... for both gross margin and bottom-line profit*," as the issues with the Systems Transition would be resolved during the fourth quarter.

> **[Deutsche Bank Analyst:]** So RJ, I just wanted to follow up on the system upgrades. I mean, it does sound like you anticipated some disruption but then it has actually come in well ahead of that. Like, one, is that a fair characterization? And then two, is it fair to say that this doesn't alter any of the margin structure into next year or the long term? And you'll essentially be able to fully recapture all of the margin pressures once you lap the third and the fourth quarters?
>
> **[Defendant Sheedy:]** The -- yes, for your first question, that is a fair characterization. *We did expect -- this is a big transition from a legacy platform that we've been operating on for the past several decades. So -- and it's something that we've been working on for a couple of years now. So we've always known how large it was and complex. We did expect as a result, some disruption*, certainly not to this degree or this magnitude. So I think you characterized it well.
>
> And then in terms of impact looking forward, and I think similar to the earlier question, we -- as I said, we do [expect] the transitional impact to be contained to this year, from what we've already experienced in the third quarter. And then largely behind us at the end of the year. So you should think about us reverting back to previous performance and all the things that we've always talked about related to consumer trends, top line sales and how we've managed for both gross margin and bottom-line profit.

94.    These underlined statements were misleading because Defendants knew they had no reasonable basis to assure analysts and investors that the impacts of the Systems Transition would be resolved over the few weeks remaining until the end of the year, and that the Company would revert to previous performance and trends, *especially* "from what [Grocery Outlet had] already experienced

in the third quarter." Specifically, Defendants knew at the time these statements were made that: (1) Grocery Outlet had launched the Systems Transition without being adequately prepared and immediately faced widespread disruptions across critical business functions; (2) the Company had atypically poor visibility into its normal business reporting and tools that led to difficulty with forecasting and limited data visibility; (3) the disruptions from the Systems Transition were so rampant that they created a material weakness in the Company's internal control over financial reporting and deficiencies in other business controls; and (4) while Defendants claimed that the disruptions were to some extent "expected," they admitted that they had significantly underestimated the magnitude of the problems, which were still ongoing and unresolved when these assurances were made. These statements (along with other similar statements during the same call) gave investors the false impression that Defendants had a realistic grasp of the extent of the problems from implementing the Systems Transition and a reasonable basis for claiming the impacts would end by the end of the quarter when they made these statements, based on the disruptions the Company experienced in the third quarter, when in fact they did not.

95.    Defendant Sheedy also stated twice during the Q3'23 Earnings Call that: the Company "anticipate[s] the transitional impacts to be largely behind us as we get to the end of the year."

96.    These statements were misleading because Defendants knew they had no reasonable basis to assure analysts and investors that the impacts of the Systems Transition would be resolved over the few weeks remaining until the end of the year. Specifically, Defendants knew at the time these statements were made that: (1) Grocery Outlet had launched the Systems Transition without being adequately prepared and immediately faced widespread disruptions across critical business functions; (2) the Company had atypically poor visibility into its normal business reporting and tools that led to difficulty with forecasting and limited data visibility; (3) the disruptions from the Systems Transition were so rampant that they created a material weakness in the Company's internal control over financial reporting and deficiencies in other business controls; and (4) while Defendants claimed that the disruptions were to some extent "expected," they admitted that they had significantly underestimated the magnitude of the problems, which were still ongoing and unresolved when these assurances were made. These statements (along with other similar statements during the same call)

1    gave investors the false impression that Defendants had a realistic grasp of the extent of the problems

2    from implementing the Systems Transition and a reasonable basis for claiming the impacts would end

3    by the end of the quarter when they made these statements, when in fact they did not.

4        97.    Defendant Bracher also stated that "Given the progress that we've made and the daily

5    progress that we continue to make, we do feel confident in being able to resolve these outstanding

6    issues to the point where the impact is then largely behind us by the end of the year."

7        98.    This statement was misleading because Defendants knew they had no reasonable basis

8    to assure analysts and investors that the impacts of the Systems Transition would be resolved over

9    the few weeks remaining until the end of the year, *especially* in light of the "progress" Grocery Outlet

10   had made (or lack thereof) in resolving those disruptions and mitigating the impacts. Specifically,

11   Defendants knew at the time this statement was made that: (1) Grocery Outlet had launched the

12   Systems Transition without being adequately prepared and immediately faced widespread disruptions

13   across critical business functions; (2) the Company had atypically poor visibility into its normal

14   business reporting and tools that led to difficulty with forecasting and limited data visibility; (3) the

15   disruptions from the Systems Transition were so rampant that they created a material weakness in the

16   Company's internal control over financial reporting and deficiencies in other business controls; and

17   (4) while Defendants claimed that the disruptions were to some extent "expected," they admitted that

18   they had significantly underestimated the magnitude of the problems, which were still ongoing and

19   unresolved when these assurances were made. This statement (along with other similar statements

20   during the same call) gave investors the false impression that Defendants had a realistic grasp of the

21   extent of the problems from implementing the Systems Transition and a reasonable basis for claiming

22   the impacts would end by the end of the quarter when they made these statements, based on the

23   disruptions and impacts the Company experienced in the third quarter, when in fact they did not.

24       99.    Defendant Bracher also explained during the Q3'23 Earnings Call that "at the outset"

25   of the Systems Transition, Grocery Outlet decided to provide commission support to its operators

26   during the Systems Transition. As Bracher described, the Company's "inventory visibility and

27   ordering challenges...impacted the operators' ability to manage the flow of product into their stores."

28   When the Company experienced problems from the Systems Transition with, it became "very

Amended Complaint

difficult" for operators to "pull[] product in through the order guide." Accordingly, when they first implemented the Systems Transition, Grocery Outlet decided to provide its operators with commission support "to help minimize the impact of this transition on their commission and income."

100.    As FE1 explained, paying commissions to IOs was typically a "standard process" by which the IOs received about half of Grocery Outlet's overall gross profits. Determining the amount of commission to pay to IOs included taking a physical inventory count at the end of a period, determining the overall COGS for the period, and then making adjustments following a period close based on final reconciliations of these results, after which additional commissions were paid based on those adjustments. However, during the rocky implementation of the Systems Transition, Grocery Outlet's margin rates were "all over the place." So, to determine COGS during the periods impacted by the Systems Transition disruptions, the Company looked at historical margins and paid the commissions based on those historical margins, even if they were higher than the margins as derived imperfectly from the new SAP systems outputs.

101.    The Company's decision to provide commission support to its IOs "at the outset" of the Systems Transition further shows that Defendants were aware of, or recklessly disregarded, the material risk that their premature launch of the Systems Transition was likely to cause significant disruptions for its operators that would materially impact the Company's margins (upon which the IOs' commissions were based).

102.    On this news, the price of Grocery Outlet stock fell $1.31, or 4.6%, to close at $27.15 on November 8, 2023, on higher than usual trading volume.

103.    However, while the Q3'23 Earnings Call partially revealed the impact of disruptions during the third and fourth quarters of 2023, and Defendants admitted those problems were expected prior to implementing the Systems Transition, it did not fully reveal the impacts of the undisclosed risks, which would continue to plague the Company into the first half of 2024. This was especially true in light of Defendants' misleading comments assuring analysts that the impacts of disruptions from the System Transition would be resolved by the end of 2023.

104.    On December 11, 2023, after the market closed, Grocery Outlet issued a press release reporting that Defendant Bracher "has informed the Company of his intention to step down as Chief

Financial Officer, effective as of March 1, 2024." The market understood Bracher's departure to be related to the previous partial disclosure of the problems resulting from the Systems Transition. Thus, this announcement further partially revealed to the market the extent of the impact from the Company's decision to "go live" with the Systems Transition despite being inadequately prepared to do so.

105.    For example, an analyst report by Guggenheim Partners on December 12, 2023 noted that Defendant Bracher's "surprising" departure from Grocery Outlet "was not anticipated, and is ill-timed in light of recent, uncharacteristic ERP transition issues." As the report explained: "Investors may rightly be concerned by this development since ... most importantly, it occurs in the immediate aftermath of an uncharacteristic ERP-driven 3Q miss and guide-down."

106.    On this news, the price of Grocery Outlet stock fell $1.83, or 6.2%, to close at $27.91 on December 12, 2023, on higher than usual trading volume.

107.    On February 27, 2024, after the market closed, Defendants issued a press release entitled "Grocery Outlet Holding Corp. Announces Fourth Quarter and Fiscal 2023 Financial Results." The Company announced that for the fourth quarter of 2023, the Company's comparable store sales for the quarter increased by 2.7% year-over-year, its gross margin for the quarter was unchanged at 30.2%, and its Adjusted EBITDA decreased 6.3% to $50.9 million.

108.    The release also revealed that the Systems Transition issues continued to plague the Company through the end of the fourth quarter of 2023:

> As previously disclosed, the Company experienced disruptions as a result of the implementation of new technological platforms in late August 2023. Such disruptions are estimated to have negatively impacted store sales by approximately 200 basis points and gross margin by 130 basis points in the fourth quarter.

109.    Later that same day, the Company held an earnings conference call for its fourth quarter and full-year 2023 results ("Q4'23 Earnings Call"). During the Q4'23 Earnings Call, Defendants provided further updates on the Company's progress in resolving disruptions and other consequences from the Systems Transition.

110.    Defendant Bracher explained that Grocery Outlet estimated that "the system transition impacted comp sales by approximately 200 basis points for the quarter." Additionally, he noted that "the margin impact of our system integration ... was approximately 130 basis points in the quarter."

111.    However, Defendants also revealed that the impacts of implementing the Systems Transition were persisting into the first quarter of 2024 – they were not resolved in the fourth quarter of 2023 as Defendants previously represented. As Defendant Sheedy explained during the call, "***data integration efforts are taking longer than expected and are still impacting our business results***. The largest remaining issues are related to warehouse product expiry data and store level reporting for IOs."

112.    With respect to the Company's guidance for the first quarter of 2024, Bracher revealed that the Company projected "comp[arable store sales] growth in the first quarter to be approximately 2%, ***which includes an estimated 50-basis-point impact from the system transition***," and "gross margin for the quarter of approximately 30.4%, ***which includes an estimated 100-basis-point impact from the system transition***."

113.    This surprised the market, and during the conference call, analysts pressed Defendants on the total impact of the Systems Transition and when the Company expected to finally be clear of the disruptions and impacts on the Company's financial results. Defendant Bracher shared that the bottom-line EBITDA impact from the Systems Transition was approximately $20 million in the fourth quarter of 2023, and it was projected to be $14 million in the first quarter of 2024.

> **[GUGGENHEIM PARTNERS ANALYST:]** Wanted to start with when do you think -- is it really the end of the first quarter when there is a complete normalization in how the IOs are using the systems and financial impact? Is that fair? And then, how do you think about when you try to forecast the recovery in the back half of the year because you lost over 200 basis points of comp and over 100 basis points of gross? I mean, it looks like there's some recovery, but certainly nowhere near a complete recovery.
>
> **[DEFENDANT BRACHER:]** So in total, think about the EBITDA impact from the technology transition and interruptions is impacting EBITDA by $20 million in the fourth quarter, about half of that comes from the elective IO commission support that we provided to operators.
>
> The balance coming from combination of the impact of the top line and gross margin rate as we've disclosed. In the first quarter, those impacts

> continued, but to a lesser degree. So that -- what had been a $20 million EBITDA impact in Q4, down to what we estimate and is implied in our guidance of roughly $14 million impact to the first quarter. Again, half of that coming from elective IO commission and the balance from sales and margin impact.

114.    According to the fourth quarter earnings release the Company's EBITDA for the fourth quarter was approximately $43.2 million, which means that it would have been nearly 50% higher but for the disruptions from the Systems Transition.

115.    Defendant Bracher also explained that the Company's first quarter guidance was based on the assumption that the Company would resolve the remaining issues with the Systems Transition and returned to normal operations, including terminating commission support, during the first quarter.

> Our current guidance assumes that we resolve the remaining issues in front of us and are back to steady state operations and conclude the elective commission support by the end of the first quarter.

116.    However, once again Sheedy assured analysts and investors that "[w]e expect these [data integration efforts, including issues related to warehouse product expiry data and store level reporting for IOs] to be resolved soon, *after which the P&L impact will be behind [us]*."

117.    This statement was misleading because Defendants knew they had no reasonable basis to assure analysts and investors that the impacts of the Systems Transition would be resolved over the four weeks remaining until the end of the quarter. Specifically, Defendants knew at the time this statement was made that: (1) Grocery Outlet had launched the Systems Transition without being adequately prepared and immediately faced widespread disruptions across critical business functions; (2) the Company had atypically poor visibility into its normal business reporting and tools that led to difficulty with forecasting and limited data visibility; (3) the disruptions from the Systems Transition were so rampant that they created a material weakness in the Company's internal control over financial reporting and deficiencies in other business controls; (4) over the preceding six months, Defendants had repeatedly significantly underestimated the magnitude of the disruptions stemming from the Systems Transition, how long it would take for Grocery Outlet to resolve those problems, and how long the material financial impacts from those disruptions would persist.

118.     Moreover, when this statement was made Defendants knew that the Company had not yet completed "catch-up invoice processing and final margin reconciliation at the end of the quarter." As the Company's interim CFO later admitted in May 2024 when the Company revealed lingering impacts from the Systems Transition had persisted into the second quarter:

> ... store margins and IO commissions are determined when we take physical inventory counts in the store. ... And this residual cost that we are talking about in the second quarter relates to certain elements of margin and commission, which can only be calculated after a full inventory period has been completed. ... So this is what is reflected in the 100 basis points lower margin that we talked about as residual cost in the second quarter. It also relates to, within our guidance for slightly higher commission in SG&A for the commission that also will be paid in the second quarter.

In other words, Defendants could not know that the "P&L impact" from the Systems Transition would be "behind [us]" when they had not yet completed physical story inventory counts and the final margin reconciliation, upon which the IO commissions and the Company's second quarter margins and SG&A expenses would be based. Accordingly, Defendant Sheedy's statement once again gave investors the false impression that Defendants had a realistic grasp of the extent of the problems from implementing the Systems Transition and a reasonable basis for claiming the impacts would end by the end of the quarter when they made this statement, when in fact they did not.

119.     On this news, the price of Grocery Outlet stock fell $0.32, or 1.2%, to close at $26.15 on February 28, 2024, on higher than usual trading volume.

120.     After the market closed on February 28, 2024, Grocery Outlet filed with the SEC on Form 10-K its Annual Report for the fiscal year ended December 30, 2023 ("2023 10-K").

121.     The 2023 10-K contained the following statements about the Systems Transition, providing additional detail as to how the Systems Transition directly impacted the Company's operations:

> We rely on our distribution, transportation and technology network and systems to provide goods to our distribution centers and stores in a timely and cost-effective manner. Our stores are highly dependent on the successful operations of our distribution, transportation and technology networks, as IOs use these systems to order multiple deliveries per week and many of our products have a limited shelf life

from the time of purchase, particularly opportunistic buys and fresh foods. Deliveries to our stores occur from our distribution centers or directly from our suppliers. We use three primary leased distribution centers that we operate and five primary distribution centers operated by third-parties. Any disruption, unanticipated or unusual expense or operational failure related to these processes and systems could affect store operations negatively. For example, during fiscal 2023 we replaced components of our enterprise resource planning system, including our financial ledger, inventory management platform and product data warehouse system. The implementation of these system upgrades resulted in ordering and inventory disruptions beginning in late August 2023, which resulted in reduced net sales and gross margin.

122.   Moreover, the 2023 10-K also revealed for the first time that implementing the Systems Transition before the Company was prepared had led to disruptions so rampant that they resulted in a material weakness in the Company's internal control over financial reporting:

The Company's management conducted an assessment of the Company's internal control over financial reporting based on the framework established by the Committee of Sponsoring Organizations of the Treadway Commission in Internal Control - Integrated Framework (2013). In connection with this assessment, the Company's management identified deficiencies in the design and operating effectiveness of controls in its internal control over financial reporting related to certain information technology general computer controls ("ITGC's"). ***The replacement of components of our enterprise resource planning system in late August 2023 led to a significant increase in the volume of transactions across user access, program change management, and IT operations for which our existing controls were not designed to address. As a result, certain of the Company's related business controls that are dependent upon the affected ITGC's were also deemed ineffective***. We did not identify any misstatements to the consolidated financial statements as of and for the year ended December 30, 2023 because of these control deficiencies. However, ***the pervasive impact of these control deficiencies to the Company's internal control over financial reporting created a reasonable possibility that a material misstatement to the consolidated financial statements would not be prevented or detected on a timely basis. Therefore, we concluded that the deficiencies represent a material weakness in our internal control over financial reporting and, as such, our internal control over financial reporting was not effective as of December 30, 2023.***

123.   On this news, the price of Grocery Outlet stock fell another $0.36, or 1.4%, to close at $25.79 on February 29, 2024, on higher than usual trading volume.

124.    On May 7, 2024, after the market closed, Defendants issued a press release announcing their financial results for the first quarter of 2024, revealing that challenges from the Systems Transition had had a larger continuing impact on the Company's results during the first quarter than had been disclosed. The press release provided additional detail on the impact of the Systems Transition on sales and expenses during the first quarter:

- Gross margin decreased 180 basis points to 29.3%. As previously disclosed, the Company experienced disruptions as a result of the implementation of new technology platforms in late August 2023. Such disruptions are estimated to have negatively impacted gross margin by 210 basis points in the first quarter.

- Selling, general and administrative expenses increased by 13.3% to $303.4 million, or 29.3% of net sales. This includes $12.4 million of commission support we elected to provide our operators in connection with our system upgrades.

125.    During the corresponding earnings conference call later that same day, Defendants outlined the persistent impacts Grocery Outlet was *still* experiencing from the Systems Transition.

> **[DEFENDANT SHEEDY:]** ***Our low first quarter margins were the result of both expected and unexpected impacts from our systems transition***. We've made good progress since our last call, resolving known issues and have ended the IO commission support program as planned. ***However, our results were incrementally impacted by unforeseen systems transition costs that surfaced at the end of the quarter.*** ...
>
> \*    \*    \*
>
> ***First quarter gross margin of 29.3% was 110 basis points below our expectations and includes approximately 210 basis points of impact from our systems transition issues***. In late August, we upgraded our product, inventory, financial and reporting platforms. This transition has disrupted our business operationally and financially over the past 8 months as we discussed on our last 2 calls.
>
> ***In February, there were 2 large remaining system issues impacting profit. One was related to warehouse product expiry data and the other related to store level reporting. We have since resolved both of these and the negative impact to first quarter gross margin came in as expected at about 100 basis points.*** We've reduced warehouse shrink close to normal levels with better data visibility and accurate store-level reporting enabled us to end the commission support program in March.

126.    Lindsay Gray, the Company's interim CFO following the departure of Defendant Bracher, added the following details about the Company's guidance for the second quarter of 2024, and admitted for the first time that Defendants' ability to accurately forecast the Company's financial prospects had been impacted by, and throughout the implementation of, the Systems Transition:

> ***Forecasting has been difficult during the system transition as we have not had good visibility to our normal business reporting and tools. Compounding this have been data integration issues and new processes that we and our operators are adapting to within new applications.*** Our guidance takes [this] into consideration as we complete final stages of our stabilization work.
>
> *            *            *
>
> We expect gross margin for the second quarter of approximately 30.0%, which includes an estimated 100 basis point impact from the systems transition. This is due to residual expense from our commission support program as we finish store physical inventory counts in the second quarter.

127.    The fact that, as Ms. Gray admitted, "[f]orecasting has been difficult during the system transition as we have not had good visibility to our normal business reporting and tools," but Defendants never disclosed this difficulty or lack of visibility when providing Grocery Outlet's quarterly guidance further supports an inference that Defendants acted with deliberate recklessness when they provided misleading half-truths to investors during the Class Period regarding the ongoing disruptions and financial impacts from the Systems Transition.

128.    In response to a question by a Craig Hallum analyst as to "the cumulative effect over the course now of four quarters," Gray explained that "overall, the impact that the systems transition has had on us is about $65 million."

129.    In response to a follow-up question from a Morgan Stanley analyst "on the gross margin and the systems issues" and why they persisted into the second quarter, Defendant Sheedy further explained that:

> For the first quarter, this additional 110 basis point impact, we identified this on the back end of the quarter. It was quantified during catch-up invoice processing and margin reconciliation. So we had some delayed payment processes due to the new systems. ***But really the main cause was limited data visibility for how we manage and forecast margin. It was a bigger issue in the first quarter than it was***

> *in the fourth quarter because of the amount of time that we've been managing the business with limited data.*

130.     This news surprised the market once again and Grocery Outlet stock fell $5.02 per share, or 19.4%, to close at $20.88 on May 8, 2024, on extremely high volume.

131.     A number of well-known analysts who had been following Grocery Outlet lowered their price targets in response to Grocery Outlet's May 7, 2024 disclosures. For example, Guggenheim Partners, while remaining "neutral" despite cutting estimates, highlighted that "[t]he ERP-related operational/financial disruption, which has dominated the narrative over the past six months, reached a crescendo with the largest 'miss and guide-down' to date driving the shares ~15% lower after-hours." Speaking to Grocery Outlet's overall performance for the quarter and disappointing second quarter guidance, the analyst further noted the following:

> However, adjusted EBITDA missed by $14 million with margin declining a greater-than-we-modeled 270 basis points. Reported gross margin eroded by 182 basis points, *a shortfall of more than 100 basis points which was attributed to a lack of visibility into margin dynamics. GO's unique, treasure hunt-oriented procurement model requires informed buying and pricing decisions and this was lacking, in our view.*
>
> *             *             *
>
> The 2Q guide was even more surprising since we assumed that the transitory costs were behind us. Instead, ... management guided to gross and EBITDA margins of 30.0% and 5.4%, respectively, *150-200 basis points below our estimates*.

132.     Additionally, Telsey Advisory Group, while cutting their price target, summarized the issues surrounding the Systems Transition in detail, stating in pertinent part:

> In August 2023, Grocery Outlet started to upgrade its inventory, financial, and reporting systems, but the implementation has taken longer to execute, creating product and data visibility issues as well as operating challenges. In February 2024, the company finally completed the upgrade of its last two remaining systems —warehouse product expiry data and store level reporting. However, execution challenges, physical inventory counting, and invoicing issues caused pressure on the gross margin. Furthermore, Grocery Outlet provided commission support to its independent operators (IOs) during this disruption, which further elevated expenses. Overall, the system transition issue created profit pressure of ~$65MM over the past year, with half of it being IO commission support[.]

133.     Similarly, Jefferies, while also cutting their price target, highlighted the impact resulting from Systems Transition in the current quarter as follows:

> GM came in at ~29.3%, below cons of ~30.4%, due to the new systems integration headwinds. The co. estimated the systems disruption equated to a ~210bps drag on GM in Q1, or ~110bps higher than mgmt's expectations. Looking ahead, GO expects the disruption to continue through Q2; however, noted that critical reporting and visibility functions have been restored, and anticipate a reversion to a more normalized margin level in 2H.

134.     Deutsche Bank also cut its price target and noted that in light of the repeated disclosures of extended impacts from the Systems Transition, "the market will certainly question management's handle on the business given the lingering system integration challenges. ... patience will be required and we need to see improved execution moving forward."

135.     The careful and consistent attention that these analysts, among others, frequently paid to the impact of the Systems Transition on Grocery Outlet's sales, gross margins, and EBITDA shows that investors were acutely attuned to the impacted metrics and found the impact of the Systems Transition, as the concealed risks materialized, highly material to Grocery Outlet's stock price valuation.

136.     Then, on October 30, 2024, before the market opened, the Company filed with the SEC a Current Report on Form 8-K. This Current Report revealed that: "After discussion with the Board of Directors of the Company (the "Board"), on October 29, 2024, Robert J. Sheedy, Jr. agreed to step down as the Company's President and Chief Executive Officer and resign as a member of the Board, effective immediately."

137.     On this news, the price of Grocery Outlet stock fell $2.71 per share, or 16.3%, to close at $13.90 per share on October 30, 2024, on higher than usual trading volume. This stock price drop was also a result of Defendants' continued misleading statements and omissions concerning the effects of the Systems Transition during the Class Period.

138.     Ultimately, Sheedy was forced out because of the operational and financial challenges that the Systems Transition created during the first four quarters after it was implemented. Sheedy was held responsible because he was intimately aware that the Company was woefully unprepared to

launch the Systems Transition in August 2023, and that there was a material and undisclosed likelihood that prematurely implementing the Systems Transition would (and did) significantly disrupt Grocery Outlet's business, operations, ability to make financial projections, and ultimately its bottom line and margins.

139.    On November 5, 2024, the Company held an earnings conference call for the third quarter of 2024. During that call, Eric Lindberg, Grocery Outlet's interim CEO and Chairman of the Company's board of directors confirmed that the board had asked Defendant Sheedy to resign due to the problems the Company had encountered over the prior year with the Systems Transition. In response to an analyst asking for "more color on RJ [Sheedy]'s departure," Lindberg explained that:

> So let me start first with the CEO transition. You all know, this last year has been really difficult it's been an operational challenge year from the systems transition. We have not executed like we want like our expectations and like our history. And that's been super challenging. I'd say because of the relationship that we've all enjoyed, working with RJ [Sheedy] for many, many years, we were patient. We felt like that was the right thing to do to be patient. And but I can tell you the same way that you all might be feeling about our performance we were feeling that internally as well. So, we finally got to a point after the last Board Meeting where, we sat down. We had a frank conversation and we had an agreement to move forward.

## CLASS ACTION ALLEGATIONS

140.    Plaintiff brings this action as a class action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rule of Civil Procedure on behalf of himself and the Class.

141.    The members of the Class are so numerous that joinder of all members is impracticable. Millions of shares of the Company's common stock were traded publicly during the Class Period on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

142.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

143.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

144.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether Defendants violated the federal securities laws as alleged herein;

(b) whether, during the Class Period, Defendants made false or misleading statements of material fact to the investing public, or omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(c) whether the Defendants caused the Company to issue false and misleading SEC filings and public statements during the Class Period;

(d) whether Defendants acted negligently, knowingly, or recklessly in issuing, or causing the Company to issue, false and misleading SEC filings and public statements during the Class Period;

(e) whether the price of the Company's common stock during the Class Period was artificially inflated because of Defendants' conduct complained of herein; and

(f) whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

145.    Plaintiff will rely in part upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things: (a) during the Class Period, Defendants made public statements of material fact that were false, misleading, or were rendered misleading because of Defendants' failure to disclose material facts necessary to prevent such statement from being misleading; (b) as a result of the false and misleading statements and omissions of material fact, the

Company's common stock traded at artificially inflated prices during the Class Period; (c) Plaintiff and other members of the Class purchased or otherwise acquired the Company's common stock relying on the integrity of the market price of the Company's common stock and market information relating to the Company, and have been damaged thereby.

146. During the Class Period, the artificial inflation of the Company's common stock was caused by Defendants' material misrepresentations and omissions as described above, causing the damages sustained by Plaintiff and the other members of the Class. Defendants' material misrepresentations and omissions created an unrealistically positive assessment of the Company and its business, operations, and prospects, causing the price of the Company's common stock to be artificially inflated at all relevant times, including when Plaintiff and other members of the Class purchased the stock. When the truth hidden by these misrepresentations and omissions was disclosed, that disclosure negatively affected the value of the Company's common stock, dissipating the artificial inflation and damaging Plaintiff and other members of the Class.

147. The market for the Company's common stock was an efficient market at all times during the Class Period for the following reasons, among others:

(a) Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b) As a regulated issuer, the Company filed periodic public reports with the SEC;

(c) The Company regularly communicated with public investors by means of established market communication mechanisms, including through regular dissemination of Current Reports in their SEC filings;

(d) The Company's shares were liquid and traded with moderate to heavy volume during the Class Period. On average, approximately 6.9 million shares of the Company's common stock, or roughly 7.0% of the Company's total shares outstanding, were traded weekly during the Class Period, permitting a very strong presumption that its shares traded on an efficient market;

Amended Complaint

(e) During the Class Period, the Company's common stock met the requirements for listing, and were listed and traded on the NASDAQ, a highly efficient and automated market;

(f) The Company was covered by multiple securities analysts employed by brokerage firms who wrote reports about the Company, which were distributed to customers, made publicly available, and entered the public marketplace;

(g) The misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

(h) Unexpected material news about the Company was rapidly reflected in and incorporated into the Company's securities prices during the Class Period.

148.    Based on the foregoing, the market for the Company's common stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in the prices of the Company's common stock shares. Under these circumstances, all purchasers of the Company's common stock during the Class Period suffered similar injury through their purchase of the Company's common stock at artificially inflated prices, and thus are entitled to a presumption of reliance.

149.    Alternatively, Plaintiff and the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are in large part grounded on Defendants' omissions of material facts in their Class Period statements in violation of Defendants' duty to disclose such facts. Thus, positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld were material in that a reasonable investor might have considered them important in making investment decisions. Here, the misleadingly omitted facts were material, so the presumption applies.

150.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

151.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudication with respect to individual members of the Class that would establish incompatible standards of conduct for the party opposing the Class.

### COUNT I
**Violation of Section 10(b) of the Exchange Act and Rule 10b-5**
**Against All Defendants**

152.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

153.    This Count is asserted against the Company and the Individual Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

154.    During the Class Period, the Company and the Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or recklessly disregarded were false and/or misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

155.    The Company and the Individual Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they: employed devices, schemes and artifices to defraud; made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of the Company's common stock during the Class Period.

156.    The Company and the Individual Defendants acted with scienter in that they knew or recklessly disregarded that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew or recklessly disregarded that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants, by virtue of their receipt of information reflecting the true facts about the Company, their control over, and/or receipt and/or

- 43 -

1  modification of the Company's allegedly materially misleading statements, and/or their associations

2  with the Company which made them privy to confidential proprietary information concerning the

3  Company, participated in the fraudulent scheme alleged herein.

4       157.    The Individual Defendants, the senior officers and/or directors of the Company, had

5  actual knowledge of the material omissions and/or the falsity of the material statements set forth

6  above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative,

7  acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in

8  the statements made by them or other personnel of the Company to members of the investing public,

9  including Plaintiff and the Class.

10       158.    As a result of the foregoing, the market prices of the Company's common stock were

11  artificially inflated during the Class Period. In ignorance of the falsity of the Company's and the

12  Individual Defendants' statements, Plaintiff and the other members of the Class relied on the

13  statements described above and/or the integrity of the market price of the Company's common stock

14  during the Class Period in purchasing the Company's common stock at prices that were artificially

15  inflated as a result of the Company's and the Individual Defendants' false and/or misleading

16  statements.

17       159.    Had Plaintiff and the other members of the Class been aware that the market price of

18  the Company's common stock had been artificially inflated by the Company's and the Individual

19  Defendants' false and/or misleading statements, they would not have purchased the Company's

20  common stock at the artificially inflated prices that they did, or at all.

21       160.    As a result of the wrongful conduct alleged herein, Plaintiff and other members of the

22  Class have suffered damages in an amount to be established at trial.

23       161.    By reason of the foregoing, the Company and the Individual Defendants have violated

24  Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiff

25  and the other members of the Class for substantial damages which they suffered in connection with

26  their purchases of the Company's common stock during the Class Period.

27

28

## COUNT II
### Violations of Section 20(a) of The Exchange Act
### Against The Individual Defendants

162.   Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

163.   During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Due in part to their senior positions, as well as the facts alleged above, they knew the adverse non-public information regarding the Company's business practices.

164.   As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

165.   Due in part to their positions of control and authority as senior officers, as well as the facts alleged above, the Individual Defendants had the power, which they exercised, to direct the actions of the Company as alleged herein and control the contents of the various public statements which the Company disseminated in the marketplace during the Class Period. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of the Company's common stock.

166.   Each of the Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

167.   By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of himself and the Class, prays for relief and judgment as follows:

A.     Determining that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, designating Plaintiff as class representative and Plaintiff's counsel and class counsel;

B.     Awarding damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding Plaintiff and the Class prejudgment and post-judgment interest and their reasonable costs and expenses incurred in prosecuting this action, including reasonable attorneys' fees and expert fees; and

D.     Awarding such other and further relief as this Court may deem just and proper.

**JURY TRIAL DEMAND**

Plaintiff hereby demands a trial by jury.

Date:  August 19, 2025                    **THE ROSEN LAW FIRM, P.A.**

By: */s/Joshua Baker*
Laurence M. Rosen, Esq. (SBN 219683)
355 S. Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

Jonathan Stern (*pro hac vice*)
Josh Baker (*pro hac vice*)
275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
Email: jstern@rosenlegal.com
Email: jbaker@rosenlegal.com

*Lead Counsel for Lead Plaintiff and the Class*

- 46 -

Amended Complaint

**THE SCHALL LAW FIRM**
Brian Schall
2049 Century Park East, Suite 2460
Los Angeles, CA 90067
Telephone: (310) 301-3335
brian@schallfirm.com

*Additional Counsel for Lead Plaintiff*

Amended Complaint