GIBSON, DUNN & CRUTCHER LLP
CRAIG VARNEN, SBN 172603
    cvarnen@gibsondunn.com
333 South Grand Avenue
Los Angeles, California  90071-3197
Telephone:    213.229.7000
Facsimile:    213.229.7520

JEFF LOMBARD, SBN 285371
    jlombard@gibsondunn.com
310 University Avenue
Palo Alto, California  94301-1744
Telephone:    650.849.5300
Facsimile:    650.849.5333

*Attorneys for Defendants*
*Grocery Outlet Holding Corp., Robert Joseph*
*Sheedy, and Charles C. Bracher*

# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

| | |
|---|---|
| IN RE GROCERY OUTLET HOLDING CORP. SECURITIES LITIGATION | CASE NO. 4:25-cv-957-JST<br><br>CLASS ACTION<br><br>Hon. Jon S. Tigar<br>Courtroom 6<br><br>**DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS AMENDED COMPLAINT**<br><br>Date:      March 19, 2026<br>Time:      2:00 p.m.<br><br>Action Filed:  January 30, 2025 |

**TO PLAINTIFF AND HIS ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE that on March 19, 2026 at 2:00 p.m., or as soon thereafter as the matter may be heard, in the United States District Court for the Northern District of California, located at 1301 Clay Street, Oakland Courthouse, Courtroom 6, Oakland, CA 94612, Defendants Grocery Outlet Holding Corp. ("Grocery Outlet" or the "Company"), Robert Joseph Sheedy, and Charles C. Bracher will and hereby do move for an order dismissing the Amended Consolidated Complaint for Violations of the Federal Securities Laws (the "Amended Complaint") pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(6) (the "Motion").

Defendants move to dismiss the Amended Complaint pursuant to Rule 12(b)(6) for failure to state a claim under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"). This Motion is based on this Notice, the supporting Memorandum of Points and Authorities, the accompanying Declaration of Jeff Lombard, and the exhibits attached thereto, Defendants' Request for Judicial Notice, all records in this action, and any additional materials and arguments as may be considered in connection with the hearing on the Motion.

DATED: October 21, 2025

Respectfully submitted,

GIBSON, DUNN & CRUTCHER LLP

By: */s/ Craig Varnen*
    Craig Varnen

*Attorneys for Defendants Grocery Outlet Holding Corp., Robert Joseph Sheedy, and Charles C. Bracher*

# TABLE OF CONTENTS

Page

I.    STATEMENT OF ISSUES TO BE DECIDED ........................................................1

II.   INTRODUCTION ................................................................................................1

III.  FACTUAL BACKGROUND ...............................................................................2

    A.    Grocery Outlet Overhauls Its Dated ERP Infrastructure.................................2

    B.    Grocery Outlet Warned Investors of Implementation Risks and Disclosed Setbacks in Real Time.................................................................................3

IV.   LEGAL STANDARD ..........................................................................................4

V.    ARGUMENT .......................................................................................................5

    A.    Plaintiff's Rule 10b-5(b) and Exchange Act Claims Must Be Dismissed for Failure to Plead a Materially False or Misleading Statement .........................5

       1.    Defendants' statements were not false or misleading. ........................5

       2.    The challenged statements are not actionable as a matter of law. ......8

    B.    Plaintiff's Section 10(b) Claim Must Be Dismissed for Failure to Plead Scienter ..................................................................................................10

       1.    Plaintiff's confidential witnesses do not establish scienter. ............11

       2.    The circumstantial allegations of purported knowledge do not support an inference of scienter. ...............................................13

       3.    The most plausible inference is that Defendants acted in good faith. ....15

    C.    Plaintiff's Section 10(b) Claims Must Be Dismissed for Failure to Plead Loss Causation ..................................................................................................16

VI.   CONCLUSION ...................................................................................................17

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*In re Accuray, Inc. Sec. Litig.*,
  757 F. Supp. 2d 936 (N.D. Cal. 2010) ........................................................13

*In re Autodesk, Inc. Sec. Litig.*,
  132 F. Supp. 2d 833 (N.D. Cal. 2000) ..........................................................5

*In re Bare Escentuals, Inc. Sec. Litig.*,
  745 F. Supp. 2d 1052 (N.D. Cal. 2010) ........................................................9

*Bhangal v. Hawaiian Elec. Indus., Inc.*,
  2024 WL 4505465 (N.D. Cal. Oct. 15, 2024) ............................................16

*In re BofI Holding, Inc. Sec. Litig.*,
  977 F.3d 781 (9th Cir. 2020)...............................................................5, 17

*Brody v. Transitional Hosps. Corp.*,
  280 F.3d 997 (9th Cir. 2002)..............................................................5, 8

*Browning v. Amyris, Inc.*,
  2014 WL 1285175 (N.D. Cal. Mar. 24, 2014) ...........................................11

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
  856 F.3d 605 (9th Cir. 2017)................................................................10

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
  752 F.3d 173 (2d Cir. 2014)...................................................................8

*City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*,
  880 F. Supp. 2d 1045 (N.D. Cal. 2012) ......................................................15

*In re Cloudera, Inc.*,
  121 F.4th 1180 (9th Cir. 2024) ............................................................5, 6

*In re Cornerstone Propane Partners, L.P.*,
  355 F. Supp. 2d 1069 (N.D. Cal. 2005) ......................................................15

*In re Cutera Sec. Litig.*,
  610 F.3d 1103 (9th Cir. 2010)................................................................9

*In re Daou Sys., Inc.*,
  411 F.3d 1006 (9th Cir. 2005)................................................................1

*Davoli v. Costco Wholesale Corp.*,
  854 F. App'x 116 (9th Cir. 2021) .............................................................6

*In re Downey Sec. Litig.*,
  2009 WL 2767670 (C.D. Cal. Aug. 21, 2009)...............................................9

*Dura Pharms., Inc. v. Broudo*,
  544 U.S. 336 (2005)............................................................................17

ii

*In re Facebook, Inc. Sec. Litig.*,
   405 F. Supp. 3d 809 (N.D. Cal. 2019), *rev'd on other grounds*, 87 F.4th 934 (9th
   Cir. 2023) ................................................................................................................8

*Lloyd v. CVB Fin. Corp.*,
   811 F.3d 1200 (9th Cir. 2016) ...............................................................................16

*Loos v. Immersion Corp.*,
   762 F.3d 880 (9th Cir. 2014)...........................................................................5, 17

*Macomb Cnty. Emps. Ret. Sys. v. Align Tech., Inc.*,
   39 F.4th 1092 (9th Cir. 2022) ................................................................................10

*Mallen v. Alphatec Holdings, Inc.*,
   861 F. Supp. 2d 1111 (S.D. Cal. 2012) ..................................................................15

*Mazzaferro v. Aruba Networks Inc.*,
   2014 WL 12680773 (N.D. Cal. Aug. 1, 2014)..........................................................7

*McGovney v. Aerohive Networks, Inc.*,
   367 F. Supp. 3d 1038 (N.D. Cal. 2019) ..................................................................12

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.*,
   540 F.3d 1049 (9th Cir. 2008) ...............................................................................14

*In re Nektar Therapeutics*,
   2020 WL 3962004 (N.D. Cal. July 13, 2020)...........................................................8

*In re Nektar Therapeutics Sec. Litig.*,
   34 F.4th 828 (9th Cir. 2022) ..................................................................................13

*Nguyen v. Endologix, Inc.*,
   962 F.3d 405 (9th Cir. 2020).................................................................4, 7, 11, 13

*Nuveen Mun. High Income Opportunity Fund v. City of Alameda, Cal.*,
   730 F.3d 1111 (9th Cir. 2013) ...............................................................................17

*In re NVIDIA Corp. Sec. Litig.*,
   768 F.3d 1046 (9th Cir. 2014).........................................................................14, 17

*In re NVIDIA Corp. Sec. Litig.*,
   2011 WL 4831192 (N.D. Cal. Oct. 12, 2011), *aff'd*, 768 F.3d 1046 (9th Cir. 2014) ...................13

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
   575 U.S. 175 (2015)................................................................................................10

*City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*,
   2019 WL 6877195 (N.D. Cal. Dec. 17, 2019) ........................................................12

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
   759 F.3d 1051 (9th Cir. 2014).............................................................4, 8, 10, 12, 14

*Prodanova v. H.C. Wainwright & Co., LLC*,
   993 F.3d 1097 (9th Cir. 2021)........................................................................11, 15

iii

*In re Rackable Sys., Inc. Sec. Litig.*,
   2010 WL 3447857 (N.D. Cal. Aug. 27, 2010) ........................................................................13

*In re Rigel Pharms., Inc. Sec. Litig.*,
   697 F.3d 869 (9th Cir. 2012) ...............................................................................................4

*In re Robinhood Order Flow Litig.*,
   2022 WL 9765563 (N.D. Cal. Oct. 13, 2022) ......................................................................8

*Ronconi v. Larkin*,
   253 F.3d 423 (9th Cir. 2001), *rev'd on other grounds*, *Glazer Cap. Mgmt., L.P. v.
   Forescout Techs., Inc.*, 63 F.4th 747 (9th Cir. 2023) ....................................................12, 13

*S. Ferry LP, No. 2 v. Killinger*,
   542 F.3d 776 (9th Cir. 2008) ..............................................................................................14

*Scheller v. Nutanix, Inc.*,
   450 F. Supp. 3d 1024 (N.D. Cal. 2020) ..............................................................................11

*In re Splash Tech. Holdings, Inc. Sec. Litig.*,
   160 F. Supp. 2d 1059 (N.D. Cal. 2001) ..............................................................................10

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
   551 U.S. 308 (2007) ...........................................................................................................15

*In re Tibco Software, Inc.*,
   2006 WL 1469654 (N.D. Cal. May 25, 2006) .....................................................................16

*In re Twitter, Inc. Sec. Litig.*,
   506 F. Supp. 3d 867(N.D. Cal. 2020), *aff'd sub nom. Weston Fam. P'ship LLLP v.
   Twitter, Inc.*, 29 F.4th 611 (9th Cir. 2022) ......................................................................9, 10

*In re VeriFone Sec. Litig.*,
   11 F.3d 865 (9th Cir. 1993) ..................................................................................................9

*Vess v. Ciba-Geigy Corp. USA*,
   317 F.3d 1097 (9th Cir. 2003) ..............................................................................................4

*Wozniak v. Align Tech., Inc.*,
   850 F. Supp. 2d 1029 (N.D. Cal. 2012) ........................................................................10, 12

*Yaron v. Intersect ENT, Inc.*,
   2020 WL 6750568 (N.D. Cal June 19, 2020) .....................................................................16

*Zucco Partners, LLC v. Digimarc Corp.*,
   552 F.3d 981 (9th Cir. 2009).........................................................................11, 12, 14, 16, 17

**Statutes**

15 U.S.C. § 78u-4(b)(1)–(2).....................................................................................................4

15 U.S.C. § 78u-4(b)(1)(B) ......................................................................................................5

15 U.S.C. § 78u-4(b)(2)(A)..................................................................................................5, 11

iv

**Regulations**

17 C.F.R. § 240.10b-5(a) ................................................................................................................8

17 C.F.R. § 240.10b-5(c) ................................................................................................................8

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    STATEMENT OF ISSUES TO BE DECIDED

1.    Whether Plaintiff's claim under Section 10(b) of the Exchange Act should be dismissed for failure to plead adequately falsity, scienter, and loss causation.

2.    Whether Plaintiff's claim under Sections 20(a) of the Exchange Act should be dismissed for failure to plead a primary violation of the Exchange Act.

### II.    INTRODUCTION

Plaintiff's Amended Complaint attempts to shoehorn ordinary business challenges regarding a major corporate initiative into securities fraud.  Plaintiff's theory is that Defendants knew Grocery Outlet was unprepared to launch its new back-end information technology systems in August 2023 but nonetheless pushed forward and later experienced disruptions that hurt the Company's performance. What Plaintiff alleges is not fraud at all, but hindsight disagreement with how Defendants executed a complex IT systems transition.  The federal securities laws, however, do not punish imperfect execution or forecasts, or even executive optimism.  In fact, far from concealing information, Grocery Outlet consistently disclosed the very issues Plaintiff claims were hidden, providing quarterly updates that disclosed then-known execution issues and quantifying the associated financial impact on the Company's results and future outlook.  A company, like Grocery Outlet, that candidly acknowledges problems, reports their impact on the company's bottom-line, and continues to guide investors based on its best, known expectations for the future is the exact opposite of one attempting to commit "fraud." Lacking any allegation of insider trading, personal motive, or even a theory that comports with common sense, Plaintiff's claim epitomizes the very "fraud by hindsight" that Congress sought to foreclose through the Private Securities Litigation Reform Act ("PSLRA").  *In re Daou Sys., Inc.*, 411 F.3d 1006, 1021 (9th Cir. 2005).  The Court should dismiss the Amended Complaint because Plaintiff fails to plead with particularity three required elements of his Section 10(b) claim:  falsity, scienter, and loss causation.  And for this reason, his Section 20(a) claim also fails.

**Falsity.**  Plaintiff identifies no contemporaneous facts that contradict Defendants' statements when made.  Instead, he cherry-picks later developments and attempts to repackage them as "proof" earlier statements must have been false.  Plaintiff cannot retroactively transform acknowledged risks

and later business setbacks into actionable misstatements. Moreover, many of the challenged statements are independently inactionable as forward-looking statements, opinions, or corporate optimism.

**Scienter.** Plaintiff pleads no facts showing that either Individual Defendant knew their statements were false. Instead, Plaintiff relies on vague anecdotes from disgruntled former employees who neither interacted with the Individual Defendants about the systems upgrade nor contend that contradictory information about it was ever provided to them. Because Plaintiff fails to allege any motive to commit fraud, his scienter theory boils down to the unremarkable assertion that senior executives were aware of execution challenges they disclosed to the market. This cannot state a claim under the PSLRA.

**Loss Causation.** Plaintiff identifies no corrective disclosure revealing the prior falsity of any challenged statement. Instead, the alleged stock drops followed the materialization of *disclosed* risks and disappointing results. The Supreme Court has made clear that these kinds of disclosures do not reveal any previously undisclosed "truth," and thus cannot support loss causation.

For these reasons, as set forth below, the Amended Complaint should be dismissed in its entirety.

### III.    FACTUAL BACKGROUND

Grocery Outlet is a discount retailer with more than 500 locations across the United States, with most of its locations operated by independent, third-party operators.[1] *See* ¶ 28. Robert Joseph Sheedy was the Company's CEO from January 2023 to October 29, 2024, and Charles Bracher was the Company's CFO from August 2012 until March 1, 2024. ¶¶ 21, 22.

**A.    Grocery Outlet Overhauls Its Dated ERP Infrastructure**

In 2021, Grocery Outlet began a multi-year project to replace its outdated legacy AS400 internal enterprise resource planning ("ERP") and information technology systems with new ERP software from SAP. ¶ 2. The upgrade was meant to streamline operations across all facets of the Company, including product, inventory, financial and reporting platforms. *Id.* The Company conducted extensive

---

[1] Citations to "¶__" or "¶¶__" refer to paragraphs of the Amended Complaint. Citations to "Ex.__" are to the Declaration of Jeff Lombard filed concurrently herewith. Unless stated otherwise, all emphasis is added and all internal citations and quotations are omitted.

development and testing throughout 2021 and 2022, with the goal of rolling out the new software in March 2023. ¶¶ 3, 46. However, in March 2023, the Company determined that the launch date would be premature and pushed the software's official implementation to August 2023. ¶¶ 6, 46–50. On August 8, 2023, the day before the class period began, the Company disclosed on its Q2 2023 earnings call that it "look[ed] forward to delivering this new application to operators this quarter." ¶ 72. A few weeks later, in late August 2023, SAP went live. ¶ 5.

### B. Grocery Outlet Warned Investors of Implementation Risks and Disclosed Setbacks in Real Time

The SAP launch did not progress as smoothly as Grocery Outlet had hoped. During Q3 2023, it became clear that the systems transition had caused inventory and ordering management issues, hurting Grocery Outlet's Q3 results. ¶ 86. The Company disclosed these challenges in its November 2023 earnings call, stating that it had "experienced operational disruptions as [it] transition[ed] to upgraded systems." *Id.* The Company also disclosed the impact of these "operational disruptions" on its Q3 2023 results, telling investors that the "system upgrades impacted comparable store sales by an estimated 150 basis points," and "impacted gross margin by approximately 50 basis points." ¶ 87. Grocery Outlet also told investors that it expected "the system implementation disruptions to continue to impact sales and gross margin" into Q4 2023 and possibly beyond. Ex. 4 at 20. Bracher stated that the Company "expect[ed] and believe[d] that [the impact] will be largely behind [it] by the end of the year." ¶ 91. Following these disclosures, "the price of Grocery Outlet stock fell $1.31, or 4.6%, to close at $27.15." ¶ 102.

On February 27, 2024, the Company disclosed its Q4 2023 financial results. ¶ 106. Grocery Outlet explained to investors that "[a]s previously disclosed, the Company experienced disruptions as a result of the implementation of new technological platforms in late August 2023." ¶ 108. The Company also revealed that, despite its best efforts, "data integration efforts [were] taking longer than expected and [were] still impacting [Grocery Outlet's] business results." ¶ 111. As he did on the Q3 earnings call in November 2023, Bracher disclosed the impact of the disruptions on the Company's financial performance, noting that "the system transition impacted comp sales by approximately 200 basis points for the quarter" and "the margin impact of our system integration . . . was approximately

3

130 basis points in the quarter." ¶ 110.  Bracher also disclosed that, as a result of the systems transition, Grocery Outlet will "continue to experience P&L impacts during the first quarter" of 2024, while expressing optimism that its issues would "be resolved soon, after which the P&L impact will be behind [it]." ¶ 116; Ex. 7 at 7.  Following these disclosures, "the price of Grocery Outlet stock fell $0.32, or 1.2%, to close at $26.15." ¶ 119.

As the Company had forecasted during its Q4 2023 earnings call, the impact of the systems transition difficulties persisted into the first quarter of 2024.  ¶ 124.  On the Q1 2024 earnings call on May 7, 2024, Sheedy updated investors that the Company's revenues had fallen "110 basis points below [its] expectations" due to "approximately 210 basis points of impact from [its] systems transition issues." ¶ 125.  Sheedy disclosed that the financial impact was the result of both "expected" impacts, which had been forecasted when the Company announced its Q4 and fiscal year 2023 earnings in February 2024, and "unexpected impacts," which had not been forecasted.  *Id.*  The *expected* impacts were the result of issues with warehouse and store inventory reporting, which caused 100 basis points of impact.  *Id*.  The *unexpected* impacts were due to unforeseen accounting issues which were only "quantified during catch up invoice processing and final margin reconciliation *at the end of the [first] quarter*." Ex. 9 at 4; ¶ 126.  Following these disclosures, "Grocery Outlet stock fell $5.02 per share, or 19.4%, to close at $20.88." ¶ 130.  Predictably, this lawsuit soon followed.

## IV.    LEGAL STANDARD

Securities fraud claims under Rule 10b-5(b) must meet the "demanding pleading requirements" of Rule 9(b) and the PSLRA.  *In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 876 (9th Cir. 2012); 15 U.S.C. § 78u-4(b)(1)–(2).  These requirements have "teeth" and "present no small hurdle for the securities fraud plaintiff."  *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 414 (9th Cir. 2020).  Rule 9(b) requires a plaintiff to "state with particularity the circumstances constituting fraud or mistake" by pleading the "who, what, when, where, and how" of the alleged fraud.  *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003).   The PSLRA imposes even "more exacting pleading requirements," *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1057–58 (9th Cir. 2014), and requires the plaintiff to (i) "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading," and (ii) "state with particularity facts giving

rise to a strong inference that the defendant acted with the required state of mind" for each act or omission.  15 U.S.C. § 78u-4(b)(1)(B), 78u-4(b)(2)(A); *see also In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 791 (9th Cir. 2020).

To state a Section 10(b) claim under these strict standards, the Amended Complaint must allege facts sufficient to show (1) a material misrepresentation or omission (*i.e.*, falsity); (2) made with scienter; (3) in connection with the purchase or sale of a security; (4) on which Plaintiff relied; (5) economic loss; and (6) loss causation.  *Loos v. Immersion Corp.*, 762 F.3d 880, 887–88 (9th Cir. 2014).  Because Plaintiff's allegations fall far short of satisfying Rule 9(b) and the PSLRA, the Court must dismiss the Amended Complaint.

## V.     ARGUMENT

### A.     Plaintiff's Rule 10b-5(b) and Exchange Act Claims Must Be Dismissed for Failure to Plead a Materially False or Misleading Statement

Plaintiff has failed to allege adequately a single false or misleading statement.[2]  A statement is false or misleading only if it (1) directly contradicts what the defendant knew at the time *or* (2) omits material information necessary to make the statement not misleading.  *In re Cloudera, Inc.*, 121 F.4th 1180, 1186 (9th Cir. 2024).  Statements are misleading by omission only if they "affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists." *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002).  Here, Plaintiff fails to plead any statement that was false or misleading, and many of the challenged statements are also inactionable as forward-looking statements, opinions, or puffery.

#### 1.     Defendants' statements were not false or misleading.

The Amended Complaint challenges eleven different statements about Grocery Outlet's ERP systems upgrade (set forth in full in Appendix A), claiming they were false because Defendants allegedly knew and failed to disclose:  (1) the Company launched the systems transition without

---

[2] Although Plaintiff claims certain documents contained the statements he presumably believes were false or misleading, he fails to identify the specific statements that are false or misleading therein.  *See* ¶¶ 74, 82.  This is impermissible puzzle pleading.  *See In re Autodesk, Inc. Sec. Litig.*, 132 F. Supp. 2d 833, 842 (N.D. Cal. 2000) (dismissing complaint where "plaintiffs have left it up to defendants and the court to try to figure out exactly what the misleading statements are").

adequate preparation and was already experiencing disruptions across core functions, ¶¶ 3–7, 47–49, 58–61, 86–90; (2) the Company lacked normal visibility into reporting and forecasting tools, ¶¶ 59, 111–12, 126, 129; (3) the disruptions created a material weakness in internal controls, ¶¶ 80, 122; and (4) Defendants had underestimated the magnitude of the problems, which remained unsolved when they offered assurances, ¶¶ 90, 92–94, 117–18.  But all of the challenged statements were true, and there were no material omissions.  Plaintiff does not identify any contemporaneous facts contradicting what Defendants told investors.  Instead, he strings together later developments and projects them backwards, faulting management for failing to predict that integration challenges would persist longer than originally anticipated.  That is impermissible fraud-by-hindsight.[3]

Far from concealing information, Grocery Outlet repeatedly disclosed the very challenges Plaintiff claims were hidden.  Each quarter, management identified transition-related disruptions, quantified their impact on quarterly results, and updated guidance.  *See supra* at 3–4; ¶¶ 86–94, 110–17, 124–30.  For instance, on the November 2023 earnings call, Defendants disclosed "ordering and inventory disruptions" that reduced comparable store sales by 150 basis points and gross margin by 50 basis points.  ¶¶ 86, 87.  On the February 2024 earnings call, Defendants reported an additional 200-basis-point sales impact and 130-basis-point margin impact and cautioned that "data integration efforts are taking longer than expected and are still impacting our business results."  ¶ 111; *see also* ¶ 108.  And in May 2024, the Company announced a further 210-basis-point margin impact and over $12 million in incremental commission support, while candidly acknowledging that "[f]orecasting has been difficult during the system transition as we have not had good visibility to our normal business reporting and tools."  ¶¶ 125–26.  Analysts confirmed they understood these disclosures.  ¶¶ 131–32.  This is corporate transparency, not concealment:  "later, sobering revelations do not by themselves make the earlier, cheerier statement a falsehood."  *Cloudera*, 121 F.4th at 1189.

---

[3] Plaintiff's attempt to challenge the Q3 2023 Form 10-Q's internal controls disclosure, ¶¶ 79–82, fails for similar reasons.  The disclosure simply reflected management's then-current assessment.  The fact that a *later*, year-end review (*i.e.*, conducted after the close of the *next* quarter) identified a material weakness in internal controls does not retroactively make the *earlier* disclosure false.  *Davoli v. Costco Wholesale Corp.*, 854 F. App'x 116, 118 (9th Cir. 2021) ("[T]he inferences raised by the complaint's allegations are not as compelling as the opposing innocent inference that Costco did not know that its internal control was ineffective until the more rigorous internal review performed in advance of the October 2018 Form 10-K.").

Plaintiff leans heavily on three former employees ("FE"), but these allegations are insufficient under the PSLRA. For example, FE1 claims that end-to-end user acceptance testing ("UAT") had not been completed before the August 2023 launch, ¶¶ 50–55, and Plaintiff speculates this means the Company "would have" avoided later problems had testing been finished. ¶ 61. But Defendants never represented that UAT had been completed, much less that testing was problem-free, so FE1's allegations don't contradict any challenged statement. ¶¶ 50–55. FE2 opines that "most of us thought it was premature" to launch and purportedly recalls lingering data issues. ¶¶ 49, 56–57. And FE3 claims the transition "broke all the functionality of everything." ¶ 60. These vague and subjective views from low-level employees—none of whom worked in IT or had any role in implementing the systems transition (*see infra* at 11–13)—are "short on the facts" and, again, do not contradict Defendants' contemporaneous public statements warning of operational disruptions and their associated financial impact. *Nguyen*, 962 F.3d at 416.

Moreover, Plaintiff has a timing problem—before the new ERP system launched, there were no materialized issues yet, only *risks* that the Company accurately disclosed. This defect is most evident in connection with the challenged statements made on August 8, 2023. *See* ¶¶ 68, 72, 74; App'x Statement Nos. 2, 3, 4. For instance, the August 8, 2023 Form 10-Q accurately stated there were "no material changes" to the March 2023 Form 10-K's risk disclosure warning that the systems upgrade could result in "implementation, operational and functionality issues, delays, higher than expected costs and other issues." ¶¶ 66, 68. By Plaintiff's own account, though, that statement was indisputably true—no such risks had yet materialized because the SAP system had not even launched on August 8, 2023. The transition began weeks *later*, in late August 2023. ¶ 6. Defendants could not have concealed problems that did not yet exist. At most, the FE allegations confirm that problems arose during rollout—problems the Company disclosed as they occurred—not that earlier statements were false when made. *See Mazzaferro v. Aruba Networks Inc.*, 2014 WL 12680773, at *1 (N.D. Cal. Aug. 1, 2014) (confidential witness statements "would not, if true, demonstrate that Aruba's statements were false or misleading").

Ultimately, Plaintiff's theory boils down to the claim that Defendants should have disclosed more detail or sounded more pessimistic when describing the progress and challenges associated with

the systems upgrade. But the securities laws "prohibit only misleading and untrue statements, not statements that are incomplete." *Brody*, 280 F.3d at 1006; *Intuitive Surgical*, 759 F.3d at 1061 ("We have expressly declined to require a rule of completeness for securities disclosures because no matter how detailed and accurate disclosure statements are, there are likely to be additional details that could have been disclosed but were not." (cleaned up)). Nor are public companies required to "confess" every internal doubt or adopt a gloomy or defeatist tone about unfounded risks. *See, e.g.*, *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 184 (2d Cir. 2014) ("Disclosure is not a rite of confession, and companies do not have a duty to disclose uncharged, unadjudicated wrongdoing." (cleaned up)); *In re Facebook, Inc. Sec. Litig.*, 405 F. Supp. 3d 809, 836 (N.D. Cal. 2019) ("[C]ompanies are not required to engage in 'self-flagellation' by disclosing unproven allegations."), *rev'd on other grounds*, 87 F.4th 934 (9th Cir. 2023). As the Amended Complaint and the documents incorporated by reference make clear, Defendants repeatedly acknowledged systems-related disruptions, accurately quantified their impact on quarterly results, and explained mitigation measures and their expected impact on the Company's future results. Plaintiff pleads no *facts* suggesting any of these statements were false or misleading *when made*.[4] For that reason, Plaintiff fails to plead falsity and the Amended Complaint should be dismissed.

### 2. The challenged statements are not actionable as a matter of law.

The challenged statements are also inactionable for several other reasons.

***Forward-Looking Statements.*** Most of the challenged statements are protected as forward-looking. *See* App'x Statements Nos. 1, 3, 4, 7–11. Forward-looking statements are immune from liability under the PSLRA so long as they are either "accompanied by 'meaningful cautionary

---

[4] Plaintiff also gestures at a "scheme liability" claim under Rule 10b-5(a) and (c), ¶¶ 155–56, but that claim fails because the Amended Complaint does not allege any independent deceptive conduct apart from the purported misstatements and omissions addressed above. It is well-settled that plaintiffs cannot repackage a deficient misrepresentation claim into a viable "scheme" claim merely by relabeling it. *See, e.g.*, *In re Nektar Therapeutics*, 2020 WL 3962004, at *13 (N.D. Cal. July 13, 2020) ("To allege a violation of Rule 10b–5(a) and (c), 17 C.F.R. § 240.10b–5(a) and (c), a plaintiff must allege the same elements as a Rule 10b–5(b) claim, except that plaintiff's scheme liability claim cannot be based solely on false or misleading statements, but must instead involve deceptive conduct beyond those misrepresentations or omissions." (cleaned up)); *In re Robinhood Order Flow Litig.*, 2022 WL 9765563, at *13 (N.D. Cal. Oct. 13, 2022) (scheme claim must "encompass conduct beyond those misrepresentations or omissions").

statements,' or are 'immaterial,' or were not made 'with actual knowledge' of the falsity or misleading nature of the statement." *In re Twitter, Inc. Sec. Litig.*, 506 F. Supp. 3d 867, 882 (N.D. Cal. 2020), *aff'd sub nom. Weston Fam. P'ship LLLP v. Twitter, Inc.*, 29 F.4th 611 (9th Cir. 2022).  Here, statements predicting that disruptions would be "behind us" or that margins would "revert" fall squarely within the PSLRA's safe harbor.  For instance, Sheedy stated during the November 2023 earnings call that the Company "anticipate[s] the transitional impacts to be largely behind us as we get to the end of the year," ¶ 95, and Bracher assured that "we do feel confident . . . the impact is then largely behind us by the end of the year."  ¶ 97.  These are quintessential forward-looking statements.  Courts repeatedly hold that projections about a company's future performance and similar statements of expectation "easily meet the definition of a forward-looking statement."  *In re Bare Escentuals, Inc. Sec. Litig.*, 745 F. Supp. 2d 1052, 1079–80 (N.D. Cal. 2010).

Grocery Outlet's forward-looking statements are protected because they were accompanied by meaningful cautionary language.  For example, among other risks, the March 2023 Form 10-K specifically warned that ERP modernization "could result in implementation, operational and functionality issues, delays, higher than expected costs and other issues during the course of implementing and utilizing these improvements," and that "with any update or replacement of our systems and infrastructure there is a risk of business disruption, liability and reputational damage . . . including from not accurately capturing and maintaining data [or] efficiently testing and implementing changes."  ¶ 66.  The August 2023 Q2 2023 Form 10-Q incorporated these same risk factors.  ¶ 68.  Plaintiff's theory is nothing more than second-guessing management for not predicting precisely how long challenges would persist.  *See In re Downey Sec. Litig.*, 2009 WL 2767670, at *11 (C.D. Cal. Aug. 21, 2009) ("[S]econd-guessing of management decisions by confidential witnesses does not provide a basis for securities fraud.").  But "[t]he fact that the prediction proves to be wrong in hindsight does not render the statement untrue when made."  *In re VeriFone Sec. Litig.*, 11 F.3d 865, 871 (9th Cir. 1993); *see also In re Cutera Sec. Litig.*, 610 F.3d 1103, 1112–13 (9th Cir. 2010).

**Opinion.**  Many of the challenged statements are also inactionable opinions.  *See* App'x Statements Nos. 1, 3, 4, 7–11.  It is well-established that statements prefaced with phrases like "I think" or "I believe" are nonactionable opinions because they do not "express[] certainty about a thing."

9

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 183 (2015).  Here, Plaintiff claims many opinion statements are misleading, such as "I think . . . the first thing that comes to mind is just easier access to information and access to new information," ¶ 74, "we . . . believe that it will be largely behind us by the end of the year," ¶ 91, and "[w]e expect these [issues] to be resolved soon."  ¶ 116.  But opinions like these are actionable only if:  (1) the speaker does not honestly hold the stated opinion; (2) it includes an "embedded statement[] of fact" that is false; or (3) it omits facts that are necessary to make the opinion not misleading.  *Omnicare*, 575 U.S. at 184–86, 193 (2015); *accord City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 616 (9th Cir. 2017).  Plaintiff does not allege Defendants did not honestly hold these opinions, nor does he identify any embedded statements of fact that are false or any omissions of fact that make these opinions misleading.

     ***Optimism.***    Finally, Plaintiff challenges generalized statements of corporate optimism.  *See* App'x Statements Nos. 3, 4.  Statements of corporate optimism are not "objectively verifiable" but, instead, are "vague, generically positive" statements that investors do not rely upon.  *Macomb Cnty. Emps. Ret. Sys. v. Align Tech., Inc.*, 39 F.4th 1092, 1099 (9th Cir. 2022).  Here, Sheedy's statements touting that the new store portal would provide "better analytics," ¶ 72, "easier access to information," ¶¶ 72, 74, and "efficiencies" that would "grow sales and improve margin," ¶ 74, are textbook puffery.  Such aspirational language is inactionable because no reasonable investor would have relied on it as a concrete guarantee of performance.  *See, e.g.*, *Twitter*, 29 F.4th at 621 (holding that company did not have to disclose specific "software bugs" when stating that its overall program was "on track"); *Wozniak v. Align Tech., Inc.*, 850 F. Supp. 2d 1029, 1036–37 (N.D. Cal. 2012) ("we are very pleased with our progress to date" was puffery); *In re Splash Tech. Holdings, Inc. Sec. Litig.*, 160 F. Supp. 2d 1059, 1077 (N.D. Cal. 2001) (phrases such as "better than expected," "robust," "well positioned," "solid," and "improved," were not actionable).

### B.    Plaintiff's Section 10(b) Claim Must Be Dismissed for Failure to Plead Scienter

     The Amended Complaint independently fails because Plaintiff does not plead that any Defendant acted with scienter, *i.e.*, an "intent to deceive, manipulate, or defraud."  *Intuitive Surgical*, 759 F.3d at 1061.  To plead scienter, the complaint must "state with particularity facts giving rise to a

strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). This is a "high burden," *Prodanova v. H.C. Wainwright & Co., LLC*, 993 F.3d 1097, 1108 (9th Cir. 2021), which requires a showing of "a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care," *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 991 (9th Cir. 2009). The Amended Complaint pleads no particularized facts about either Individual Defendant's state of mind, and Plaintiff does not even try to allege a motive to defraud. Instead, Plaintiff attempts to raise a roundabout inference of scienter from three far-removed FEs and a grab-bag of circumstantial allegations. But that is the sort of placeholder pleading the Ninth Circuit routinely rejects.

### 1.    Plaintiff's confidential witnesses do not establish scienter.

Plaintiff's reliance on three FEs does not come close to creating a strong inference of scienter. To support an inference of fraudulent intent, FE allegations must clear a high hurdle: (1) the FEs "must be described with sufficient particularity to establish their reliability and personal knowledge" and (2) those statements attributed to FEs "with sufficient reliability and personal knowledge must themselves be indicative of scienter." *Zucco*, 552 F.3d at 995. "[T]he Court may disregard [FE] statements that are speculative, lack specificity, or are not based on personal knowledge." *Browning v. Amyris, Inc.*, 2014 WL 1285175, at *18 (N.D. Cal. Mar. 24, 2014); *see also Nguyen*, 962 F.3d at 416 (FE allegations "high on alarming adjectives" but "short on the facts" insufficient to plead scienter). Here, Plaintiff's FE allegations fail both prongs.

*First*, none of the FEs are reliable. By Plaintiff's own telling, the FE witnesses were not in positions to opine on the ERP integration, much less executive intent related thereto. FE1 worked in Financial Planning and Analysis and supported forecasting, ¶ 38, FE2 was a grocery buyer, ¶ 39, and FE3 was an assistant planner helping with product purchases and allocation. ¶ 40. There are no allegations that any worked on SAP integration, had technical IT systems expertise, or interacted with Sheedy or Bracher about either the systems implementation or investor-facing statements related thereto.[5] These are precisely the "vague and unreliable" accounts the Ninth Circuit repeatedly rejects—

---

[5] FE1's allegation that he "participated in monthly business review meetings with Bracher both in person and by email," ¶ 38, is not enough to establish the witness's reliability—much less that Bracher acted with scienter. *See, e.g.*, *Scheller v. Nutanix, Inc.*, 450 F. Supp. 3d 1024, 1041–42 (N.D. Cal.

where the FEs were "not positioned to know the information alleged," reported "only unreliable hearsay," or offered only "conclusory assertions of scienter." *See Zucco*, 552 F.3d at 996; *see also McGovney v. Aerohive Networks, Inc.*, 367 F. Supp. 3d 1038, 1053–54 (N.D. Cal. 2019) (failure to allege that the FEs were in positions to have the knowledge they profess rendered their allegations unreliable). Courts regularly dismiss similar confidential witness-driven "technology rollout" cases for lack of specificity. For instance, in *Wozniak*, 850 F. Supp. 2d at 1037, numerous FEs complained that the company's CEO was "personally informed" a new product "could not be launched" on schedule, that the CEO "was aware that [the product] was ineffective both during its beta testing and after its commercial launch," and that "feedback from beta users was poor." *Id.* The court found these allegations too vague to support scienter: "[T]he [FEs'] conclusory statements that initial feedback regarding [new software tools] was negative, 'poor,' or that an unspecified number of users found it 'ineffective,' do not contradict [the CEO's] optimistic statements," even if the FEs "ha[d] sufficient knowledge upon which to base" their allegations. *Id.*

     *Second*, even if the FEs were reliable, nothing attributed to them is indicative of scienter. Indeed, none provide any "first-hand knowledge regarding what the individual defendants knew or did not know." *Intuitive Surgical*, 759 F.3d at 1063; *see also City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*, 2019 WL 6877195, at *19 (N.D. Cal. Dec. 17, 2019) (discrediting confidential witness allegations because they lacked personal knowledge as to whether the defendant read the presentations sent to his direct report or otherwise heard the information therein). What some employees thought about "readiness" *pre-launch* is irrelevant to whether Sheedy and Bracher believed their statements were true *after launch*. The FEs' anecdotes describe internal friction familiar to any large IT implementation. According to FE2, "most of us thought it was premature" to go live, ¶ 49; FE1 complained that UAT was "not conducted end-to-end," ¶ 54; and FE3 believed the upgrade "broke all the functionality of everything," ¶ 60. These allegations amount to little more than corporate water cooler talk, not evidence of fraudulent intent. As the Ninth Circuit has explained: "Problems and difficulties are the daily work of business people. That they exist does not make a lie out of any of the

2020) ("Merely being present at quarterly 'all-hands' meetings does not demonstrate the requisite personal knowledge to establish scienter.").

alleged false statements." *Ronconi v. Larkin*, 253 F.3d 423, 434 (9th Cir. 2001), *rev'd on other grounds*, *Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747 (9th Cir. 2023).  At bottom, the FEs provide no insight into whether Sheedy or Bracher believed that specific operational problems meant Grocery Outlet could not successfully implement its systems upgrade.  *See In re NVIDIA Corp. Sec. Litig.*, 2011 WL 4831192, at *11 (N.D. Cal. Oct. 12, 2011), *aff'd*, 768 F.3d 1046 (9th Cir. 2014) ("Knowledge of the problem, however, is insufficient to infer that [defendant] acted with the intent to defraud or with deliberate recklessness in not reporting the issue publicly.").

Moreover, none of the FEs identify any specific information conveyed to Sheedy or Bracher that contradicted any challenged statement.  In other words, no FE "allege[s] contemporaneous facts in sufficient detail and in a manner that would create a strong inference that the alleged adverse facts were known at the time of the challenged statements."  *In re Rackable Sys., Inc. Sec. Litig.*, 2010 WL 3447857, at *9 (N.D. Cal. Aug. 27, 2010) (allegations from 22 FEs insufficient where they only raised general knowledge of problems but "[did] not provide the level of particularity from which to infer that Rackable knew that it would miss its gross margin and EPS projections").  What some lower-level employees may have thought about project readiness is irrelevant to whether the executives themselves *knew* their public statements were misleading.  *See, e.g.*, *In re Accuray, Inc. Sec. Litig.*, 757 F. Supp. 2d 936, 949 (N.D. Cal. 2010) ("[I]t is difficult to surmise how the opinions and observations of the [FEs] could support a reasonable inference about what the[] Defendants knew or did not know").

Ultimately, the FEs offer hindsight critiques of the Company's decision to "rip off the band-aid" and launch SAP before every possible box had been checked.  ¶ 48.  But vague and unfounded allegations of poor planning or operational missteps amount to post-hoc second-guessing, not fraudulent intent.  *See, e.g.*, *Nguyen*, 962 F.3d at 416–17 (no scienter inference where FE referenced "a stream of complaints and incident reports" but "the complaint does not plead any details about these reports"); *In re Nektar Therapeutics Sec. Litig.*, 34 F.4th 828, 837 (9th Cir. 2022) (no scienter inference where "[FE] #2 relies on vague and hyperbolic allegations").

### 2. The circumstantial allegations of purported knowledge do not support an inference of scienter.

With no allegations that Sheedy or Bracher knew they were misleading investors, Plaintiff

13

attempts to plead an indirect inference of fraudulent intent, which also fails.

*First*, Plaintiff tries to plead that Sheedy and Bracher must have known their statements to investors were false because of their senior positions at the Company. *See* ¶¶ 23, 44, 62, 64. But the Ninth Circuit regularly rejects such *ipse dixit*: "[C]orporate management's general awareness of the day-to-day workings of the company's business does not establish scienter—at least absent some additional allegation of specific information," not alleged here, "conveyed to management and related to the fraud." *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1068 (9th Cir. 2008); *see also Intuitive Surgical*, 759 F.3d at 1063 ("Mere access to reports containing undisclosed . . . data is insufficient to establish a strong inference of scienter."). That reasoning applies here.

*Second*, a "core operations" inference fails for similar reasons. The doctrine, in very limited circumstances, allows a plaintiff to create an inference "that facts critical to a business's 'core operations' or important transactions are known to key company officers." *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 783–85 (9th Cir. 2008). But plaintiffs still must allege "*specific information* conveyed to management and related to the fraud" that gives rise to an inference of fraudulent intent. *In re NVIDIA*, 768 F.3d at 1063; *see also Intuitive Surgical*, 759 F.3d at 1063 ("Missing are allegations linking specific reports and their contents to the executives, not to mention the link between the witnesses and the executives."). Absent here, though, is the key ingredient. Plaintiff identifies no contemporaneous facts known to either Sheedy or Bracher—or anyone else—that contradicts any challenged statement when made. In fact, Plaintiff doesn't identify any contradictory information, period. *See supra* at 5–8, 12–13.

*Third*, Bracher's announced resignation in December 2023 and Sheedy's October 2024 departure do not support scienter. ¶¶ 21, 20, 104, 136. It is Plaintiff's burden to "allege sufficient information to differentiate between a suspicious change in personnel and a benign one." *Zucco*, 552 F.3d at 1002 (resignation of defendant's independent accounting firm a month after the restatement and resignation of other executives "shortly before" restatement not indicative of scienter). Plaintiff has not done so here; both departures were entirely benign. Bracher's resignation, announced on December 8, 2023 but not effective until March 1, 2024, underscores that his departure after twelve years with the Company was long-planned and innocuous. ¶ 104. In fact, the Company explained that

14

1   Bracher's departure was a "personal decision to pursue another opportunity and was not the result of

2   any disagreement with the Company on any matter relating to the Company's operations, policies or

3   practices" and that Grocery Outlet would "enter into a consulting agreement with Bracher to support

4   the transition," making clear his departure was amicable.  Ex. 6 at 1.  Plaintiff makes no attempt to

5   challenge that explanation.  Nor does Plaintiff plead facts suggesting Sheedy's October 2024 departure

6   was suspicious.  Under Plaintiff's own allegations, Sheedy's departure occurred five months after the

7   alleged problems with the systems transition were fully disclosed and was mutually agreed to with the

8   Board.  ¶¶ 12, 136–39.  His exit simply reflects the reality that executives often depart a public company

9   after it experiences disappointing performance.  *See, e.g.*, *In re Cornerstone Propane Partners, L.P.*,

10  355 F. Supp. 2d 1069, 1093 (N.D. Cal. 2005) ("Most major stock losses are often accompanied by

11  management departures, and it would be unwise for courts to penalize directors for these decisions.");

12  *Mallen v. Alphatec Holdings, Inc.*, 861 F. Supp. 2d 1111, 1138 (S.D. Cal. 2012) (CFO's resignation

13  two months after the alleged "corrective announcement, without any other facts about the resignation,

14  does not support a strong inference of scienter.").

15              **3.      The most plausible inference is that Defendants acted in good faith.**

16          Even considered holistically, Plaintiff's allegations do not establish a strong inference of

17  scienter.  A complaint satisfies the PSLRA only if the inference of scienter is "cogent and at least as

18  compelling as any opposing inference of nonfraudulent intent."  *Tellabs, Inc. v. Makor Issues & Rts.,*

19  *Ltd.*, 551 U.S. 308, 314 (2007).  "Taken as a whole," Plaintiff's allegations "fail to give rise to a strong

20  inference of scienter in light of competing innocent inferences."  *City of Royal Oak Ret. Sys. v. Juniper*

21  *Networks, Inc.*, 880 F. Supp. 2d 1045, 1069 (N.D. Cal. 2012).  Here, the far more cogent inference is

22  that Defendants acted in good faith.  Throughout the Class Period, Defendants candidly acknowledged

23  operational challenges, accurately quantified the associated impact on sales and gross margin,

24  explained their decision to provide commission support to independent operators, and ultimately

25  disclosed a material weakness in internal controls.  That steady, incremental stream of information to

26  the market is the exact opposite of concealment and makes clear that Plaintiff's real grievance is tonal

27  (*i.e.*, Defendants should have been more pessimistic in describing when the problems would abate).

28          Tellingly, Plaintiff offers no plausible theory of "why" two senior executives would knowingly

15

mislead investors about problems they were openly and regularly disclosing. There are no allegations of suspiciously timed stock sales or unique compensation. *See, e.g.*, *Prodanova*, 993 F.3d at 1108 ("[T]he lack of a plausible motive certainly makes it much less likely that a plaintiff can show a strong inference of scienter."); *Bhangal v. Hawaiian Elec. Indus., Inc.*, 2024 WL 4505465, at *16 (N.D. Cal. Oct. 15, 2024) (no scienter where "Plaintiffs do not allege why Individual Defendants concealed information regarding the company's wildfire mitigation efforts and do not allege any Individual Defendant benefited from the alleged fraud by selling stock at an inflated price"). In fact, the Company was actively repurchasing stock during the Class Period—stock that Plaintiff claims it knew was artificially inflated, which makes no sense.[6] *See In re Tibco Software, Inc.*, 2006 WL 1469654, at *21 (N.D. Cal. May 25, 2006) ("[S]tock repurchase programs actually negate a finding of scienter.").

At bottom, the far more compelling inference—and certainly the only cogent one—is that management underestimated the complexity of the technology systems transition and did the best it could by disclosing problems as they came into focus. That is ordinary business judgment, not the sort of "extreme departure from the standards of ordinary care" the PSLRA requires. *Zucco*, 552 F.3d at 991.

### C.    Plaintiff's Section 10(b) Claims Must Be Dismissed for Failure to Plead Loss Causation

Plaintiff also fails to plead loss causation, which is independently fatal. "[T]he plaintiff in a securities fraud action must demonstrate that an economic loss was caused by the defendant's misrepresentations, rather than some intervening event." *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1209 (9th Cir. 2016). Loss causation is typically satisfied by pleading that the defendant or some other source "revealed the truth [about the defendant's alleged misstatements] through 'corrective disclosures' which 'caused the company's stock price to drop and investors to lose money.'" *Id.*

Here, though, Plaintiff does not identify any disclosure that revealed a prior statement was false. *See supra* at 5–8. The alleged stock price declines reflect the materialization of known and disclosed risks that the ERP systems upgrade *might* impact the Company's operations and financial performance.

---

[6] During fiscal year 2022, the Company repurchased 139,718 shares for approximately $3.5 million, Ex. 1 at 82, and in fiscal year 2023, it repurchased 254,516 shares for ~$6.8 million. Ex. 8 at 85.

But that cannot establish loss causation. *See Yaron v. Intersect ENT, Inc.*, 2020 WL 6750568, at *10 (N.D. Cal June 19, 2020) (no loss causation where there were no allegations of "any *hidden* risk"). Grocery Outlet consistently warned that implementing new ERP systems could disrupt operations, impair inventory visibility, and affect financial reporting. *See supra* at 3–4, 6–8. When those very challenges surfaced, the Company disclosed them—including in its November 2023 and February 2024 earnings calls (disclosing inventory and forecasting headwinds, ¶¶ 86–93, 107–18) and its May 2024 earnings release (quantifying residual impacts, ¶¶ 124–30). *See supra* at 3–4, 6–8. And because the Company had already disclosed *all* of the risks that ultimately materialized, ¶¶ 33, 66–70, the purported corrective disclosures did not "reveal new information to the market that ha[d] not yet been incorporated into the price." *In re BofI*, 977 F.3d at 794. Plaintiff simply assumes that every later disclosure was a "partial" corrective revelation yet never explains how. ¶ 84.

Ultimately, the stock price declines Plaintiff complains about reflect the market's reaction to disappointing business performance and leadership changes, which are insufficient to plead loss causation. *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342–46 (2005); *see also Loos*, 762 F.3d at 887 ("[A]llegations regarding Immersion's disappointing financial results were insufficient to establish loss causation as a matter of law."); *Nuveen Mun. High Income Opportunity Fund v. City of Alameda, Cal.*, 730 F.3d 1111, 1121–23 (9th Cir. 2013). Because the Amended Complaint fails to plead a causal connection between any alleged misrepresentation and the claimed losses, the Amended Complaint must be dismissed for failure to plead loss causation.[7]

## VI.     CONCLUSION

For the foregoing reasons, the Motion should be granted with prejudice.

---

[7] Because Plaintiff fails to allege a primary violation of violation of Section 10(b) and Rule 10b-5, the Section 20(a) claim necessarily fails. *See In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1052 (9th Cir. 2014); *Zucco*, 552 F.3d at 990.

DATED:  October 21, 2025

Respectfully submitted,

GIBSON, DUNN & CRUTCHER LLP


By: */s/ Craig Varnen*
_____
    Craig Varnen

*Attorneys for Defendants Grocery Outlet Holding Corp., Robert Joseph Sheedy, and Charles C. Bracher*

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS AMENDED COMPLAINT
CASE NO. 4:25-CV-957-JST