Laurence M. Rosen, Esq. (SBN 219683)
THE ROSEN LAW FIRM, P.A.
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Lead Counsel for Lead Plaintiff and the Class*

*[Additional Counsel on Signature Page]*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re Grocery Outlet Holding Corp. Securities Litigation | Master File No: 4:25-cv-957-JST |
| | CLASS ACTION |
| | **PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS** |
| | JUDGE:   Hon. Jon. S. Tigar, U.S.D.J. |
| | DATE:    March 19, 2026 |
| | TIME:    2:00 p.m. |
| | CTRM:    6 |
| This Document Relates To: All Actions | |

# **TABLE OF CONTENTS**

I.    PRELIMINARY STATEMENT ................................................................................1

II.   STATEMENT OF FACTS ....................................................................................2

      A.    The Company and the Systems Transition ................................................2

      B.    Grocery Outlet Was Not Prepared to Launch the Systems Transition,
            Risking and Causing Rampant Disruptions to Critical Operations ........................3

      C.    Disruptions Persisted Even as Defendants Recklessly Assured Investors the
            Disruptions Were Nearly Over ................................................................5

III.  ARGUMENT ................................................................................................6

      A.    The Complaint Adequately Alleges Falsity as to Each Challenged
            Statement................................................................................7

            1.    The Complaint is Not Puzzle Pleading ........................................8

            2.    Misleading Statements About the Systems Transition ........................8

                  a.    The August 2023 Statements Were Misleading..............................9

                  b.    The August 2023 Statements Are Actionable..............................11

            3.    False Statements About Grocery Outlet's Internal Controls ...................13

            4.    Misleading Statements About Defendants' Visibility Into the
                  Financial Impacts of the Systems Transition Disruptions ........................14

                  a.    Defendants' Assurances Were Misleading ...................................15

                  b.    Defendants' Statements Are Actionable........................................16

      B.    The Complaint Alleges a Cogent and Compelling Inference of Scienter..............17

            1.    Sheedy and Bracher Knew or Recklessly Disregarded that Their
                  Statements Would Mislead Investors........................................17

            2.    The FE Allegations Are Sufficiently Pled ....................................21

            3.    Plaintiff's Inference of Scienter is the Most Plausible.............................22

      C.    The Complaint Adequately Alleges Loss Causation ...........................................24

      D.    The Complaint Adequately Alleges a Claim under § 20(a) of the
            Exchange Act..........................................................................25

IV.   CONCLUSION..............................................................................................25

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS; 4:25-CV-957-JST

# TABLE OF AUTHORITIES

**Cases**

*Amgen Inc. v. Conn. Ret. Plans and Tr. Funds*,
   568 U.S. 455 (2013)................................................................................25

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)..................................................................................6

*Azar v. Yelp, Inc.*,
   2018 WL 6182756 (N.D. Cal. Nov. 27, 2018) ........................................20

*Berson v. Applied Signal Tech., Inc.*,
   527 F.3d 982 (9th Cir. 2008) ...........................................................10, 17

*Brendon v. Allegiant Travel Co.*,
   412 F. Supp. 3d 1244 (D. Nev. 2019)......................................................21

*Cement & Concrete Workers Dist. Council Pension Fund v. Hewlett Packard Co.*,
   964 F. Supp. 2d 1128 (N.D. Cal. 2013) ...................................................25

*Cho v. UCBH Holdings, Inc.*,
   890 F. Supp. 2d 1190 (N.D. Cal. 2012) ...................................................23

*City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*,
   2019 WL 6877195 (N.D. Cal. Dec. 17, 2019)..........................................22

*Davoli v. Costco Wholesale Corp.*,
   854 F. App'x 116 (9th Cir. 2021) ............................................................13

*Dura Pharms., Inc. v. Broudo*,
   544 U.S. 336 (2005)................................................................................24

*Eminence Cap., LLC v. Aspeon, Inc.*,
   316 F.3d 1048 (9th Cir. 2003) ................................................................25

*Emps. Ret. Sys. of Puerto Rico Elec. Power Auth. v. Conduent Inc.*,
   2020 WL 3026536 (D.N.J. June 5, 2020)..................................................7

*Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*,
   63 F.4th 747 (9th Cir. 2023) ...........................................................*passim*

*Grigsby v. BofI Holding, Inc.*,
   979 F.3d 1198 (9th Cir. 2020) ................................................................24

*Hall v. Rent-A-Ctr., Inc.*,
   2017 WL 6379334 (E.D. Tex. Dec. 14, 2017)...........................................8

*Hefler v. Wells Fargo & Co.*,
2018 WL 1070116 (N.D. Cal. Feb. 27, 2018) .................................................. 25

*In re Alphabet, Inc. Sec. Litig.*,
1 F.4th 687 (9th Cir. 2021) .................................................................. 10, 16

*In re Apple Inc. Sec. Litig.*,
2020 WL 6482014 (N.D. Cal. Nov. 4, 2020) .................................................. 23

*In re Autodesk, Inc. Sec. Litig.*,
132 F. Supp. 2d 833 (N.D. Cal. 2000) ........................................................ 8

*In re BofI Holding, Inc. Sec. Litig.*,
977 F.3d 781 (9th Cir. 2020) .................................................................. 24

*In re ChinaCast Educ. Corp. Sec. Litig.*,
809 F.3d 471 (9th Cir. 2015) .................................................................. 17

*In re Facebook, Inc. Sec. Litig.*,
84 F.4th 844 (9th Cir. Oct. 18, 2023) ......................................................... 10, 16

*In re Fibrogen, Inc. Sec. Litig.*,
2022 WL 2793032 (N.D. Cal. July 15, 2022) ............................................... 19, 20

*In re Gilead Sci. Sec. Litig.*,
536 F.3d 1049 (9th Cir. 2008) ............................................................... 7, 25

*In re Immune Response Sec. Litig.*,
375 F. Supp. 2d 983 (S.D. Cal. 2005) ........................................................ 17

*In re Intuitive Surgical Sec. Litig.*,
65 F. Supp. 3d 821 (N.D. Cal. 2014) ......................................................... 8

*In re NVIDIA Corp. Sec. Litig.*,
768 F.3d 1046 (9th Cir. 2014) ............................................................... 19, 22

*In re Quality Sys., Inc. Sec. Litig.*,
865 F.3d 1130 (9th Cir. 2017) .................................................................. 12

*In re Rackable Sys., Inc. Sec. Litig.*,
2010 WL 199703 (N.D. Cal. Jan. 13, 2010) ................................................ 22

*In re Splash Tech. Holdings, Inc. Sec. Litig.*,
160 F. Supp. 2d 1059 (N.D. Cal. 2001) ...................................................... 12

*In re Splunk Inc. Sec. Litig.*,
592 F. Supp. 3d 919 (N.D. Cal. 2022) ........................................................ 18

*In re SunPower Corp. Sec. Litig.*,
769 F. Supp. 3d 1042 (N.D. Cal. 2025) ..................................................... 10, 12

*In re VeriFone Holdings, Inc. Sec. Litig.*,
  704 F.3d 694 (9th Cir. 2012) ................................................................................. 17

*In re WageWorks, Inc., Sec. Litig.*,
  2020 WL 2896547 (N.D. Cal. June 1, 2020) ........................................................... 24

*Knollenberg v. Harmonic, Inc.*,
  152 F. App'x 674 (9th Cir. 2005) ........................................................................... 15

*Knox v. Yingli Green Energy Holding Co.*,
  2016 WL 6609210 (C.D. Cal. May 10, 2016) ......................................................... 14

*Maiman v. Talbott*,
  2010 WL 11421950 (C.D. Cal. Aug. 9, 2010) ......................................................... 23

*Matrixx Initiatives, Inc. v. Siracusano*,
  563 U.S. 27 (2011) .................................................................................................... 7

*McGovney v. Aerohive Networks, Inc.*,
  367 F. Supp. 3d 1038 (N.D. Cal. Feb. 5, 2019) ...................................................... 22

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.*,
  540 F.3d 1049 (9th Cir. 2008) ................................................................................ 19

*Michel v. Sumo Logic, Inc.*,
  779 F. Supp. 3d 1038 (N.D. Cal. 2025) .................................................................. 11

*Miller v. Thane Int'l, Inc.*,
  519 F.3d 879 (9th Cir. 2008) .................................................................................... 7

*No. 84 Employer-Teamster Joint Council Pension Tr. Fund v. Am. West Holding Corp.*,
  320 F.3d 920 (9th Cir. 2003) .................................................................................. 23

*Ohio Pub. Emps. Ret. Sys. v. Meta Platforms, Inc.*,
  2024 WL 4353049 (N.D. Cal. Sept. 30, 2024) ........................................................ 25

*Omnicare, Inc. v. Laborers Dist. Council*,
  575 U.S. 175 (2015) ........................................................................................ 7, 11, 16

*Pampena v. Musk*,
  705 F. Supp. 3d 1018 (N.D. Cal. 2023) .................................................................. 18

*Police Pension & Ret. Sys. v. LifeLock, Inc.*,
  780 F. App'x 480 (9th Cir. 2019) ............................................................................. 9

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
  759 F.3d 1051 (9th Cir. 2014) ................................................................................ 22

*Provenz v. Miller*,
  102 F.3d 1478 (9th Cir. 1996) ................................................................................ 15

*Reese v. BP Expl. (Alaska) Inc.*,
    643 F.3d 681 (9th Cir. 2011) ............................................................. 7, 10

*S. Ferry LP, No. 2 v. Killinger*,
    542 F.3d 776 (9th Cir. 2008) ........................................................... 19, 20

*Schueneman v. Arena Pharm., Inc.*,
    840 F.3d 698 (9th Cir. 2016) ........................................................... 11, 17

*Special Situations Fund III QP, L.P. v. Brar*,
    2015 WL 1393539 (N.D. Cal. Mar. 26, 2015) ........................................ 25

*Starr v. Baca*,
    652 F.3d 1202 (9th Cir. 2011) ................................................................. 6

*State Teachers Ret. Sys. of Ohio v. ZoomInfo Tech., Inc.*,
    2025 WL 3013683 (W.D. Wash. Oct. 28, 2025) .................................... 23

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) ............................................................... 7, 17, 23

*Towne Servs., Inc. Sec. Litig.*,
    184 F. Supp. 2d 1308 (N.D. Ga. 2001) .................................................. 8

*Vernazza v. S.E.C.*,
    327 F.3d 851 (9th Cir. 2003) ................................................................ 17

*Warshaw v. Xoma Corp.*,
    74 F.3d 955 (9th Cir. 1996) .................................................................. 12

*Weston Fam. P'ship LLLP v. Twitter, Inc.*,
    29 F.4th 611 (9th Cir. 2022) ................................................................. 12

*Wozniak v. Align Tech., Inc.*,
    850 F. Supp. 2d 1029 (N.D. Cal. 2012) ................................................. 12

*Wozniak v. Align Tech., Inc.*,
    2011 WL 2269418 (N.D. Cal. June 8, 2011) .......................................... 22

*Yaron v. Intersect ENT, Inc.*,
    2020 WL 6750568 (N.D. Cal. June 19, 2020) ........................................ 24

*Zucco Partners, LLC v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009) ................................................................ 22

**Statutes**

15 U.S.C. § 78t(a) ......................................................................................... 25

15 U.S.C. § 78u-5 ........................................................................................ 12

Lead Plaintiff Casey Cavanaugh ("Plaintiff") submits this memorandum of points and authorities in opposition to Defendants' motion to dismiss Plaintiff's Amended Complaint ("Complaint," Dkt. No. 38).[1]

## I.    PRELIMINARY STATEMENT

In August 2023, Grocery Outlet Holding Corp. ("Grocery Outlet" or the "Company") prematurely launched an overhaul of its enterprise resource planning ("ERP") and information technology systems (the "Systems Transition"). The Systems Transition immediately caused massive operational disruptions and materially impacted the Company's financial results, which persisted for nearly a year as Grocery Outlet struggled to implement and troubleshoot the new systems. Plaintiff alleges that Defendants decided to launch the Systems Transition while knowing the Company was ill-prepared to implement the new systems, and knowing that doing so would likely cause significant disruptions and have adverse financial impacts. Defendants closely tracked each department's readiness (or lack thereof), and they knew the Company had not even performed critical end-to-end User Acceptance Testing of the new systems with real data, which was a significant risk. When they decided in July 2023 to "rip off the band-aid" and launch the Systems Transition anyway, they concealed those critical risks from investors.

After the Company went "live" with its new systems it immediately encountered widespread disruptions and implementation problems, infecting all aspects of the Company's business from inventory management to financial reporting. The disruptions were so rampant they created a material weakness in the Company's internal controls. As the disruptions and resulting impacts on Grocery Outlet's financial results were gradually revealed to investors over the course of the following three quarters, and both the CEO and CFO abruptly departed the Company under suspicious circumstances, the Company's stock price fell, harming investors.

However, at the same time that Defendants slowly disclosed the impacts of the premature Systems Transition implementation, they also repeatedly attempted to reassure investors by misrepresenting that the worst of it was behind them and that they would return to normal

---

[1] References to "Mtn." are to Defendants' motion to dismiss the Complaint (Dkt. No. 39). Citations to "¶__" are to the paragraphs of the Complaint.

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS; 4:25-CV-957-JST

operations and results in the following quarter. Not only were Defendants wrong, they were deliberately reckless and misled investors by making those assurances. As they later revealed in May 2024, Defendants had no reasonable basis for telling investors during the interim periods that the problems would be resolved and the financial impacts would be limited to the then-current quarter. Defendants knew when they made those statements that they lacked critical data visibility for their business reporting tools and had data integrity issues, which materially impaired their ability to make accurate forecasts. Moreover, a substantial part of the financial impact from the disruptions was the commission assistance payments Grocery Outlet was making to its independent store operators due to the operational disruptions and impaired store margins stemming from the Systems Transition. As Defendants later acknowledged, those commissions could not even be calculated until after inventory and margin reconciliation was performed at the end of each quarter. Thus, Defendants could not possibly know the extent of the financial impact from the commissions for the *next* quarter until after the end of the *current* quarter.

In their motion, Defendants tell a tale of "corporate transparency, not concealment," but they ignore the crux of Plaintiff's allegations. Defendants are not liable for simply mismanaging the rollout of new ERP systems and informing investors when it went awry, they are liable for misleading investors by concealing known material risks about the premature rollout—even though they later admitted they "always knew" and "did expect" that the Systems Transition would cause disruptions and financial impacts—and reassuring investors of a prompt resolution knowing they had no factual basis upon which to make such assurances. The Complaint adequately alleges each of the elements of Plaintiff's claims. Accordingly, the Court should deny Defendants' motion.

## II.    STATEMENT OF FACTS

### A.    The Company and the Systems Transition

Grocery Outlet describes itself as an "extreme value retailer of consumables and fresh products sold via a network of independently owned and operated stores." ¶27. Grocery Outlet's business model is similar to a franchise model, with the vast majority of its stores run by "independent operators," or "IOs" at the local level. *Id.* Grocery Outlet generally shares 50% of its store-level gross profits with its IOs, paid as "commissions" based on store margins. *Id.* The

IOs manage and operate their own store operations, while other business functions like procuring inventory, distribution, and information systems, are handled centrally by Grocery Outlet. ¶28.

The Company's information systems were deeply integrated into the Company's centralized procurement, inventory and warehouse management, and supply chain effectiveness. ¶¶29-31. The Company recognized that any disruptions to its information systems could have an immediate and substantive impact on the Company's financial results. ¶33.

In 2021, Grocery Outlet decided to overhaul its ERP and information technology systems. ¶¶41-42. As the Company prepared to implement the new systems, it engaged in a months-long internal campaign to align the new SAP systems' functionalities with legacy systems and train its personnel on the new systems. ¶37. The new systems would impact how inventory was tracked and managed, how the Company's buyers and planners would strategize what goods to purchase, how the Company's IOs would view and order inventory from the Company's warehouses, and how the Company's financial and accounting systems would integrate with the new systems. *Id.* Defendants spearheaded and oversaw the implementation of the new systems. ¶¶44, 48, 62.

**B.    Grocery Outlet Was Not Prepared to Launch the Systems Transition, Risking and Causing Rampant Disruptions to Critical Operations**

As the Company worked to prepare its various interconnected information systems for the Systems Transition, Defendants kept close tabs on the Company's progress and readiness. The Company's Chief Information Officer ("CIO") helmed a Project Steering Committee, which tracked each department's internal readiness to implement the Systems Transition via department-specific tracking documents, as well as a "master document" maintained on a shared platform on the Company's computer systems. ¶¶43-45. These documents tracked the various open issues for each department to prepare for and implement the Systems Transition, including "continuing risk levels" for each issue. *Id.* The master document also rated the open issues by urgency and resources needed and identified relevant personnel. ¶45. The Project Steering Committee held weekly meetings, led by the CIO and typically attended by the Company's top executives, including Defendant Bracher and the Company's "C-suite" and its Executive Vice Presidents, to discuss critical issues with implementing the Systems Transition. ¶44.

As the original planned launch date of March 2023 approached, Defendants knew that Grocery Outlet was not prepared to effectively implement the new systems. ¶46. At that point, the Company had not even attempted to conduct end-to-end testing of the new systems, *i.e.*, testing how the new systems would interact between critical departments and functions like procurement, inventory and warehouse management, and store-level reporting, as opposed to simply testing within each "silo" as they had done to that point. ¶47. Defendants postponed the launch date until July 2023. ¶¶46-47.

As the preparations continued into the summer of 2023, the Company continued to struggle with integrating and testing the new system. As of July 2023, the Company was still critically unprepared to launch the new system. ¶¶48-49. In fact, it had not even completed crucial User Acceptance Testing ("UAT"), the final phase of pre-implementation ERP testing, which entails having the Company's actual end-users (like IOs, planners and buyers, and accounting personnel) test the new integrated systems using real-world applications and data. ¶¶50-54. If performed, UAT serves to catch usability, data migration, or cross-functionality issues early, helping to prevent costly disruptions after full deployment. ¶¶51-52. For Grocery Outlet's SAP implementation, UAT would have entailed having IOs attempt to use the new portal and inventory ordering systems, having planners and buyers attempt to manage warehouse inventory, and having finance and accounting personnel attempt to make accurate calculations and projections for cost of goods sold, margins, and other key metrics. ¶53. By failing to conduct end-to-end UAT with real data, Grocery Outlet was unable to confirm the full functional flow of information needed to effectively conduct the Company's most central operations. ¶¶54-55. By July 2023, the Company had also not completed reconciling and scrubbing data from its legacy systems, which created major issues with inventory control and impacted the Company's entire operations. ¶¶56-59.

Despite knowing the Company had not completed UAT and other critical preparations and testing for the Systems Transition, in July 2023 Sheedy decided to "rip off the band-aid" for his ambitious pet project and proceed with implementation anyway. ¶48. None of this was disclosed to investors. When the Company announced that their new system upgrades were being brought online in August 2023, Sheedy touted the numerous benefits the new systems would provide but

concealed from investors that the Company had not completed critical preparations and testing before implementing the new SAP systems. ¶¶65-78. Sheedy later admitted that he "always knew" and "did expect" the transition would cause disruptions and impact financial results. ¶¶89, 93.

The Company went "live" with its new SAP systems in late August 2023 and immediately encountered widespread disruptions caused by severe problems with inventory visibility and management, end-user errors, and data integrity, among others. ¶¶56-60. These disruptions and other problems infected all aspects of the Company's business, from inventory control and ordering by IOs to financial forecasting and reporting. ¶¶56-60, 86-89, 99-100. The problems were so rampant that they created a material weakness in the Company's internal controls. ¶122.

### C.    Disruptions Persisted Even as Defendants Recklessly Assured Investors the Disruptions Were Nearly Over

Over the next few quarters, Defendants repeatedly assured the market that while they had encountered significant disruptions that had materially impacted the Company's sales, margins, and earnings, the worst was behind them and the financial impacts of the Systems Transition disruptions were contained. They were wrong. More critically, Defendants never had a reasonable basis for making those assurances, contrary to what they implied.

For example, when the Company disclosed its third quarter results in November 2023, the Company reported disappointing financial results and revealed for the first time that the Systems Transition had caused significant disruptions and material impacts to the Company's financials. ¶¶86-87. Defendants even admitted that "*we've always known* how large [the Systems Transition] was and complex. *We did expect as a result, some disruption*." ¶93. At the same time, Defendants also reassured investors that the "transitional impacts" would be "largely behind us by the end of the year," and that investors "should think about us reverting back to previous performance... related to consumer trends, top line sales and how we've managed for both gross margin and bottom-line profit." *See* ¶¶93, 95, 97. That was not the case.

When Defendants reported their 2023 fourth quarter financial results in February 2024, Defendants revealed not only a much larger fourth quarter impact than previously discussed, but also that they expected the 2024 first quarter results to be materially affected by the Systems

Transition as well. ¶¶108-12. Yet again, Defendants' disclosure came with the reassurance that the disruptions would be "resolved" during the quarter and that "the P&L impact [from the disruptions] will be behind [us]." ¶¶115-16. Once again, not so.

In May 2024, the Company revealed that not only were the 2024 first quarter results impacted by the Systems Transition disruptions, but the financial impact was even greater than the prior quarter (*more than double* their prior estimate) and were *still* lingering in the second quarter. ¶¶124-29. Defendants also admitted that the Systems Transition had impaired the Company's ability to forecast financial results due to poor visibility from business reporting systems and tools, as well as data integration issues and new processes within the new applications. ¶126. The Company also explained that the lingering impacts were due to quarter-end inventory and margin calculations, upon which commission payments (paid in the next quarter) were based. ¶118.

The Company's stock price repeatedly declined as Defendants provided these piecemeal admissions of the damage the Systems Transition was inflicting, even as Defendants kept falsely assuring investors that the worst was behind them. ¶¶102, 106, 119, 123, 130. While the direct financial impacts appeared to finally end after the second quarter of 2024, the fallout from Defendants' disclosures and the failed Systems Transition did not. In October 2024, Sheedy was fired by the Board of Directors for the Company's struggles to effectively implement the Systems Transition (¶¶136-39), causing the Company's stock price to fall again. ¶137.

## III.    ARGUMENT

A motion to dismiss under Rule 12(b)(6) tests only whether the factual allegations in the complaint "plausibly suggest an entitlement to relief." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011); *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).[2] While a securities fraud complaint is subject to the heightened pleading requirements of Rule 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), a court considering a motion to dismiss must assess the complaint "in its entirety," accepting all well-pled factual allegations as true and construing those allegations

---

[2] Internal citations and quotations are omitted unless otherwise indicated.

in the light most favorable to the plaintiff. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *In re Gilead Sci. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).

A motion to dismiss a complaint for violation of § 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") will be denied if the plaintiff alleges: "(1) a material misrepresentation or omission by the defendant ["falsity"]; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Matrixx Initiatives, Inc. v. Siracusano,* 563 U.S. 27, 37-38 (2011). In their motion, Defendants challenge only the elements of falsity, scienter, and loss causation, each of which are adequately alleged in the Complaint.

## A.    The Complaint Adequately Alleges Falsity as to Each Challenged Statement

Statements and omissions of material fact are actionable if they are either false or misleading. *Matrixx*, 563 U.S. at 37. Falsity can be shown by pointing to a statement that "directly contradict[s] what the defendant knew at that time." *Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 764 (9th Cir. 2023). "A statement or omission is misleading in the securities fraud context if it would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists." *Reese v. BP Expl. (Alaska) Inc.*, 643 F.3d 681, 691 (9th Cir. 2011). Even literally true statements may mislead, due to their context and manner of presentation. *Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 886 (9th Cir. 2008); *Omnicare, Inc. v. Laborers Dist. Council*, 575 U.S. 175, 192 (2015) ("literal accuracy is not enough: An issuer must as well desist from misleading investors by saying one thing and holding back another.").

The Complaint alleges particularized facts plausibly demonstrating that Defendants concealed from investors: (1) material risks of prematurely implementing the Systems Transition; (2) a material weakness in the Company's internal controls; and (3) that Defendants had no reasonable factual basis for assuring investors that the disruptions from the Systems Transition were under control. Courts routinely sustain claims at the pleading stage based on misrepresentations about a company's problematic ERP implementation. *See, e.g., Emps. Ret. Sys. of Puerto Rico Elec. Power Auth. v. Conduent Inc.,* 2020 WL 3026536, at *1 (D.N.J. June 5, 2020) (defendants falsely "overstated to investors the progress that [the company] was making in

modernizing the IT infrastructure supporting [the] business."); *Hall v. Rent-A-Ctr., Inc.,* 2017 WL 6379334, at *1 (E.D. Tex. Dec. 14, 2017) (defendants misrepresented "rollout of [a] proprietary [IT] system" and failed to disclose "functionality problems that directly affected the Company's ability to complete sales"); *IIn re Towne Servs., Inc. Sec. Litig.*, 184 F. Supp. 2d 1308, 1319–20 (N.D. Ga. 2001)(misrepresentations concerning reliability of IT systems were actionable).

### 1.      The Complaint is Not Puzzle Pleading

As a preliminary matter, there is no merit to Defendants' half-hearted argument, buried in a footnote, that the Complaint engages in "impermissible puzzle pleading." Mtn. at 5 n.2. Defendants' assertion that the Complaint identifies only the documents containing the challenged statements and does not identify the statements themselves, is patently untrue. The Complaint identifies with particularity each statement—not just the document—that Plaintiff alleges was false or misleading, underlining the specific part at issue where a longer quotation is included for proper context. ¶¶68, 72, 74, 79, 82, 91, 93, 95, 97, 115-16. Each of those statements is followed immediately by an explanation as to why that statement was false or misleading. ¶¶69-71, 73, 75, 80, 83, 92, 94, 96, 98, 117-18. Courts in this District routinely find no "puzzle pleading" warranting dismissal where, as here, a plaintiff "precisely detailed each problematic statement, alleged that each statement is false and misleading, and alleged the reasons as to why each statement was false or misleading." *In re Intuitive Surgical Sec. Litig.*, 65 F. Supp. 3d 821, 831 (N.D. Cal. 2014).[3]

### 2.      Misleading Statements About the Systems Transition

Defendants made misleading statements in August 2023 that concealed the material risk that the Systems Transition would cause widespread disruptions and significantly impact Grocery Outlet's operations and financial results. Plaintiff is not alleging fraud-by-hindsight over a business decision that did not work out. Plaintiff alleges that Defendants' decision to prematurely implement the Systems Transition entailed significant risks of major disruptions to the Company's operations with material financial impacts, and that Defendants misled investors as to those risks.

---

[3] This case is nothing like *In re Autodesk, Inc. Sec. Litig.*, 132 F. Supp. 2d 833, 842 (N.D. Cal. 2000), in which "plaintiffs have left it up to defendants and the court to try to figure out exactly what the misleading statements are, and to match the statements up with the reasons they are false or misleading."

Defendants are liable for securities fraud where, as here, they not only "mismanage their company" but "lie to investors about that mismanagement." *Okla. Police Pension & Ret. Sys. v. LifeLock, Inc.*, 780 F. App'x 480, 484 n.4 (9th Cir. 2019)

First, in the Company's quarterly report for the second quarter of 2023 ("August 2023 10-Q"), Defendants stated that there had been "no material changes to our risk factors since the 2022 Form 10-K." ¶68. The 2022 Form 10-K stated: "It is **possible** that we **could** experience implementation, operational and functionality issues, delays, higher than expected costs and other issues during the course of implementing and utilizing these improvements," including to the Company's "customized enterprise resource planning system, components of which ... we are replacing over the next several years." ¶67 (emphasis added). As the 2022 Form 10-K continued:

> With **any** update or replacement of our systems and infrastructure there is a risk of business disruption, liability and reputational damage associated with these actions, including from not accurately capturing and maintaining data, efficiently testing and implementing changes, realizing the expected benefit of the change and managing the potential disruption of the actions and diversion of internal teams' attention as the changes are implemented.

*Id.* (emphasis added). Thus, the August 2023 10-Q incorporated the risk factor from the 2022 Form 10-K and indicated that nothing had changed with respect to those risks.

Second, during the Company's earnings conference call for the same quarter, Sheedy described the purported benefits of the Company's new store portal (a key part of the Systems Transition), including "provid[ing] operators with better analytics and easier access to information." ¶72. Later during the call, in response to an analyst asking for more details about "[w]hat will be the most impactful for the IOs," Sheedy boasted that there were "so many" benefits for IOs, including "easier access to information" and that "this new platform portal will allow [IOs] to operate even more efficiently, ... or operate the P&L more efficiently." ¶74.

### a.    The August 2023 Statements Were Misleading

The statement in the August 2023 10-Q was misleading because in July 2023, Defendants had decided to deploy the new SAP systems despite knowing that the Company was unprepared and there was a material risk of significant disruptions. The purported risk disclosure, as incorporated into the August 2023 10-Q, framed these risks as hypothetical and generalized, when

Defendants knew (or recklessly disregarded) by August 2023 that the *specific* risks from their decision to launch with the Systems Transition before the Company was ready were not merely hypothetical and had, in fact, already materialized. ¶¶69-71.[4]

Disclosures that warn of risks that "could" or "may" occur are misleading when the issuer knows that those risks have materialized. *In re Facebook, Inc. Sec. Litig.*, 84 F.4th 844, 859 (9th Cir. Oct. 18, 2023); *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 704 (9th Cir. 2021) (similar); *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985–87 (9th Cir. 2008) (risk disclosures can be misleading to investors when they "speak[] entirely of as-yet-unrealized risks and contingencies" and do not "alert[] the reader that some of these risks may already have come to fruition."). The risks do not need to have become an absolute certainty for the statement to mislead; Defendants' awareness "of a significant likelihood that the risk would materialize" suffices. *Forescout*, 63 F.4th at 780-81 (disclosure was misleading where defendants "did not meaningfully update the risk disclosure" after learning new information that made the risk significantly more likely to occur); *In re SunPower Corp. Sec. Litig.*, 769 F. Supp. 3d 1042, 1055-56 (N.D. Cal. 2025).

Here, it was misleading to say it was "*possible*" the Systems Transition "*could*" cause implementation issues and disruptions, when in fact Defendants had chosen to undertake a specific risky tactic by rushing out the Systems Transition before the Company was adequately prepared. This was akin to saying that replacing a car's engine "*could*" cause the car to drive poorly, without disclosing that you pulled the engine off of the production line early and never tested it before installation. Defendants' failure to disclose that they had launched the Systems Transition while the Company was inadequately prepared gave "reasonable investor[s] the impression of a state of affairs that differs in a material way from the one that actually exists." *Reese*, 643 F.3d at 691.

Moreover, Sheedy's statements were misleading when made because he admitted that he knew there was a material risk of significant operational disruptions and material financial impact from the premature implementation of the new systems that Sheedy touted, particularly with respect to operational efficiencies and data visibility. ¶¶73, 75. Indeed, he later admitted that "we

---

[4] Plaintiff does not allege that the risk disclosure was misleading when filed in March 2023, only when it was incorporated into the August 2023 10-Q. *See* ¶69.

did expect some disruption during this transition," and "always knew" about the complexities and risks of the transition. ¶¶89, 93. It was misleading for Sheedy to tout the purported benefits of the Systems Transition while omitting the likelihood that the Company would experience disruptions and reduced visibility into inventory and finances due to being inadequately prepared. *Id.* Once Sheedy chose "to tout positive information to the market" about the purported benefits from the Systems Transition, he was "bound to do so in a manner that wouldn't mislead investors, including disclosing adverse information [like the material risks from prematurely launching the Systems Transition] that cuts against the positive information." *Schueneman v. Arena Pharm., Inc.*, 840 F.3d 698, 705-06 (9th Cir. 2016); *see also Michel v. Sumo Logic, Inc.*, 779 F. Supp. 3d 1038, 1051 (N.D. Cal. 2025) ("Half-truths—representations that state the truth only so far as it goes, while omitting critical qualifying information—can be actionable misrepresentations.").

### b.    The August 2023 Statements Are Actionable

Sheedy's statements about the purported benefits of the Systems Transition were not opinions, but even if they were, they are nonetheless actionable. Opinions are actionable where, as here, a defendant "lacked the basis for making those statements that a reasonable investor would expect," or the opinion did not "fairly align[] with the information in [his] possession." *Omnicare,* 575 U.S. at 188-89, 196. Sheedy knew that launching the Systems Transition prematurely created a material risk of operational disruptions that would jeopardize the realization of the very benefits he touted, thus the statements are actionable even if opinions.

Sheedy's statements were also not merely inactionable corporate optimism because at issue is not Sheedy's "vague, generically positive" characterization of the purported benefits of the Systems Transition, *cf.* Mtn. at 10, but the violation of his duty to disclose the material risks to make his statements not misleading. Moreover, the purported benefits that Sheedy touted, such as "provid[ing] operators with better analytics and easier access to information," ¶72, and allowing IOs to "operate the P&L more efficiently," ¶74, were exactly the types of issues that the Company's new ERP systems were designed to improve. They are also exactly the kinds of system-wide functionalities that end-to-end UAT with real data—which Sheedy knew was skipped—is designed to catch and address, if not working properly. *See* ¶¶51-62. Those benefits

are not generic, aspirational language. They are specific and verifiable facts in the context of the Systems Transition.[5] Even "'general statements of optimism, when taken in context, may form a basis for a securities fraud claim' when those statements address specific aspects of a company's operation." *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1143-44 (9th Cir. 2017) (quoting *Warshaw v. Xoma Corp.*, 74 F.3d 955, 959 (9th Cir. 1996)).

Finally, to the extent Sheedy's August 2023 statements were forward-looking, they were not protected by the PSLRA's safe harbor. Forward-looking statements are not protected if: (1) they were not accompanied by meaningful cautionary language; and (2) they were "made with actual knowledge [] that the statement[s] w[ere] false or misleading." *Forescout,* 63 F.4th at 767; 15 U.S.C. § 78u-5. Here, Sheedy's statements were made with actual knowledge of their misleading nature because he knew that the premature rollout of the Systems Transition entailed significant risks of operational disruptions and material adverse impacts on the Company's financial results. His statements were not accompanied by meaningful cautionary language because, as set forth above, the pertinent risk disclosure misleadingly presented the risks from the Systems Transition implementation as hypothetical when in fact they had already materialized. Cautionary language is not meaningful where, as here, the risk disclosures themselves were misleading and failed to disclose "the ***specific*** risk to which [Defendants] had been alerted." *Forescout,* 63 F.4th at 780-81 ("cautionary language is not 'meaningful' if it discusses as a mere possibility a risk that has already materialized.") (emphasis added). "The safe harbor does not immunize such conduct," where boilerplate risk disclosures are not meaningful and "insufficient in light of the undisclosed hard facts critical to appreciating the magnitude of the risks described." *SunPower*, 769 F. Supp. 3d at 1055-56.

---

[5] Sheedy's statements are thus nothing like those at issue in the cases cited by Defendants (Mtn. at 10). *Weston Fam. P'ship LLLP v. Twitter, Inc.*, 29 F.4th 611, 621 (9th Cir. 2022) (statement that the company's overall program was "on track"); *Wozniak v. Align Tech., Inc.*, 850 F. Supp. 2d 1029, 1036–37 (N.D. Cal. 2012) ("we are very pleased with our progress to date"); *In re Splash Tech. Holdings, Inc. Sec. Litig.*, 160 F. Supp. 2d 1059, 1077 (N.D. Cal. 2001) (phrases such as "better than expected," "robust," "well positioned," "solid," and "improved").

### 3.    False Statements About Grocery Outlet's Internal Controls

Grocery Outlet revealed in February 2024 that the Systems Transition had "led to a significant increase in the volume of transactions across user access, program change management, and IT operations for which [the Company's] existing controls were not designed to address. As a result, certain of the Company's related business controls that are dependent upon the affected [information technology general computer controls] were also deemed ineffective." ¶122. The Company also revealed that "the pervasive impact of these control deficiencies ... created a reasonable possibility that a material misstatement to the consolidated financial statements would not be prevented or detected on a timely basis." *Id.* In other words, the cascade of disruptions generated by the rocky Systems Transition rollout overwhelmed certain of the Company's internal controls over financial reporting and rendered them ineffective, representing a material weakness.

In its quarterly report filed in November 2023 ("November 2023 10-Q"), Grocery Outlet explained that it had replaced certain components of its ERP system, "modified certain existing internal controls, [and] implemented new controls and procedures impacted by the implementation of these new systems." ¶79. As the report stated: "Except for the implementation of these new systems, there was no change in our internal control over financial reporting identified...." *Id.* The November 2023 10-Q was also accompanied by certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") attesting to the disclosure of any material changes to (or material weaknesses in) the Company's internal control over financial reporting. ¶82.

These statements were false and misleading because they failed to disclose the existing material weakness in the Company's internal control over financial reporting caused by the rampant disruptions from the Systems Transition during the third quarter of 2023. ¶¶80, 83. Contrary to Defendants' argument, Mtn. at 6 n.3, it is reasonable to infer that the material weakness was known by November 2023 because it was caused by the rampant disruptions from the Systems Transition which manifested in the third quarter, well before November 2023. ¶¶80, 122.[6]

---

[6] Unlike in *Davoli v. Costco Wholesale Corp.*, 854 F. App'x 116, 118 (9th Cir. 2021), where there were insufficient allegations of the defendants' knowledge when the statements were made, here there is little question that Defendants knew of the operational disruptions from the Systems Transition by November 2023, which created the material weakness. ¶122.

### 4. Misleading Statements About Defendants' Visibility Into the Financial Impacts of the Systems Transition Disruptions

Defendants began to reveal the widespread disruption and impacts from the Systems Transition in November 2023, but as they did so, they also misleadingly reassured investors (in November 2023 and again in February 2024) that they had a good handle on the problems and that they had reason to expect the issues would be limited to the then-current quarter. Defendants were wrong each time, as the disruptions and impacts persisted through the second quarter of 2024. The reason their statements were misleading, however, is because they failed to disclose that they knew poor reporting visibility and data integration issues had hindered their ability to make accurate forecasts in the first place, despite their confident assurances to investors. Moreover, they knew that commission expense calculations materially affecting the next quarter's results could not be made until the current quarter's end. This is not fraud-by-hindsight (Mtn. at 6), which "simply contrast[s] a defendant's past optimism with less favorable actual results." *Knox v. Yingli Green Energy Holding Co.,* 2016 WL 6609210, at *8 (C.D. Cal. May 10, 2016). The Complaint alleges Defendants' statements were misleading due to facts known when those statements were made.

First, during a November 2023 earnings call where Defendants first revealed that the Systems Transition had caused significant operational disruptions and material adverse financial impacts, Bracher reassured investors that "we do expect and believe that [the impacts of the Systems Transition] will be largely behind us by the end of the year. And so our view at this point is we will enter the new year without any lingering cost impacts or otherwise related to the transition." ¶91. Likewise, Sheedy stated that "in terms of impact looking forward... we do [expect] the transitional impact to be contained to this year.... And then largely behind us at the end of the year. So you should think about us reverting back to previous performance ... for both gross margin and bottom-line profit." ¶93. Sheedy also stated twice that Grocery Outlet "anticipate[s] the transitional impacts to be largely behind us as we get to the end of the year." ¶95. Bracher also stated: "we do feel confident in being able to resolve these outstanding issues to the point where the impact is then largely behind us by the end of the year." ¶97.

Then, in February 2024, Defendants revealed that the disruptions and impacts of the Systems Transition had persisted into the first quarter of 2024. ¶¶107-15. However, undeterred by

their prior failure to ascertain the scope and severity of the disruptions, Defendants once again assured investors that the end of their troubles was nigh. Bracher stated that "Our current guidance assumes that we ... are back to steady state operations and conclude the elective commission support by the end of the first quarter." ¶115. Sheedy stated: "We expect these [data integration issues] to be resolved soon, after which the P&L impact will be behind [us]." ¶116.

### a.    Defendants' Assurances Were Misleading

Each of these statements falsely conveyed that Defendants had a reasonable basis for claiming that the disruptions and resulting financial impacts would be resolved during, and not persist beyond, the quarter in which each statement was made. *See* ¶¶92, 94, 96, 98, 117-18. The truth was revealed in May 2024, when the Company's interim CFO, Lindsay Gray, admitted that "[f]orecasting has been difficult during the system transition as we have not had good visibility to our normal business reporting and tools. Compounding this have been data integration issues and new processes that we and our operators are adapting to within new applications." ¶127. Sheedy also confirmed that the Company had "limited data visibility for how we manage and forecast margin," which persisted through the preceding fourth and first quarters. ¶129. Gray also explained that the Company had to complete "catch-up invoice processing and final margin reconciliation and the end of the quarter" in order to calculate store margins and IO commissions, which "can only be calculated after a full inventory period has been completed." ¶118. In other words, Defendants *could not possibly know* the full impact on the Company's margins or commission expenses for the then-current or subsequent quarters until the then-current quarter had ended. *Id.*

Defendants' November 2023 and February 2024 statements were thus misleading because Defendants did not have a reasonable basis for their assurances to investors, contrary to what their statements implied. Such statements can be "actionably false if 'there is no reasonable basis for the belief' or 'the speaker is aware of undisclosed facts tending seriously to undermine the statements' accuracy.'" *Knollenberg v. Harmonic, Inc.*, 152 F. App'x 674, 683 (9th Cir. 2005) (quoting *Provenz v. Miller*, 102 F.3d 1478, 1487 (9th Cir. 1996)). Defendants' failure to disclose that their statements were based on a haphazard foundation of impaired data reporting visibility and calculations they could not yet make rendered their statements materially misleading.

### b.    Defendants' Statements Are Actionable

First, to the extent Defendants' November 2023 and February 2024 statements were opinions, they were nonetheless actionable. Defendants had no reasonable basis to say that the disruptions would be resolved during the then-current quarters—even more so in February 2024 when they had already seen how the same deficiencies marred their projections in November 2023. ¶117. Thus, Defendants "lacked the basis for making those statements that a reasonable investor would expect," and the statements did not "fairly align[] with the information in [Defendants'] possession." *Omnicare*, 575 U.S. at 188-89, 196.

Second, while these statements were facially forward-looking, they are not protected by the PSLRA's safe harbor. Plaintiff alleges that by November 2023 and February 2024, Defendants knew that they lacked adequate visibility for business reporting and forecasting, as compounded by "data integration issues" due to the Systems Transition, and that they could not make calculations of store margins or commission expenses for the then-ongoing or subsequent quarters when they made the assurances to investors. ¶¶118, 127, 129. With respect to purported meaningful cautionary language, Defendants point only to the March 2023 risk disclosure, which Plaintiff alleges was misleading and not meaningful by August 2023. *See supra*, §III(A)(2). Stating that ERP modernization "***could*** result in implementation, operational and functionality issues," ¶66 (emphasis added), did not meaningfully apprise investors of the specific risks that, by November 2023 and February 2024, the rampant disruptions from the Systems Transition had *already* materialized and hampered Defendants' data visibility for business reporting and forecasting. *Facebook*, 84 F.4th at 859; *Alphabet*, 1 F.4th at 704. Similarly, the disclosure that "with ***any*** update or replacement of our systems and infrastructure there is a risk of business disruption," ¶66 (emphasis added), is a generic statement that does nothing to apprise investors of the *specific* risks from the ongoing Systems Transition of impaired data visibility and difficulty forecasting. *Forescout*, 63 F.4th at 780-81. Defendants identify no risk warning that meaningfully disclosed that commission expenses could not be calculated until the end of the quarter and thus any statements purporting to assess future commission expenses were inherently specious.

### B.    The Complaint Alleges a Cogent and Compelling Inference of Scienter

At the pleading stage, Plaintiff need only "'state with particularity facts giving rise to a strong inference' that defendants acted with the intent to deceive" or, at minimum, "with deliberate recklessness as to the possibility of misleading investors." *Berson*, 527 F.3d at 987 (quoting PSLRA); *see also Vernazza v. S.E.C.*, 327 F.3d 851, 860 (9th Cir. 2003) (scienter "may be supported by knowing or reckless conduct, without a showing of willful intent to defraud"). "Reckless conduct may be defined as a highly unreasonable omission, involving ... an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 702 (9th Cir. 2012). The relevant inquiry "is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter." *Tellabs*, 551 U.S. at 322-23. The inference of knowing or reckless fraud "need not be irrefutable, *i.e.*, of the smoking-gun genre," and it need only be at least *equally* as likely as any non-culpable explanation for the alleged conduct. *Id.* at 314, 324. Here, the Complaint alleges a strong inference of scienter as to each of the Defendants.

#### 1.    Sheedy and Bracher Knew or Recklessly Disregarded that Their Statements Would Mislead Investors

Defendants do not even attempt to address many of the allegations in the Complaint which support the inference that Defendants knew their statements were false and acted with deliberate recklessness. *See Schueneman*, 840 F.3d at 707 (scienter adequately alleged where defendants had knowledge of facts that made their statements misleading); *also In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 1022 (S.D. Cal. 2005) ("[T]hat the defendants published statements when they knew facts suggesting the statements were inaccurate … is classic evidence of scienter.").[7]

**Knowledge of Disruptions and Financial Impact**. First, the Complaint alleges that Defendants "always knew" that the Systems Transition would cause disruptions and affect the Company's financial statements but failed to disclose it. ¶¶89, 93.  In the November 2023 Earnings Call, Sheedy admitted that when transitioning to the new system "we did expect some disruption"

---

[7] Defendants do not dispute that Sheedy and Bracher's scienter is properly imputed to Grocery Outlet. *In re ChinaCast Educ. Corp. Sec. Litig.*, 809 F.3d 471, 476 (9th Cir. 2015).

which would negatively impact the Company's financials, and the Company had even adjusted its financial guidance in the prior period to account for those expected disruptions.[8] *Id*. *See In re Splunk Inc. Sec. Litig.*, 592 F. Supp. 3d 919, 938, 947 (N.D. Cal. 2022) (finding scienter where the defendants concealed from investors matters they had discussed previously).

Detailed allegations from former employees ("FEs") further support an inference that Defendants knew the Company was unprepared to launch the Systems Transition. FE1 detailed how the "Project Steering Committee" for the Systems Transition held weekly meetings (attended by Bracher) to discuss "critical issues" with the transition and what was "ready and not ready." ¶¶43-45. Bracher provided "readouts" of these meetings to FE1 and others in regular weekly meetings. *Id.* The committee maintained "tracking documents" to track ongoing issues and readiness, which the Accounting and Finance departments discussed during weekly meetings. *Id.*

FE1 also explained that when the decision was made to launch the Systems Transition, the Company had not even tested the system using live data (it had only used "dummy" data) or completed end-to-end UAT. ¶¶49-56. This lack of testing was specifically noted in the internal tracking documents available to Defendants. ¶50. Based on these details—the same facts made available to and reviewed by Bracher—FE1 assessed that by July 2023, "the Company was still not ready to implement the SAP systems" when it made the launch decision. ¶48. FE2 corroborated FE1's account, stating that FE2 and most colleagues felt the launch was premature. ¶49. Read holistically, these allegations support the inference that Defendants were aware of the Company's lack of readiness and significant risk of disruptions by July 2023. At a minimum they were reckless in failing to disclose these facts. *See Pampena*, 705 F. Supp. 3d at 1048-49 ("general allegations

---

[8] Although this statement is not attributed to Bracher directly, Bracher was on the earnings call with Sheedy and it is reasonable to infer that "we" includes Bracher. It would be "absurd" to suggest that Bracher was not also aware of the expected disruptions that the CEO (among others) knew about given that he was the CFO, was deeply involved in the Systems Transition, had access to key information about outstanding readiness issues (¶¶44-45, 91, 97), and that the disruptions were expected to impact the Company's financials and had factored into prior guidance, squarely within Bracher's domain as CFO (¶89). *See Pampena v. Musk*, 705 F. Supp. 3d 1018, 1048 (N.D. Cal. 2023) (inference of scienter supported by "allegations regarding a management[ defendant]'s role in the company ... that suggest that the defendant had actual access to the disputed information, and where the nature of the relevant fact is of such prominence it would be absurd to suggest that management was without knowledge of the matter").

about a defendant's involvement" that are "buttressed with detailed and specific allegations about management's exposure to factual information" support an inference of scienter).

Unlike *Metzler Inv. GMBH v. Corinthian Colleges, Inc*., 540 F.3d 1049, 1068 (9th Cir. 2008), where allegations of a general data monitoring system were insufficient because the complaint failed to identify any specific information in the system or how management received it, the Complaint here lays out "additional allegations of specific information … conveyed to management and related to the fraud."

**Core Operations**.   The core operations inference also supports a strong inference of scienter. This doctrine "allows a court to impute" scienter when "the nature of the relevant fact is of such prominence that it would be absurd to suggest that management was without knowledge of the matter." *In re Fibrogen, Inc. Sec. Litig.*, 2022 WL 2793032, at *29-31 (N.D. Cal. July 15, 2022). Courts "need not close their eyes to circumstances that are probative of scienter viewed with a practical and common-sense perspective." *S. Ferry LP, No. 2 v. Killinger,* 542 F.3d 776, 784 (9th Cir. 2008) (applying core operations doctrine).

Citing *In re NVIDIA Corp. Sec. Litig*., 768 F.3d 1046, 1064 (9th Cir. 2014), Defendants argue that Plaintiff must allege "specific information conveyed to management and related to the fraud...." Mtn. at 14. This is not the full rule or quote. Citing *S. Ferry*, the court in *NVIDIA* actually stated that the core operations doctrine would not apply "absent some additional allegation of specific information conveyed to management and related to the fraud ***or other allegations supporting scienter....***" 768 F.3d at 1063 (emphasis added). While Plaintiff meets the standard even as Defendants frame it, the Complaint's core operations allegations support scienter because they accompany "other allegations that, when read together, raise an inference of scienter that is cogent and compelling." *S. Ferry*, 542 F.3d at 785–86.

As discussed above, the Complaint alleges that Bracher not only had access to the information but that he actually reviewed it. With respect to Sheedy, the Complaint alleges: (1) that he spoke regularly and fluently on the topic to investors and at company-wide meetings (¶¶64, 72-76, 84-86, 89, 93, 111, 116, 125, 129); (2) that he was responsible for and "spearheaded" the important Company-wide project and emailed the entire Company about its launch (¶¶48, 62, 64);

(3) his "role in a corporate structure" as CEO (*S. Ferry*, 542 F.3d at 785); and (4) his admissions that "we did expect some disruption during this transition," and he "always knew" about the complexities and risks of the transition (¶¶89, 93). The Complaint also plainly identifies the "importance of the corporate information." *S. Ferry*, 542 F.3d at 785. The Systems Transition was "such a central component of [the Company's] operations that Defendants can be presumed to have knowledge of the problems with [it]." *Azar v. Yelp, Inc.*, 2018 WL 6182756, at *20 (N.D. Cal. Nov. 27, 2018) *see also Fibrogen*, 2022 WL 2793032, at *30-31. These allegations support a strong inference of scienter on a holistic basis because they are "made in conjunction with detailed and specific allegations about management's exposure to factual information." *S. Ferry*, 542 F.3d at 785.

**Lack of Visibility Into Financials and Inventory**. While Sheedy and Bracher admitted on the November 2023 earnings call that they knew the Systems Transition had "challenged" the Company's inventory visibility with respect to IOs ordering and managing inventory, ¶¶89, 99, they did *not* disclose until May 2024 that they had impaired visibility into business reporting and tools throughout the Systems Transition, which directly hindered their forecasting ability. ¶¶126, 129. Moreover, when Defendants assured investors the impacts would end during the then-current quarters (¶¶91, 93, 95, 97, 115-16), they *could not possibly have known* the extent of the financial impacts on the Company for the then-ongoing or following quarters because IO commissions (a significant expense resulting from the Systems Transition) were based on store margins, which could not be calculated until the end-of-quarter inventory counts were completed. ¶118. Defendants thus knew they had no reasonable basis for their assurances to investors.

**Internal Controls**. The allegations in the Complaint also reflect that Defendants knew their internal controls were ineffective from the start of the transition because they knew they could not accurately track inventory, costs of goods sold, commissions, margins and other key metrics due to the disruptions from the Systems Transition. *See* ¶¶57-60, 86, 89, 93, 100, 126. Nonetheless, in the November 2023 10-Q, Sheedy and Bracher signed SOX certifications falsely asserting that internal controls remained effective even three months into the tumultuous Systems Transition. ¶¶79-82 (also noting that Sheedy and Bracher were responsible for the controls and understood

them, as they represented in the certifications); *see also* ¶¶126-27. Defendants then admitted in February 2024 that their internal controls were, and had been, ineffective as a result of "the pervasive impact of these control deficiencies." ¶122.

**Defendants' Resignations**.  The departures of Sheedy and Bracher also lend support to the overall allegations of scienter. Bracher's departure in December 2023 was in the midst of the crisis, soon after the problems were first partially revealed in November 2023, and was deemed "surprising" by analysts. ¶¶104-05. Such departures can support an inference of scienter. *Brendon v. Allegiant Travel Co*., 412 F. Supp. 3d 1244, 1263 (D. Nev. 2019). Defendants' self-serving characterization (based on evidence that should not be considered at this stage) that it was a "personal decision" and a long transition period do not negate these allegations and just as plausibly could be PR spin and accommodations common in such situations. Likewise, the Complaint plausibly alleges that Sheedy was terminated and "held responsible because he was intimately aware that the Company was woefully unprepared to launch the Systems Transition in August 2023," and the concomitant risks of his decision to launch it anyway. ¶¶138-39; *Allegiant*, 412 F. Supp. 3d at 1263 (noting an executive departure supported scienter where evidence suggested it was a result of operational challenges).

## 2.     The FE Allegations Are Sufficiently Pled

With respect the FE allegations, the central question is whether the complaint provides "an adequate basis for determining that the witnesses in question have personal knowledge of the events they report." *Forescout*, 63 F.4th at 767. For this determination, "the court considers the level of detail provided by the confidential witnesses, the plausibility of the allegations, the number of sources, the reliability of the sources, corroborating facts, and similar indicia of reliability." *Id.*

Defendants argue that "none of the FEs are reliable" and that "there are no allegations that any worked on SAP integration … or interacted with Sheedy or Bracher about … systems implementation." Mtn. at 11. Defendants must be reading a different complaint. *See* ¶¶37-64. FE1 was a Director of Financial Planning and Analysis responsible for the "full P&L" and forecasting, directly reporting one-level below Bracher. The Complaint explains FE1s involvement with the both the Systems Transition and Bracher. ¶41. FE1 described the Project Steering Committee's

weekly meetings attended by Bracher and how FE1 received weekly readouts *from Bracher* regarding outstanding issues with the Systems Transition. ¶44. The Complaint also alleges that FE1 personally reviewed the tracking documents which are described in detail. *See* ¶¶42-56, 58-59. The Complaint likewise adequately alleges details about FE2 and FE3's experience, positions, and the basis for their relevant knowledge. ¶¶39-40, 56-57. FE1's detailed allegations are corroborated by FE2 and FE3's accounts, as well as Defendants' own admissions of their prior knowledge. These are a far cry from the vague, unreliable, and irrelevant FE allegations rejected in the cases Defendants cite.[9]

Contrary to Defendants' arguments, the FE allegations do not need to demonstrate firsthand knowledge of Defendants' subjective *belief* to support scienter. In *In re Rackable Sys., Inc. Sec. Litig.,* 2010 WL 199703, at *8 (N.D. Cal. Jan. 13, 2010), the court merely refused to rely on "vague assertions" from a witness who had no interactions with the defendants, provided them with no information, and said nothing relevant regarding their knowledge of false financial statements.

### 3.    Plaintiff's Inference of Scienter is the Most Plausible

Defendants knew that prematurely launching the Systems Transition carried significant risk of operational disruptions and was likely to cause adverse financial impacts. They decided to "rip off the band-aid" anyway. Later, they repeatedly tried to downplay the ongoing impacts and reassure investors that the worst was over, knowing they had no reasonable basis for doing so. This was hardly a story of transparency and good faith. Defendants did not reveal any of the

---

[9] *See e.g. Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 997-98 (9th Cir. 2009) (FEs lacked personal knowledge and knowledge was based on "vague hearsay"); *McGovney v. Aerohive Networks, Inc.*, 367 F. Supp. 3d 1038, 1053 (N.D. Cal. Feb. 5, 2019) (complaint failed to describe the FEs' job responsibilities or allege that they "were in a position to have the knowledge they profess"); *Wozniak v. Align Tech., Inc*., 2011 WL 2269418, at *12 (N.D. Cal. June 8, 2011) (no scienter based on FEs who only made vague and conclusory allegations and did not "describe[] the contents of any of the meetings"); *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.,* 759 F.3d 1051, 1063 (9th Cir. 2014) (low-level FE of three months who made an unsubstantiated statement without substance or context and other FEs who provided only "snippets" of vague information); *City of Sunrise Firefighters' Pension Fund v. Oracle Corp.,* 2019 WL 6877195, at *19 (N.D. Cal. Dec. 17, 2019) (FEs could not confirm the executives actually received reports); *NVIDIA,* 768 F.3d at 1058-59 (FE at issue failed to explain how management would have received the information, and the information he was aware of did not even relate to the fraud).

disruptions or impacts until November 2023, three months *after* the rollout that had immediately thrown a wrench into the Company's operations. Even then, they did not "accurately quantif[y] the impact on sales and gross margins," Mtn. at 15, they baselessly assured investors that everything was under control. The fact that Defendants eventually disclosed the internal controls weakness *six months after the disruptions began*, Mtn. at 15, is hardly exculpatory.

Defendants also argue that Plaintiff does not allege Defendants' motive. While an allegation of motive can help support scienter, it is not required. *Tellabs*, Inc. 551 U.S. at 310. Here, Defendants were motivated to conceal and downplay the foreseeable results of the risks they knowingly took on. Defendants also claim that the Company made stock repurchases in 2022, *before* the fraud, and then during some *unspecified* time in 2023, pursuant to a 2021 share repurchase program. Mtn. at 16, n.6, Ex. 8 at 85. Absent conclusive evidence of exactly when and why the 2023 repurchases were made, they do not weigh against an inference of scienter. "Defendants have not provided sufficient context," and thus "such purchases would not negate the strong inference of scienter." *Maiman v. Talbott*, 2010 WL 11421950, at *7 (C.D. Cal. Aug. 9, 2010). *See also State Teachers Ret. Sys. of Ohio v. ZoomInfo Tech., Inc.*, 2025 WL 3013683, at *25 (W.D. Wash. Oct. 28, 2025) (stock repurchases "do[] not undermine scienter" and are even "less relevant for individual defendants") (citing *In re Apple Inc. Sec. Litig.*, 2020 WL 6482014, at *13 (N.D. Cal. Nov. 4, 2020)).

In any event, the Ninth Circuit has made clear that "[s]cienter can be established even if the officers who made the misleading statements did not sell stock during the class period." *No. 84 Employer-Teamster Joint Council Pension Tr. Fund v. Am. West Holding Corp.*, 320 F.3d 920, 928-38, 944 (9th Cir. 2003) (plaintiffs sufficiently pled scienter despite existence of stock repurchase). "[C]ourts have refused to hold that stock purchases were inconsistent with fraud where the defendants could have believed they could have continued to hide the fraud." *Cho v. UCBH Holdings, Inc.*, 890 F. Supp. 2d 1190, 1202 n.2 (N.D. Cal. 2012). Defendants "may have hoped" they could succeed despite the massive risks, but that "hope does not justify misleading investors." *Apple*, 2020 WL 6482014 at *13 n.12.

### C.    The Complaint Adequately Alleges Loss Causation

Pleading loss causation requires allegations of "a causal connection between the material [misrepresentations or omissions] and the loss." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342 (2005). This is a "low bar" at the pleading stage. *In re WageWorks, Inc., Sec. Litig.*, 2020 WL 2896547, at *8 (N.D. Cal. June 1, 2020). Plaintiff needs only to allege a "plausible" inference that the "revelation of fraudulent activity... proximately caused the decline in defendant's stock price." *Grigsby v. BofI Holding, Inc.*, 979 F.3d 1198, 1204-06 (9th Cir. 2020). "One way to prove loss causation is to show that the defendant's fraud was revealed to the market through one or more corrective disclosures." *In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 786 (9th Cir. 2020). Plaintiff may also plead "materialization of the risk," alleging that discloses revealed the true extent of the relevant risk. *See WageWorks*, 2020 WL 2896547 at *8; *Yaron v. Intersect ENT, Inc.*, 2020 WL 6750568, at *5 (N.D. Cal. June 19, 2020) ("Disclosure of fraud is not a sine qua non of loss causation. ... Instead, under a materialization of the risk theory, plaintiff may allege the very facts about which defendant lied caused the injuries."). The disclosures may be partial, spread over a series of disclosures revealing the entire issue gradually. *In re BofI*, 977 F.3d. at 790.

Defendants assert that they truthfully disclosed all the risks before they materialized, but the Complaint alleges otherwise. *Supra* §III(A)(2). This argument is entirely derivative of Defendants' falsity arguments, and thus it fails for the same reasons. The Complaint alleges that the concealed risk—that prematurely launching the Systems Transition would cause operational disruptions and adversely impact Grocery Outlet's financial results—gradually materialized as the Company partially revealed the true impacts of the botched Systems Transition launch, resulting in six separate stock declines. *See* ¶102 (upon the first disclosure of disruptions and financial impacts), ¶106 (upon Bracher's related departure), ¶119 (upon disclosure of continued disruptions and impacts), ¶123 (upon disclosure of material weakness in internal controls), ¶130 (upon disclosure of continued financial impacts and facts showing Defendants lacked a reasonable basis for their assurances), and ¶137 (upon Sheedy's firing due to the botched Systems Transition).

Plaintiff alleges that Sheedy's and Bracher's purported resignations were a result of their roles in bungling the Systems Transition. ¶¶106, 137. An executive resignation resulting in a stock

decline alleges loss causation where the resignation was a result of the fraud or materialization of the concealed risks such as executive misconduct. *Cement & Concrete Workers Dist. Council Pension Fund v. Hewlett Packard Co.,* 964 F. Supp. 2d 1128, 1145-46 (N.D. Cal. 2013).

Defendants' arguments that they disclosed the risk, or that the declines were solely the result of poor performance, are inherently factual inquiries that cannot be resolved at the pleading stage. *Amgen Inc. v. Conn. Ret. Plans and Tr. Funds*, 568 U.S. 455, 482 (2013) (proof that "news of the truth credibly entered the market and dissipated the effects of prior misstatements" is an issue for trial or summary judgment.); *Ohio Pub. Emps. Ret. Sys. v. Meta Platforms, Inc*., 2024 WL 4353049, at *19 (N.D. Cal. Sept. 30, 2024) (on a motion to dismiss, rejecting argument that that the truth was revealed because the facts were disputed by the complaint). In any event, "[t]he misrepresentation need not be the sole reason for the decline in value of the securities," it need only be "a substantial cause." *Gilead*, 536 F.3d at 1055; *Special Situations Fund III QP, L.P. v. Brar*, 2015 WL 1393539, at *9 (N.D. Cal. Mar. 26, 2015) (loss causation adequately pled where the market's recognition of the true level of exposure "played some part in diminishing the market value of [Plaintiff's] securit[ies]."). Plaintiff alleges a "connection" between the concealed risks and the losses incurred upon the materializations of those risks, adequately pleading loss causation.

### D.    The Complaint Adequately Alleges a Claim under § 20(a) of the Exchange Act

To state a claim under § 20(a), Plaintiff must allege: (1) a primary violation of the Exchange Act; and (2) that the individual defendants controlled the entity liable for the primary violation. 15 U.S.C. § 78t(a); *Hefler v. Wells Fargo & Co.*, 2018 WL 1070116, at *13 (N.D. Cal. Feb. 27, 2018) (Tigar, J.). The Complaint adequately alleges a primary violation by Grocery Outlet. Defendants do not contest that the Complaint adequately alleges the control element, Mtn. at 17 n.7, thus their motion to dismiss Plaintiff's § 20(a) claims must be denied. *Id.* at *13-14.

## IV.    CONCLUSION

The Court should deny Defendants' motion to dismiss. If the Court grants any part of the motion, Plaintiff respectfully requests leave to amend. *Eminence Cap., LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003) (leave to replead is routinely granted in securities cases).

Dated: December 23, 2025          Respectfully submitted,

THE ROSEN LAW FIRM, P.A.

By: /s/Joshua Baker
Laurence M. Rosen (SBN 219683)
355 S. Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Email: lrosen@rosenlegal.com

Jonathan Stern (*pro hac vice*)
Joshua Baker (*pro hac vice*)
275 Madison Avenue, 40th Floor
Telephone: (212) 686-1060
Email: jstern@rosenlegal.com
          jbaker@rosenlegal.com

*Lead Counsel for Lead Plaintiff and the Class*

THE SCHALL LAW FIRM
Brian Schall
2049 Century Park East, Suite 2460
Los Angeles, CA 90067
Telephone: (310) 301-3335
brian@schallfirm.com

*Additional Counsel for Lead Plaintiff*