UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GENRICCIO LIBERATO,<br>Plaintiff,<br>v.<br>GROCERY OUTLET HOLDING CORP. SECURITIES LITIGATION, et al.,<br>Defendants. | Case No. 25-cv-00957-JST<br>**ORDER GRANTING MOTION TO DISMISS**<br>Re: ECF No. 39 |

Before the Court is Defendant Grocery Outlet's motion to dismiss the amended complaint, a putative class action alleging violations of federal securities laws. ECF No. 39. The Court will grant the motion.

## I. BACKGROUND

The following facts are drawn from the amended complaint, ECF No. 38. Grocery Outlet is an "extreme value retailer of consumables and fresh products sold via a network of independently owned and operated stores," with most of its locations operated by independent, third-party operators, referred to as "IOs." *Id.* ¶ 27. Grocery Outlet generally shares half of its store-level profits with its IOs, paid as "commissions" based on store margins. *Id.* ¶ 27, 100. While IOs handle local operations, Grocery Outlet handles inventory procurement, distribution, and information systems. *Id.* ¶ 28. Defendant Robert Joseph Sheedy was the Company's CEO from January 2023 to October 29, 2024, and Defendant Charles Bracher was the Company's CFO from August 2012 until March 1, 2024. *Id.* ¶¶ 21, 22.

In 2021, Defendants decided to modernize and overhaul Grocery Outlet's internal enterprise resource planning ("ERP") and information technology systems (the "Systems Transition"). *Id.* ¶ 2. Its financial ledger, inventory management platform, and product data

United States District Court
Northern District of California

United States District Court
Northern District of California

warehouse system were all implicated. *Id*. The company developed and tested the new software (manufactured by a company called SAP) in 2021 and 2022 with the goal of rolling it out in March 2023, although the rollout was ultimately pushed back to August 2023. *Id*. ¶¶ 3–6, 46–49. At the time of the rollout, Defendants had still not conducted "end-to-end User Acceptance Testing ('UAT')," in which the company's actual end-users, like IOs, planners and buyers, and accounting personnel, test the new systems using real-world applications and data. *Id*. ¶¶ 50–55. Plaintiff alleges that this testing would have confirmed the full functional flow of information needed to effectively conduct the Company's operations. *Id*. ¶¶ 54–55.

When the company went "live" with its new SAP ERP systems in late August 2023, it immediately encountered widespread disruptions caused by problems with inventory visibility and management, end-user errors, and data integrity. *Id*. ¶¶ 56–60. These disruptions impacted the company's procurement, distribution, accounting, and financial reporting. *Id*. ¶¶ 2, 56–60, 86–89, 99–100.

On the November 2023 earnings call for Q3 2023, Defendants disclosed that the Systems Transition had caused significant disruptions and material impacts to the Company's financials, describing "ordering and inventory disruptions that have impacted third and fourth quarter results," including "inventory visibility . . . challenges." *Id*. ¶¶ 86, 89, 99. Bracher listed an approximately 150-basis-point impact to store sales and a 50-basis-point impact to gross margin stemming from inventory inefficiencies. *Id*. ¶ 87. He stated his expectation that the Systems Transition would "significantly impact financial results in the fourth quarter and to a greater degree than the third quarter." *Id*. Sheedy stated "that we did expect some disruption during this transition. It was factored into our previous guidance, just not to the degree that we've been experiencing it." *Id*. ¶ 89; *see also id*. ¶ 91 (Sheedy stating "we've always known how large [the Systems Transition] was and complex. We did expect as a result, some disruption"). And Bracher further stated that "as disappointed as we are with the magnitude of the impact in the fourth quarter, we do expect and believe that it will be largely behind us by the end of the year." *Id*. ¶ 91. Following these disclosures, "the price of Grocery Outlet stock fell $1.31, or 4.6%, to close at $27.15." *Id*. ¶ 102.

Bracher announced his resignation on December 11, 2023, effective March 1, 2024. Id. ¶ 104. On that news, "the price of Grocery Outlet stock fell $1.83, or 6.2%, to close at $27.91 on December 12, 2023." *Id.* ¶ 106.

On February 27, 2024, the company issued a press release disclosing its Q4 2023 financial results, ECF No. 38 ¶ 107, explaining that "[a]s previously disclosed, the Company experienced disruptions as a result of the implementation of new technological platforms in late August 2023," *id.* ¶ 108. During the earnings call the same day, Sheedy explained that "data integration efforts [were] taking longer than expected and [were] still impacting [Grocery Outlet's] business results." *Id.* ¶ 111. Bracher further acknowledged that "the system transition impacted comp sales by approximately 200 basis points for the quarter" and "the margin impact of our system integration . . . was approximately 130 basis points in the quarter." *Id.* ¶ 110. Bracher also disclosed that, as a result of the systems transition, Grocery Outlet will "continue to experience [Profit & Loss, or P&L] impacts during the first quarter" of 2024, while expressing optimism that its issues would "be resolved soon, after which the P&L impact will be behind us." ECF No. 39-9 at 8; ECF No. 38 ¶ 116. Following these disclosures, "the price of Grocery Outlet stock fell $0.32, or 1.2%, to close at $26.15." *Id.* ¶ 119. After Grocery Outlet filed its Form 10-K Annual Report, which provided additional detail about the impacts of the Systems Transition, the "the price of Grocery Outlet stock fell another $0.36, or 1.4%, to close at $25.79 on February 29, 2024." *Id.* ¶¶ 120–23.

In May 2024, the company revealed that the Q1 2024 results had been impacted by the Systems Transition to a greater extent than the prior quarter—more than double their prior estimate—with impacts lingering into the second quarter. *Id.* ¶¶ 124–25. Lindsay Gray, the company's interim CFO, also admitted on the Q1 2024 earnings call that the Systems Transition had impaired the company's ability to forecast financial results due to poor visibility from business reporting systems and tools, as well as data integration issues and new processes within the new applications. *Id.* ¶ 126. The company also explained that the lingering impacts in the next quarter were attributable to the costs of IO margin payments, which could not be made until physical inventory counts were completed after the end of the quarter. *Id.* ¶ 118. Following these disclosures, "Grocery Outlet stock fell $5.02 per share, or 19.4%, to close at $20.88." *Id.* ¶ 130.

In October 2024, Sheedy was fired by the Board of Directors based on the company's struggles to effectively implement the Systems Transition. *Id.* ¶¶ 136–39. "On this news, the price of Grocery Outlet stock fell $2.71 per share, or 16.3%, to close at $13.90 per share on October 30, 2024." *Id.* ¶ 137.

The amended complaint alleges violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Securities and Exchange Commission ("SEC") Rule 10b-5, individually and on behalf of a class defined as all persons and entities who purchased Grocery Outlet common stock between August 9, 2023 and May 7, 2024. *Id.* ¶ 1.

Defendants filed this motion to dismiss on October 21, 2025. ECF No. 39. Plaintiff opposed on December 23, 2025. ECF No. 40. Defendants replied on January 30, 2026. ECF No. 41.

## II. JURISDICTION

The Court has jurisdiction under 28 U.S.C. § 1331.

## III. LEGAL STANDARD

SEC Rule 10b–5 makes it unlawful to, among other things, "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b–5(b). "There are six elements to a securities fraud claim under § 10(b) and Rule 10b–5: (1) a material misrepresentation or omission; (2) scienter (*i.e.,* a wrongful state of mind); (3) a connection between the misrepresentation and the purchase or sale of a security; (4) reliance upon the misrepresentation (often established in 'fraud-on-the-market' cases via a presumption that the price of publicly-traded securities reflects all information in the public domain); (5) economic loss; and (6) loss causation." *Loos v. Immersion Corp.*, 762 F.3d 880, 886–87 (9th Cir. 2014), *as amended* (Sept. 11, 2014) (citing *Dura Pharmaceuticals, Inc. v. Broudo,* 544 U.S. 336, 341–42 (2005)); *see also In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 876 (9th Cir. 2012).

Such claims must meet the "heightened pleading requirements" of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act ("PSLRA"). *Id.* at 876; 15 U.S.C. § 78u-4(b)(1)–(2). These requirements have "teeth" and "present[] no small hurdle for the

securities fraud plaintiff." *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 414 (9th Cir. 2020). Rule 9(b) requires a plaintiff to "state with particularity the circumstances constituting fraud or mistake" by pleading the "who, what, when, where, and how" of the alleged fraud. *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003). The PSLRA imposes even "more exacting pleading requirements." *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1057–58 (9th Cir. 2014). It requires the plaintiff to (i) "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading," and (ii) "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind" for each act or omission. 15 U.S.C. § 78u-4(b)(1)(B), 78u-4(b)(2)(A).

Section 20(b) of the PSLRA holds jointly and severally liable "[e]very person who, directly or indirectly, controls any person liable under" the Act. 15 U.S.C. § 78t(a). To prevail on a claim for a violation of Section 20(a), "a plaintiff must first allege a violation of § 10(b) or Rule 10b-5." *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1035 n.15 (9th Cir. 2002).

## IV. DISCUSSION

### A. Material Misrepresentation or Omission (Falsity)

Plaintiff has not identified a false or misleading statement. A statement is false or misleading if it (1) directly contradicts what the defendant knew at the time or (2) omits material information. *In re Cloudera, Inc.*, 121 F.4th 1180, 1186 (9th Cir. 2024). Even literally true statements may mislead, due to their context and manner of presentation. *Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 886 (9th Cir. 2008). Statements are misleading by omission only if they "affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists." *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002). The securities laws do not prohibit statements that are merely incomplete because "no matter how detailed and accurate disclosure statements are, there are likely to be additional details that could have been disclosed but were not." *Intuitive Surgical*, 759 F.3d at 1061. In addition, there is no firm rule that "once a disclosure is made, there is a duty to make it complete and accurate." *Brody*, 280 F.3d at 1006. Falsity claims may not rely on hindsight; rather, they "must explain 'why the statements were false or misleading at the time they were made.'" *Cloudera*, 121 F.4th

at 1187 (quoting *In re Rigel Pharms.*, 697 F.3d at 876).

Plaintiff argues that the complaint alleges "particularized facts plausibly demonstrating that Defendants concealed from investors: (1) material risks of prematurely implementing the Systems Transition; (2) a material weakness in the Company's internal controls; and (3) that Defendants had no reasonable factual basis for assuring investors that the disruptions from the Systems Transition were under control." ECF No. 40 at 13. Each of these arguments fails.

**1. Statements About the Then-Forthcoming Systems Transition**

Plaintiff first argues that Defendants made statements in August 2023 fraudulently framing certain risks of the Systems Transition as hypothetical and generalized when those risks had in fact already materialized. ECF No. 40 at 15–16; ECF No. 38 ¶¶ 67, 68, 72, 74. In the company's quarterly report for the second quarter of 2023 ("August 2023 10-Q"), Defendants stated that there had been "no material changes to our risk factors since the 2022 Form 10-K." ECF No. 38 ¶ 68. The 2022 Form 10-K stated: "It is possible that we could experience implementation, operational and functionality issues, delays, higher than expected costs and other issues during the course of implementing and utilizing these improvements," and "With any update or replacement of our systems and infrastructure there is a risk of business disruption, liability and reputational damage associated with these actions, including from not accurately capturing and maintaining data, efficiently testing and implementing changes, realizing the expected benefit of the change and managing the potential disruption of the actions and diversion of internal teams' attention as the changes are implemented." *Id.* ¶ 67.

Courts find such hypothetical or speculative statements about future risks to be misleading where the risks have already "come to fruition," *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985–87 (9th Cir. 2008), or where defendants "did not meaningfully update the risk disclosure" after learning new information that made the risk significantly more likely to occur, *Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 781 (9th Cir. 2023). *See also In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 696, 703–704 (9th Cir. 2021) (statement that public concerns about privacy and security "could" harm company's reputation was misleading where company already discovered a bug that had been threatening thousands of user's personal data for

the past three years); *In re SunPower Corp. Sec. Litig.*, 769 F. Supp. 3d 1042, 1055–56 (N.D. Cal. 2025) ("boilerplate risk disclosures did not meaningfully convey the significant risk that had already materialized," namely, "that SunPower was in a severe liquidity crisis").

Plaintiff's fraud claims fail because he does not allege that any risks had already come to fruition nor that any new information had come to light. Indeed, the rollout had not yet begun. ECF No. 38 ¶ 6. He faults Defendants for stating that "it was 'possible' the Systems Transition 'could' cause implementation issues and disruptions, when in fact Defendants had chosen to undertake a specific risky tactic by rushing out the Systems Transition before the Company was adequately prepared." ECF No. 40 at 16. But no particular circumstances made the disruption risk more likely to materialize except for Defendants' failure, in Plaintiffs' view, to adequately mitigate it. On this theory, a securities fraud claim would lie any time a corporation prepared poorly or otherwise erred in implementing a change. Poor preparation is not the same thing as fraud.

In addition, Plaintiff fails to sufficiently allege that Defendants were unprepared for the transition. *See* ECF No. 40 at 16–17. The complaint cites allegations from Former Employee 1 ("FE1") that "end-to-end user acceptance testing ("UAT") had not been completed before the August 2023 launch," and that such testing could have caught the problems that later materialized. ECF No. 38 ¶¶ 50–55, 61. Plaintiff's position appears to be that Defendants could only have avoided securities fraud liability by telling investors in August 2023 that the company had not completed end-to-end UAT testing and that as such, the transition would be disruptive. But this would only be true if end-to-end UAT testing were so obviously and critically essential to an IT systems transition that (1) the transition was likely to go poorly in its absence and (2) executives are likely to have been aware that the transition was highly likely to go poorly in its absence. In other words, there must be something special about end-to-end UAT testing setting it apart from routine preparatory measures that company leadership might decide to take (or not). Plaintiffs allege none of these facts. One employee's speculation that a particular type of testing could have averted certain risks does not show that Defendants were so unprepared that their unpreparedness can be equated to fraud. This is especially so given that Defendants *did* disclose the possibility of

disruption in the August 2023 10-Q and 2022 Form 10-K.

Plaintiff also complains that, during the company's earnings conference call for the same quarter (Q2 2023), Sheedy touted the benefits of the new store portal component of the Systems Transition, including "provid[ing] operators with better analytics and easier access to information," and "allow[ing] [IOs] to operate even more efficiently, . . . or operate the P&L more efficiently." *Id.* ¶ 72, 74. But he does not adequately allege that these statements were false or misleading. The decision to postpone the launch to August 2023 suggests prudence, not deception. *Id.* ¶¶ 73, 75 (asserting that the delay decision shows why the August 2023 statements were misleading). Sheedy's later admission that he knew the transition carried risks of disruptions to operational efficiencies and data visibility, *id.* ¶¶ 89, 93, likewise do not show that his earlier statements were false or misleading. Rather, it was consistent to explain the benefits sought through a systems upgrade despite the risk of disruption during upgrade process. And as discussed above, those risks were also disclosed to investors.

That makes this case unlike *Schueneman v. Arena Pharmaceuticals, Inc.*, on which Plaintiff relies. 840 F.3d 698, 705–06 (9th Cir. 2016); ECF No. 40 at 117. Noting that "companies can control what they have to disclose under these provisions by controlling what they say to the market," the court held that "'once defendants cho[o]se to tout' positive information to the market, 'they [are] bound to do so in a manner that wouldn't mislead investors,' including disclosing adverse information that cuts against the positive information." *Id.* at 705–06 (first quoting *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 45 (2011); then quoting *Berson*, 527 F.3d at 987). But disruption risks from implementation do not necessarily "cut against" the benefits of new systems once implemented. In *Schueneman*, the defendants touted the safety and high likelihood of securing approval of a drug in part by reference to favorable animal studies, while failing to disclose a particularly unfavorable animal study suggesting the drug caused several cancers. *Id.* at 704. "Defendants went ahead and told investors about their confidence in lorcaserin's approval being based on 'the *preclinical* studies that [were] done, [and] *all the animal studies that have been completed*.'" *Id.* at 707. "The public was assured that lorcaserin's 'long-term safety and efficacy' (and thus the likelihood of its imminent approval) were 'demonstrated'

through 'long-term preclinical toxicity and carcinogenicity studies.'" *Id*. The unfavorable study that the defendants failed to disclose thus directly contradicted their representations about the drug's safety based on animal studies, and its existence made certain of those statements literally false. *Schueneman* does not apply here, where Defendants merely failed to pair positive statements about the Systems Transition's benefits once implemented with additional warnings about the disruption risks of the transition itself—particularly given that the transition risks were disclosed.

Similarly in *Matrixx*, cited in *Schueneman*, the defendants made public statements promoting their belief in a certain pharmaceutical drug's market growth in the upcoming months while concealing researchers' concerns and pending lawsuits concerning the drug's potential to damage consumers' sense of smell. 563 U.S. at 23–33 (2011). The growing evidence of permanent loss of the sense of smell cut directly against the drug's potential for growth. *Michel v. Sumo Logic, Inc.*, also cited by Plaintiff, does not apply for the same reason. 779 F. Supp. 3d 1038, 1051 (N.D. Cal. 2025). That case faulted "representations that state the truth only so far as it goes, while omitting critical qualifying information" but transition risks do not qualify the benefits of a new system. *Id*. And the transition risks were not omitted, but disclosed.

Under these circumstances, Plaintiff has not shown that the August 2023 statements about the soon-to-be underway Systems Transition were false or misleading.

### 2. Statements About Grocery Outlet's Internal Controls

Plaintiff next purports to locate falsity in Grocery Outlet's November 2023 statements concerning its internal controls. In its quarterly report filed in November 2023 ("November 2023 10-Q"), Grocery Outlet explained that it had replaced certain components of its ERP system, "modified certain existing internal controls, as well as implemented new controls and procedures impacted by the implementation of these new systems." ECF No. 38 ¶ 79. As the report stated: "Except for the implementation of these new systems, there was no change in our internal control over financial reporting identified." *Id*. The November 2023 10-Q was also accompanied by certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") attesting to the disclosure of any material changes to (or material weaknesses in) the Company's internal control over financial

reporting. *Id.* ¶¶ 81–82.

Plaintiff argues that "[t]hese statements were false and misleading because they failed to disclose the existing material weakness in the Company's internal control over financial reporting caused by the rampant disruptions from the Systems Transition during the third quarter of 2023." ECF No. 40 at 19. He bases this allegation primarily on revelations in the 2023 10-K, released in February 2024. The 10-K disclosed that the Systems Transition had increased the volume of "user access, program change management, and IT operations" transactions that Grocery Outlet's existing controls were not designed to address, such that certain dependent business controls were also rendered ineffective. ECF No. 40 at 19; ECF No. 38 ¶ 122. It stated that "these control deficiencies . . . created a reasonable possibility that a material misstatement to the consolidated financial statements would not be prevented or detected on a timely basis." *Id.* The company's "internal control over financial reporting was not effective as of December 30, 2023." *Id.*

But Plaintiff has not shown anything other than the normal process of company leadership discovering over time and timely disclosing adverse information. In other words, that Defendants knew by *February 2024* that their business controls were ill-equipped to manage the volume of new transactions does not suggest that their November 2023 statement that "there was no change in our internal control over financial reporting identified" was false. *See Davoli v. Costco Wholesale Corp.*, 854 F. App'x 116, 118 (9th Cir. 2021) ("[T]he inferences raised by the complaint's allegations are not as compelling as the opposing innocent inference that Costco did not know that its internal control was ineffective until the more rigorous internal review performed in advance of the October 2018 Form 10-K."). Plaintiff has not alleged that Defendants' November 2023 statements about their internal controls were false or misleading.

**3. Statements About Defendants' Visibility Into the Financial Impacts of the Systems Transition Disruptions**

Plaintiff also alleges that Defendants misled investors by repeatedly suggesting that the negative impacts of the Systems Transition would shortly be resolved, which was misleading because Defendants knew that "poor reporting visibility and data integration issues had hindered their ability to make accurate forecasts" and because "commission expense calculations materially

United States District Court
Northern District of California

affecting the next quarter's results could not be made until the current quarter's end." ECF No. 40 at 20. ECF No. 40 at 20.

During the November 2023 earnings call, Bracher reassured investors that "we do expect and believe that [the impacts of the Systems Transition] will be largely behind us by the end of the year. And so our view at this point is we will enter the new year without any lingering cost impacts or otherwise related to the transition." ECF No. 38 ¶ 91; *see also id.* ¶ 97. On the same call, Sheedy stated that "in terms of impact looking forward . . . we do [expect] the transitional impact to be contained to this year . . . . And then largely behind us at the end of the year. So you should think about us reverting back to previous performance . . . for both gross margin and bottom-line profit." *Id.* ¶ 93; *see also id.* ¶ 95. Then, in February 2024, after revealing that the disruptions and impacts of the Systems Transition had persisted into the first quarter of 2024, *id.* ¶¶ 107–15, Defendants again reassured investors that the end was near. Bracher stated that "Our current guidance assumes that we . . . are back to steady state operations and conclude the elective commission support by the end of the first quarter." *Id.* ¶ 115. And Sheedy stated that "[w]e expect these [data integration issues] to be resolved soon, after which the P&L impact will be behind [us]." *Id.* ¶ 116.

In seeking to establish that Defendants knew their forecasting ability was limited, Plaintiff cites May 2024 statements by the company's interim CFO to the effect that "[f]orecasting has been difficult during the system transition as we have not had good visibility to our normal business reporting and tools. Compounding this have been data integration issues and new processes that we and our operators are adapting to within new applications." ECF No. 38 ¶ 127; *see also id.* ¶ 129 (Sheedy explaining that "the gross margin and the systems issues" persisted into the second quarter in part because of "limited data visibility for how we manage and forecast margin," which was "a bigger issue in the first quarter than it was in the fourth quarter because of the amount of time that we've been managing the business with limited data").

These May 2024 admissions do not establish the falsity of Defendants' November 2023 and February 2024 predictions that the Systems Transition disruption would soon end for several reasons. First, Sheedy's comment suggests a problem that was present in the fourth quarter but

ramped up in the first quarter, meaning that only Defendants' February 2024 statements (pertaining to Q4 2023) could be expected to have accounted for the forecasting issue, which in any event was apparently still minor. Second, and more fundamentally, Plaintiff does not explain why margin forecasting accuracy bears directly on Defendants' ability to know whether and when the Systems Transition disruption would end. Defendants may have reasonably believed that as deficiencies in the new IT systems were resolved or abated, recovery of the company's margins would naturally follow. That prediction would not necessarily rely on the usual margin forecasting tools.

Plaintiff also argues that these statements were misleading because "commission expense calculations materially affecting the next quarter's results could not be made until the current quarter's end." ECF No. 40 at 20. He points to Interim CFO Lindsay Gray's statement that the company "had to complete 'catch-up invoice processing and final margin reconciliation and the end of the quarter' in order to calculate store margins and IO commissions, which 'can only be calculated after a full inventory period has been completed.'" *Id.* at 21 (citing ECF No. 38 ¶ 118). It is not clear, however, why the absence of final store margin calculations undermined Defendants' ability to make predictions about the end of the disruption caused by the Systems Transition.[1] Plaintiff has not adequately alleged falsity.

Additionally, Defendants correctly aver that these statements are forward-looking and therefore immune from liability. ECF No. 39 at 15–16. Forward-looking statements are nonetheless actionable if they were made with actual knowledge of their misleading nature. 15 U.S.C. § 78u–5(c)(1)(B)(i); *see In re Twitter, Inc. Sec. Litig.*, 506 F. Supp. 3d 867, 882 (N.D. Cal. 2020), *aff'd sub nom. Weston Fam. P'ship LLLP v. Twitter, Inc.*, 29 F.4th 611 (9th Cir. 2022). But here, for the reasons set forth above, Plaintiff has alleged no facts suggesting that Defendants predicted the impending end of the Systems Transition disruption with actual knowledge that such statements were misleading.

[1] For the same reason, the Court rejects Plaintiff's argument that the non-final nature of IO commission data establishes Sheedy and Brascher's scienter for the falsity of these reassuring statements. ECF No. 40 at 26.

* * *

Plaintiff remarks that "[c]ourts routinely sustain claims at the pleading stage based on misrepresentations about a company's problematic ERP implementation." ECF No. 40 at 13. His cited cases, however, highlight the deficiencies in the instant complaint. For instance, in *Employees Retirement System of Puerto Rico Electric Power Authority v. Conduent Inc.*, the defendants stated that they had "addressed our sub-optimized IT-related workforce and vendor relationships" and "inventoried the company's legacy IT systems," but the complaint alleged that defendants had in fact done neither. No. CV 19-8237 (SDW) (SCM), 2020 WL 3026536, at *2 (D.N.J. June 5, 2020). Other materially false statements included "informing investors that the initial phase of the Strategic Transformation was complete, and failing to disclose that the lack of systems inventory and ensuing problems with the data migration were causing significant problems with Conduent's tolling business." *Id.*

Likewise in *Hall v. Rent-A-Ctr., Inc.*, the complaint alleged that the defendants failed to disclose that "the rollout of its proprietary point-of-sale ('POS') management information system . . . was an abject failure fraught with stability and functionality problems that directly affected the Company's ability to complete sales and collect rental income." No. 4:16CV978, 2017 WL 6379334, at *1 (E.D. Tex. Dec. 14, 2017); *see also id*. at *6 (noting that "the complaint alleges Defendants repeatedly misrepresented and omitted the severe problems the Company was encountering in the development and implementation of its POS system"). And *In re Towne Servs., Inc. Sec. Litig.* denied a motion to dismiss on similar grounds. 184 F. Supp. 2d 1308, 1319 (N.D. Ga. 2001). That court found plausible the theory that "the Prospectus's open-ended, general, and future-oriented warnings about Towne's computer systems (and the possibility of customer attrition) are misleading in light of severe, discrete problems Towne had already suffered in this regard." *Id.*

Here, Plaintiff has not identified any material misrepresentation and Defendants have consistently disclosed the issues caused by the Systems Transition. As Defendants argue, "Plaintiff's theory boils down to the claim that Defendants should have disclosed more detail or sounded more pessimistic when describing the progress and challenges associated with the

systems upgrade." ECF No. 39 at 14–15. But this is not sufficient to state a claim for a violation of the securities laws. The fact that Defendants were allegedly wrong in some of their predictions is likewise insufficient. "[L]ater, sobering revelations do not by themselves make the earlier, cheerier statement a falsehood." *Cloudera*, 121 F.4th at 1189 (cleaned up). The complaint does not state a claim under Section 10(b) and Rule 10b–5 because it identifies no material misrepresentation or omission.

**B. Scienter**

Plaintiff likewise fails to allege scienter. "Scienter is 'a mental state embracing intent to deceive, manipulate, or defraud.'" *Intuitive Surgical*, 759 F.3d at 1061 (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976)). To plead scienter, the complaint must "'state with particularity facts giving rise to a strong inference' that defendants acted with the intent to deceive or with deliberate recklessness as to the possibility of misleading investors." *Berson*, 527 F.3d at 987 (quoting 15 U.S.C. § 78u–4(b)(2)); *see also Vernazza v. S.E.C.*, 327 F.3d 851, 860 (9th Cir. 2003) (scienter "may be supported by knowing or reckless conduct, without a showing of willful intent to defraud" (cleaned up)). "Reckless conduct may be defined as a highly unreasonable omission, involving . . . an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1569 (9th Cir. 1990) (en banc). This is a "high burden." *Prodanova v. H.C. Wainwright & Co., LLC*, 993 F.3d 1097, 1108 (9th Cir. 2021). The relevant inquiry "is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 310 (2007).

Here, Plaintiff does not identify any facts suggesting that Defendants were aware of or reckless about the possibility of deceiving investors.

In endeavoring to establish Defendants' knowledge that the Systems Transition would result in disruption and financial impact, Plaintiff points to Sheedy's statement in November 2023 that "we did expect some disruption," ECF No. 38 ¶¶ 89, 93, but that possibility of disruption was disclosed in the August 2023 10-Q and 2022 Form 10-K. Plaintiff also points to evidence from

FE1 that the Project Steering Committee for the Systems Transition held weekly meetings attended by Bracher to discuss "critical issues" with the transition and what was "ready and not ready," maintaining "tracking documents" to track ongoing issues and readiness, which the Accounting and Finance departments discussed during weekly meetings. *Id.* ¶¶ 43–45. But this only suggests routine planning and preparation for a major infrastructure change—not Defendants' knowledge of their own unpreparedness. Similarly, Former Employee evidence that the company made the decision to launch the systems transition without having tested the system using live data or completed end-to-end UAT likewise suggests, at worst, poor preparation. ECF No. 40 at 24. Under these circumstances, the failure to complete a certain kind of testing falls short of establishing that Defendants knew an unsuccessful and disruptive transition was likely. Plaintiff also cites Former Employees' statements that the company was unprepared for the launch and that most colleagues felt the launch was premature, ECF No. 40 at 24 (citing ECF No. 38 ¶¶ 48–49), but this testimony does not establish Defendants' knowledge or state of mind.[2]

Plaintiff is similarly unable to establish scienter concerning the company's lack of visibility into its financials and inventory or the ineffectiveness of its internal controls during the Systems Transition. Plaintiff points to Defendants' May 2024 disclosures that "[f]orecasting has been difficult during the system transition as we have not had good visibility to our normal business reporting and tools," ECF No. 38 ¶ 126, and that "limited data visibility for how we manage and forecast margin" caused margin and systems issues to persist, *id.* ¶ 129. Those statements, however, do not specify when Defendants became aware of the extent of the data visibility challenges. And the underlying alleged fraudulent statements, in any case, are

[2] Defendants argue that the Court should also disregard these Former Employee allegations for the additional reason that Plaintiff has not established that the Former Employees are "in a position to know" that the launch was premature. *See Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 996 (9th Cir. 2009), *as amended* (Feb. 10, 2009); *Forescout*, 63 F.4th at 767 (complaint may rely on confidential witness testimony if it provides "an adequate basis for determining that the witnesses in question have personal knowledge of the events they report"). The Former Employees were a Director of Financial Planning and Analysis, a grocery buyer, and an assistant planner in charge of buying and allocating products. ECF No. 38 ¶¶ 38–40. Defendants' objection is well-taken as to FE2 and FE3. As to FE1, however, the complaint alleges that FE1 worked on a team "dedicated to the implementation of the SAP systems." *Id.* ¶ 41. As such, FE1 may have held an educated opinion that the launch was premature. That opinion nonetheless does not establish Defendants' scienter.

Defendants' bullish predictions that the Systems Transition disruption would soon end. Defendants' awareness of margins forecasting difficulties does not establish scienter as to those statements.

Plaintiff also points to Defendant's 2023 10-K, released in February 2024, which disclosed pervasive control deficiencies rendering ineffective as of December 30, 2023 the company's internal control over financial reporting. ECF No. 38 ¶ 122. But as the Court already observed, evidence of what Defendants knew in February 2024 sheds little light on what they knew in November 2023 when they signed SOX certifications asserting that internal controls remained effective. *Id.* ¶¶ 79–82.

Finally, FE1's account of inventory visibility challenges commencing immediately in August 2023 and FE3's vague statement that the Systems Transition "broke all the functionality of everything" do not speak to Defendants' knowledge. *Id.* ¶¶ 58, 60; *see Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 995 (9th Cir. 2009), *as amended* (Feb. 10, 2009) ("[T]hose statements which are reported by confidential witnesses with sufficient reliability and personal knowledge must themselves be indicative of scienter.").

That Sheedy and Bracher's held high-ranking positions at the company and therefore may have been aware of the company's core operations is also insufficient to establish scienter under these circumstances. Plaintiff argues that "[t]he Systems Transition was 'such a central component of [the Company's] operations that Defendants can be presumed to have knowledge of the problems with [it].'" ECF No. 40 at 26 (quoting *Azar v. Yelp, Inc.*, No. 18-cv-00400-EMC, 2018 WL 6182756, at *20 (N.D. Cal. Nov. 27, 2018)). But that Defendants were aware of problems with the Systems Transition does not suggest they were aware of the misleading nature of their own statements. For instance, one underlying fact of which Sheedy and Bracher were supposedly aware is that the company had not conducted end-to-end UAT testing. As the Court has explained, this fact did not necessarily suggest that the transition would be unsuccessful.

The same is true of Bracher's departure in December 2023 and Sheedy's termination in October 2024; those facts falls woefully short of establishing that Defendants "acted with the intent to deceive or with deliberate recklessness as to the possibility of misleading investors."

*Berson*, 527 F.3d at 987. In fact, neither the complaint nor Plaintiff's briefing explains why the departures suggest Defendants committed fraud, rather than simply executing the IT systems transition poorly. *See* ECF No. 40 at 27; ECF No. 138 ¶¶ 104–06, 138–39. It is Plaintiff's burden to "allege sufficient information to differentiate between a suspicious change in personnel and a benign one." *Zucco*, 552 F.3d at 1002; *see In re Cornerstone Propane Partners, L.P.*, 355 F. Supp. 2d 1069, 1093 (N.D. Cal. 2005) ("Most major stock losses are often accompanied by management departures, and it would be unwise for courts to penalize directors for these decisions.").

The complaint fails to allege scienter as to any misrepresentation.

**C. Loss Causation**

Pleading loss causation requires allegations of "a causal connection between the material misrepresentation and the loss." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342 (2005). "At the pleading stage, a plaintiff need only allege that the 'revelation of fraudulent activity,' rather than changing market conditions or other unrelated factors, proximately caused the decline in defendant's stock price." *Grigsby v. BofI Holding, Inc.*, 979 F.3d 1198, 1204–05 (9th Cir. 2020). "One way to prove loss causation is to show that the defendant's fraud was revealed to the market through one or more 'corrective disclosures' and that the company's stock price declined as a result." *In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 786 (9th Cir. 2020). Plaintiff may also plead "materialization of the risk," alleging "that 'the very facts about which defendant lied' caused the injuries." *In re WageWorks, Inc., Sec. Litig.*, No. 18-CV-01523-JSW, 2020 WL 2896547, at *5 (N.D. Cal. June 1, 2020) (quoting *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F. 3d 750, 753 (9th Cir. 2018)). Plaintiff argues that concealed risk gradually materialized as the company partially revealed the true impacts of the Systems Transition, resulting in "six separate stock declines." ECF No. 40 at 30. Because the Court has concluded that that the complaint does not sufficiently allege concealment of risk, this argument fails. *See Yaron v. Intersect ENT, Inc.*, No. 19-cv-02647-JSW, 2020 WL 6750568, at *10 (N.D. Cal June 19, 2020) (no loss causation where there were no allegations of "any hidden risk").

/ / /

United States District Court
Northern District of California

## CONCLUSION

The motion to dismiss is granted. ECF No. 39. Plaintiffs may file an amended complaint addressing the deficiencies identified herein within 28 days of the date of this order.

**IT IS SO ORDERED.**

Dated: September 16, 2026

JON S. TIGAR
United States District Judge